## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### Fort Lauderdale Division

CIV - 61264

CIV - COOKE

MAGISTRATE JUDGE
BROWN

**VISIONS EAST, INC.,**
    A Florida Corporation, and

**JOHN STEPHEN MORTON,**
    An Individual,

           Plaintiffs,

    v.

           Civil Action No. _____

**FAGERDALA THIGER MARINE SYSTEMS, AB,**
    A Swedish Corporation,

**FAGERDALA WORLD FOAM, AB,**
    A Swedish Corporation,

**FAGERDALA USA, INC.,**
    A Kentucky Corporation,

**MASTER AUTOMATION GROUP, OY,**
    Finnish Corporation

**TARMO LINNA,**
    An Individual, and

**PIERRE THIGER,**
    An Individual,

           Defendants.

**Complaint For:**

Patent Infringement
Unfair Competition
RICO
Computer Abuse
Declaratory Judgment
Trade Secret Misappropriation
Conspiracy
Unfair Trade Practices
Tortious Interference
Inducement to Breach Contract
Breach of Fiduciary Duty
Breach of Contract
Fraud
Unjust Enrichment

**Preliminary Relief Requested**

## **COMPLAINT**



Plaintiff Visions East, Inc. ("Visions East"), and Plaintiff John Stephen Morton ("Morton") (jointly "Plaintiffs"), by counsel, allege against Defendants Fagerdala Thiger Marine Systems, AB ("FTMS"); Fagerdala World Foam, AB ("Fagerdala"); Fagerdala USA, Inc. ("FUSA") (collectively "Fagerdala Defendants"); Master Automation Group, OY ("MAG"); Tarmo Linna ("Linna"); and Pierre Thiger ("Thiger") as follows based on information and belief except as to allegations that pertain to Plaintiffs:

## I. THE PARTIES

1.      Plaintiff Visions East is a closely held Florida corporation with its principal place of business at 1600 West State Road 84, Suite 5 Fort Lauderdale, Florida 33315. Visions East is a marine robotics firm engaged in the design and sale of computer controlled systems that provide automated robotic application of coating systems for marine vessels ("VEbot™ System").

2.      Plaintiff Morton is an individual residing at 3201 South Port Royale Drive, Fort Lauderdale, Florida 33308, and founder, President, CEO, Chairman and principal shareholder of Plaintiff Visions East.

3.      Defendant FTMS is a Swedish corporation with its principle place of business at Augustendalsvägen 62, SE-131 27 Nacka Strand, Sweden.   FTMS, a subsidiary of Defendant Fagerdala, is a boat-builder and shipyard operator, a minority investor in Visions East and Visions East's first customer.

4.      Defendant Fagerdala, also known as Fagerdala World Foam Group, is a Swedish corporation with its principle place of business at 13482 Gustavsberg, Sweden. Fagerdala is the parent company of FTMS and FUSA.

5.      Defendant FUSA is a Kentucky corporation with its principle place of business

2

at 1300 South Parker, Marine City, Michigan 48039.  FUSA is a wholly-owned subsidiary of Defendant Fagerdala. Fagerdala's founder and President Dag Landvig is President of FUSA.

6.     Defendant MAG is a Finnish corporation with its principle place of business at Sinimäentie 10 B FIN-02630 Espoo, Finland.  MAG is a robotic systems integrator retained by Plaintiff Visions East, first to assemble and test a prototype ("Pre-Study") VEbot™ System and later to integrate the first VEbot™ System sold to Defendant FTMS.

7.     Defendant Tarmo Linna ("Linna") is an individual Finnish citizen residing at Vermonrinne 8 B FIN-00370 Helsinki, Finland.  Linna is a robotics engineer and former employee and a corporate officer (Vice President of Robotics) of Visions East.

8.     Defendant Pierre Thiger ("Thiger") is an individual Swedish citizen residing at Lövhamrav.11, 13460 Ingarö, Sweden.  Defendant Thiger is CEO and Managing Director of Defendant FTMS.  FTMS designated Thiger to represent FTMS on Plaintiff Visions East's Board of Directors. Thiger has been a member of Visions East's Board of Directors since 2003.

9.     Various other organizations and individuals have aided, collaborated and joined with the named Defendants in, and have done acts and made statements in furtherance of, the unlawful conduct alleged in this Complaint.  Such organizations comprise law firms, including MAG's Finnish law firm Krogerus & Co. ("Krogerus"), accounting firms and other firms as yet unknown.  Such individuals include Dag Landvik ("Landvik"), co-founder, President and majority share holder of Fagerdala; Teijo Fabritius ("Fabritius"), Chairman; Martti Kivelä ("Kivelä"), Managing Director; and Mika Laitinen ("Laitinen"), President of MAG; and other individuals as yet unknown.

3

## II. <u>SUBJECT MATTER JURISDICTION</u>

10.     This Court has jurisdiction over the claims in this action arising under the United States Patent Laws, 35 U.S.C. §§ 1 *et seq.*, pursuant to 28 U.S.C. §§ 1331and 1338 (Counts 1 and 2).

11.     This Court has jurisdiction over claims in this action arising under the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, pursuant to 15 U.S.C. § 1121 (Count 3).

12.     This Court has jurisdiction over the claims arising under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*, pursuant to 18 U.S.C. § 1964(c) (Count 4).

13.     This Court has jurisdiction over the claims arising under the Declaratory Judgments Act, 28 U.S.C. §§ 2201 *et seq.*, pursuant to 28 U.S.C. §§ 2201, 2202 (Count 5).

14.     This Court has jurisdiction over the claims arising under the Computer Fraud and Abuse Act, 18 U.S.C § 1030 pursuant to 28 U.S.C. §§ 1030(g), 1331 (Count 6).

15.     This Court has supplemental jurisdiction over the related Florida statutory and common law claims (Counts 7 through Count 15) pursuant to 28 U.S.C. § 1367.  This Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds the sum of $75,000, of interest and cost, and is between (a) citizens of different states and (b) citizens of a state and citizens or subjects of a foreign state.

4

## III. PERSONAL JURISDICTION

16.     This Court has personal jurisdiction over each Defendant pursuant to 28 U.S.C. § 1332 and the Florida long-arm statute, Fla. Stat. § 48.193.

### A.     FAGERDALA DEFENDANTS

17.     Defendant FTMS by Section 8.6 of its Shareholder Agreement with Visions East dated May 2, 2003 consents to the exclusive jurisdiction of this Court.  In addition, FTMS regularly conducts business in the Southern District of Florida and elsewhere in the United States.   FTMS is a minority shareholder of Plaintiff Visions East, a Florida corporation; FTMS's CEO, Defendant Thiger, regularly attends meetings of the Visions East Board of Directors as the designated Board representative of Defendant FTMS; Thiger and FTMS salesman Percy Sundquist, a resident of Florida, attended the October 2003 Fort Lauderdale Boat Show; Frederik Van Helan, an FTMS salesman, also attended the October 2004 Fort Lauderdale Boat Show and offered FTMS yachts for sale in a booth showcasing a scale model of FTMS's 84-foot FTMS yacht.

18.     Defendant Fagerdala controls the business operations of Defendants FTMS and FUSA.  According to the firm's Website, the Fagerdala Group "employs approximately 1,600 people and operates 33 factories in 16 countries."  Fagerdala is heavily invested in the U.S. and has operated in the U.S. since at least 1997.  Fagerdala's Website also lists seven U.S. subsidiaries, including its wholly-owned subsidiary Defendant FUSA, garnered in Fagerdala's acquisition of Michigan-based Paclite Corp.

19.     In 2002, Fagerdala acquired Tempur World, Inc., a Delaware corporation, which conducted business in and owed sales taxes to the State of Florida.  Following such acquisition, Tempur became part of Defendant FUSA.  Fagerdala's President Dag Landvik

5

attended and participated in Plaintiff Visions East's Board of Directors meeting by conference call on a number of occasions, including the April 15, 2005, meeting.

20.     Defendant FUSA, a Michigan company, regularly conducts business in the Southern District of Florida, elsewhere in Florida and elsewhere in the United States. FUSA operates five plants in Michigan, Illinois and California and is owned and controlled by Defendant Fagerdala.  FUSA and six other Fagerdala subsidiaries operate in the U.S. under the FUSA umbrella and share Websites and e-mail systems under "fagerdalausa.com." In 2003, FUSA acquired the technology for its GECET™ and Black EPS™ resin products through its acquisition of Huntsman, LLC, of Peru, Illinois. Fagerdala sells its resin products throughout the U.S., including the Southern District of Florida. FUSA's Rantoul, Illinois plant produces parts for consumer bicycling helmets sold throughout the U.S., including the Southern District of Florida.

21.     In September 2003, John Ballinger ("Ballinger"), Vice President and General Manager of FUSA, was instructed to attend the Society of Naval Architects ("SNAME") Show in San Francisco by Fagerdala President Landvik.  Ballinger participated in business activities at Visions East's SNAME show booth on behalf of Fagerdala.

22.     In October 2003, Defendant Linna, while in Fort Lauderdale and in connection with his employment by Visions East, contacted FUSA in Michigan by phone and e-mail on behalf of MAG to obtain black foam blocks for delivery to MAG in Fort Lauderdale.

23.     Since at least 1997, Fagerdala President Landvik has made numerous business trips to the United States to acquire and manage Fagerdala's U.S. subsidiaries.

24.     In 1999, Fagerdala brought three federal law suits in the Eastern District of Kentucky and one in the Eastern District of Virginia under the Lanham Act.

6

**B.    DEFENDANT MAG**

25.    Defendant MAG's is the corporate successor to RTS, OY ("RTS").  RTS by Section 9 of the Confidential Disclosure Agreement with Visions East dated November 12, 1999 and signed by Linna consented to exclusive personal jurisdiction in Florida.   In addition, MAG regularly conducts business in the Southern District of Florida and elsewhere in the United States.  On December 15, 2002, MAG entered into a non-disclosure agreement with Plaintiff Visions East upon which Visions East's claims against MAG are partially based, which provides that: "This Agreement and its interpretation and enforcement shall be governed by the laws of the State of Florida without reference to its principles of conflicts of laws."

26.    At Visions East's expense, MAG President Laitinen attended the October 2003 Fort Lauderdale Boat Show to provide Visions East with technical assistance   in connection with yacht systems offered for sale to Visions East's existing customers and to generate customer leads for potential new sales of Visions East's system. MAG has offered its products and services for sale throughout the United States, including its FlexMill™ system.  In December 2003, MAG submitted a proposal to act as subcontractor on Visions East's contracting proposal to Ocean Spirit, LLC, of Homestead, Florida.  In 1999, MAG's President Laitinen traveled to, stayed and worked in Chesapeake, Virginia, for several months.

**C.    DEFENDANT LINNA**

27.    Defendant Linna by Paragraph 10 of his Noncompete and Nonsolicitation Agreement with Visions East dated May 5, 2003 consents to the exclusive jurisdiction of this Court.  In addition, Linna regularly conducts business in the Southern District of Florida

and elsewhere in the United States.  From 2000 to 2001, Linna was an employed resident of Nashville, Tennessee. He became an unpaid consultant to Visions East in 2001, and a full-time salaried employee of Visions East in 2003. He attended the 2000 and 2002 IBEX shows in Fort Lauderdale and the 2003 Fort Lauderdale Boat Show in the Southern District of Florida and the World Maritime Expo in San Francisco.  Since 2001 Linna has made numerous telephone calls, sent hundreds of e-mails and has engaged in numerous Instant Messenger transmissions with Visions East officers, employees and consultants located in Fort Lauderdale.

28.    Defendant Linna has also contractually consented to the jurisdiction of and venue in this Court. Specifically, Paragraph 10(a) of the Noncompetition and Nonsolicitation Agreement between Linna and Visions East dated May 5, 2003, upon which the claims against Linna are partially based, provides in pertinent part that:

> EACH OF THE PARTIES HERETO CONSENTS TO THE JURISDICTION OF ALL STATE AND FEDERAL COURTS IN BROWARD COUNTY FLORIDA. . . .

Paragraph 10 (b) of the same Agreement provides in pertinent part that:

> EACH OF THE PARTIES HERETO HEREBY EXPRESSLY WAIVES ANY AND ALL OBJECTIONS IT MAY HAVE TO VENUE, INCLUDING WITHOUT LIMITATON, THE INCONVENIENCE OF SUCH FORUM, IN ANY SUCH COURTS.

## D.    DEFENDANT THIGER

29.    Defendant Thiger regularly conducts business in the Southern District of Florida, has been a member of Plaintiff Visions East's Board of Directors since 2003, and has participated in approximately five yearly and special Visions East board meetings by conference call.  In 2003, Thiger visited Visions East facilities in Fort Lauderdale and attended the Fort Lauderdale Boat Show to market FTMS products and services to trade show attendees, including potential customers from Florida and elsewhere in the United States.

30.    The individual and concerted acts of Defendants FTMS, MAG, Linna and Thiger, their respective agents and principals set forth in this Complaint were conducted in furtherance of an illegal conspiracy to maliciously harm the business, contracts and property of Plaintiffs Visions East and Morton in Florida; were intended by Defendants to have such effect; and have resulted in their intended adverse effect on Plaintiffs in the Southern District of Florida.  Accordingly, such acts of each co-conspirator apply to personal jurisdiction over each Defendant.

## III. VENUE

31.    Venue is proper in this court pursuant to 28 U.S.C. §§ 1391, 1400, and 1401.

## IV. FACTUAL STATEMENT

## A.    SUMMARY

32.    This case involves an international conspiracy by foreign Defendants to steal Visions East's home-grown technology and destroy its Fort Lauderdale-based business. The conspiracy gained fraudulent access to Visions East's pioneering patent applications, trade secrets and confidential customer lists.  Defendants' fraudulent scheme included five

9

years of access to proprietary technologies through (a) multiple non-disclosure agreements (1999, 2000, 2002); (b) a consulting relationship (2001); (c) an employment agreement (2003); (d) a minority investment in Visions East (2003); (e) a Visions East board seat (2003); (d) the purchase and installation of a patented Visions East VEbot™ System (2003); (f) a systems integration vendor agreement (2003) that exposed the conspirators to Visions East's business and technology; and (g) the rehiring of Linna from Visions East.

33.     Defendants' exposure to Visions East's business led to repeated attempts to gain control over Visions East and its technology that Morton and Visions East repeatedly rejected (2001, 2003, and January, April, August, and November 2004).  In early 2004, the Defendants and their co-conspirators initiated a plan to steal Visions East technology and drive the company out of business.

34.     Defendants have acted in furtherance of their conspiracy by:

a.     Willfully infringing Visions East's pioneering patents;

b.     Engaging in unfair competition and false advertising that misrepresented the ownership of and Defendants' rights to Visions East's patented VEbot™ System and proprietary know-how to the marine industry and to Visions East customers and potential customers;

c.     Misappropriating Visions East's trade secrets;

d.     Conspiring, inducing and breaching written confidentiality, non-disclosure, non-compete and non-solicitation agreements and fiduciary duties that defendants owed to Visions East;

e.     Extorting Visions East's patented technology by threats of stealing Visions East's technologies and putting the company out of business;

f.     Carrying out the Defendant's threats by soliciting, offering the sale of, and selling to Visions East's customers and others without authority from Visions East infringing copies of Visions East's VEbot™ System and proprietary technology that Defendants unlawfully converted and

misappropriated from Visions East; and

g.    Gaining unauthorized access to Visions East's computers to misappropriate, convert and profit from valuable proprietary information and to intentionally destroy data to deprive Visions East of the information and to conceal the Defendants' and their co-conspirators unlawful and tortious activities.

35.    As a result, Visions East has been deprived of multiple potential multi-million dollar sales to its clients worldwide.

36.    Plaintiffs have brought this action to obtain compensatory and punitive damages for the injuries sustained as a result of Defendants' unlawful activities, as well as injunctive relief to prevent Defendants from continuing to damage and interfere with Visions East's business.

## B.    PLAINTIFF VISIONS EAST

### History and Technology

37.    Plaintiff Visions East was founded in 1994 by Plaintiff Morton, its President, board chairman and principal shareholder.  Morton has 28 years of experience in the application of fairing and paint coating systems on new and refitted yacht projects.  Over the last 11 years, Morton has researched, developed and designed the first automated system for finishing and refinishing yachts and military and commercial vessels.  This work revolutionized the process of coating marine vessels and has resulted in several U.S. and foreign patents.

38.    Fairing is a process whereby the exterior surface of the hull, or superstructure, of a marine vessel is prepared, primed, filled, sanded, primed and sanded again until an ideally smooth surface is achieved. The vessel's surface is then re-primed in preparation for a mirror-paint finish.  Fairing is costly because the process is dangerous,

11

labor intensive, time consuming and environmentally hazardous. As a result, fairing has traditionally been performed almost exclusively on yachts. Virtually all yachts over 100 feet long and built in the last 20 years undergo this costly process. Fairing of commercial and military vessels has been limited.

39.     Preparation, fairing, priming and painting has traditionally been performed manually, using hand tools in a series of repetitive and time-consuming steps. Manual fairing and painting is dangerous work because it is performed by laborers working on temporary scaffolding, wielding heavy, awkward equipment. Workers often become fatigued, which leads to industrial accidents. Also, skilled, dependable fairing technicians are often in short supply. The work is also messy and unhealthy, generating toxic dust that is hazardous to the environment and to the workers.

40.     Visions East automated the surface preparation, fairing and painting process, making this procedure safer, less labor-intensive, more efficient, more environmentally friendly and more precise than previous methods. In addition, Visions East's computer-controlled robotic process provides consistent, uniform, high-quality coating systems, which are superior to manual methods.  The VEbot™ System also extends the life span of the coatings and reduces maintenance costs over time. Its automated process reduces fairing materials, minimizes waste, and conserves weight on vessels. Automation also enables "around-the-clock," "24/7" continuous operation, repeatable uniformity and improved coatings application quality. It also increases efficiencies by significantly reducing labor and material costs, as well as increasing the precision when measuring and mixing coatings, which creates shorter production and delivery times, a reduction in the number of coatings required and a safer, cleaner and healthier work environment.

41.     Visions East's automated process presents economies that make it cost effective for fairing to be applied beyond the limited market segment of high-end yachts. The cost effectiveness of Visions East's process is driving ever-broader application of fairing to commercial and military vessels.

42.     Numerous articles describing Visions East's technology have been published in marine industry publications crediting Visions East with developing and introducing computer-controlled robotic technology to the marine industry. Visions East's technology has earned it and its inventor Morton honors and acclaim in the industry, including the prestigious "International Superyacht Technology Innovation Award" (ISTIA) for overall innovation in advancing superyacht technology, awarded to Visions East in May 2004 at the Seas2004 Superyacht Technology Trade Show in Nice, France.

### Visions East's Patents

43.     On November 23, 1999, Morton filed his first patent application for marine vessel fairing and painting technology.

44.     On April 2, 2002, the U.S. Patent and Trademark Office ("PTO") granted Morton U.S. Patent No. 6,365,221 ("221 patent"). A true copy of the '221 patent is attached as Exhibit A.  The '221 patent, entitled Computer Controlled Method and Apparatus for Fairing and Painting of Marine Vessel Surfaces, is assigned to Visions East.

45.     On May 13, 2003, the PTO granted Morton U.S. Patent No. 6,562,139 ('139 patent"). A true copy of the '139 patent is attached as Exhibit B.  The '139 patent, titled Computer Controlled Apparatus for Fairing and Painting of Marine Vessel Surfaces, is also assigned to Visions East.

46.     The '221 and '139 patents and their issued and pending foreign counterparts

13

represent the culmination of more than a decade's work by Morton and Visions East to develop the world's first computer-controlled robotic process for preparing, fairing and painting yachts, military ships and commercial vessels.

47.    In addition to its two U.S. patents, Visions East has received eight foreign patents with patents pending in the European Union, Sweden and Finland based on the U.S. priority filing date.

### Visions East's Business

48.    Visions East designs and sells custom "turn-key" computer-controlled robotic systems to boat yards for preparing, fairing and painting marine vessel surfaces.

49.    Visions East markets its system in two ways: (a) directly to yacht builders though Morton's personal contacts in the industry and (b) by attending and displaying at U.S. and international trade shows geared toward the marine construction and maintenance industry.  Visions East targets leading yacht-builders and commercial and naval shipyards.

50.    Visions East evaluates, selects and contracts with robotics integration companies to assist in the delivery of custom-designed automated systems.  The system configuration may vary based on customer needs.  The systems can include all or some of the basic components (lasers, milling, sanding and painting) and may also incorporate other options, including wireless connectivity to the customer's network or video monitoring for remote monitoring of the system over the Internet.  Visions East determines customer requirements and develops the appropriate solution with assistance from integrator(s) contracted for each specific project.  Visions East also manages the integration effort.  Once the system is operational, Visions East may call upon the integrator to maintain the system,

assure its proper operation and honor any warranties.

C.   **DEFENDANTS' CONSPIRACY TO STEAL PLAINTIFF'S TECHNOLOGY**

**Origins of the Conspiracy**

51.     The Defendants had extensive contact with each other before they had any association with Plaintiffs Visions East and Morton.  During the late 1990's, Defendant Linna was employed in Finland by RTS OY ("RTS"), a subsidiary of Robotics Technology Services, PLC, of Manchester, United Kingdom ("RTSUK").  While at RTS, Linna worked with Defendant MAG's current President Mika Laitinen, who at the time reported to Linna.  During this period, Defendant Linna also had contact with Defendant Fagerdala concerning robotic materials and materials handling equipment on behalf of RTS with KUKA, a German robotics firm.

52.     On November 12, 1999 RTS and Visions East entered a Confidentiality Disclosure Agreement, signed by Linna, attached as Exhibit C.  Morton met Linna and Laitinen on a visit to Precision Shapes of Virginia, Inc., in Chesapeake, Virginia, on or about November 16, 1999, where Linna and Laitinen were working on the installation of a RTS robotic plug cutting system.  Morton disclosed Visions East's robotic fairing and painting technology to Linna after Linna signed a non-disclosure agreement with Visions East on November 12, 1999.

53.     In 2000, RTSUK acquired Wright Industries, LLC, a U.S. robotics firm based in Nashville, Tennessee.  Linna moved to Nashville to work at Wright Industries, LLC, which subsequently became RTS/Wright, a subsidiary of RTSUK. In April 2000, Linna pressured Morton to make a deal with RTS and abandon Visions East's own marketing efforts:

"Steve, I have to express my concern.  You have been so

15

good. Robotic Painting and Fairing missionary to your customers and I am quite sure they are waiting /eager to see your next steps. How can you be sure they don't give your ideas to the third party?   Yes, they have undersign take agreement, but we both know when it's a question a question of BIG money the world is cruel."

54.     Visions East entered into a non-disclosure agreement with RTS/Wright on December 12, 2000, to allow RTS to bid on integrating a prototype of the VEbot System for Visions East. In negotiating the non-disclosure agreement, Linna and RTS sought to limit its coverage to yachts 150 feet and under in order to misappropriate and convert the application of Visions East's technology for all other marine applications (over 150 feet) to themselves.  Visions East objected and insisted the limiting provision be removed.

55.     On February 15, 2001, RTS submitted a bid proposal to Visions East to assemble and construct a prototype of the VEbot™ System called "Prototype for Robotized Fairing and Painting for Visions East Inc."

56.     In an undated, handwritten 2001 letter, believed to be subsequent to the RTS prototype proposal, Linna wrote a letter to Morton that represented Linna and Laitinen's first attempt to misappropriate and convert Visions East's technology to themselves.   Linna wrote: "Here is how I look at the mutual business.  . . . Visions East, Inc. (VE) and RTS Finland/Milling and Grinding Unit (MG), have set up a mutual business target: to open robotic based fairing and painting automation in the shipyard industry."  Although styled as "From: Tarmo Linna, RTS Finland LTD", the handwritten nature of the letter and the inclusion of an apology for using a pen indicate that Linna was acting for himself and Laitinen.

57.     Linna defined a "joint effort" whereby Visions East would be RTS's "exclusive

16

worldwide agent for robotic fairing and painting development" and "RTS is [its] sole supplier." Morton rejected Linna's proposal.

58.     Linna's 2001 strategy sought to turn Linna's and RTS's relationship with Visions East from a potential prototype vendor into a venture in which Linna and Laitinen obtained an interest in and benefited from the sale of Visions East's technology to Visions East's customers.  Visions East rejected this approach.

### The Conspirators Infiltrate Visions East

59.     In late 2001, Linna informed Morton that he no longer was working for RTS/ Wright.  Linna agreed to assist Visions East as a part-time, unpaid consultant with the understanding that he would gain equity participation in Visions East and that Visions East would offer him a salaried position once Visions East obtained equity funding. Visions East agreed to this arrangement and Linna began working for Visions East December 2001. Linna remained subject to the non-disclosure agreement that he had entered into with Visions East in late 1999.

60.     On May 5, 2003, Linna joined Visions East as a full-time, salaried employee and officer with the title of Vice President of Robotic Systems and an annual salary of approximately $100,000.  Morton created Linna's position to assist in Visions East's implementation of Morton's patented technology. As a condition of his employment, Linna entered into the following written agreements with Visions East:

> a.     An Employment Agreement, a true copy of which is attached as Exhibit D;
>
> b.     A Non-Competition and Non-Solicitation Agreement, a true copy of which is attached as Exhibit E. This Agreement, among other things,

prohibited Linna from competing with, or accepting employment from, a firm that competes with Visions East for a period of two years after leaving his employment with Visions East;

c. A Non-Disclosure and Developments Agreement, a true copy of which is attached as Exhibit F; and

d. A Non-Qualified Stock Option Agreement, granting Linna options to purchase 444,444 shares (5% of the company) in recognition of Linna's prior unpaid consulting work.

61. As a consultant, and later as a salaried employee of Visions East, Linna had unlimited access to Visions East's proprietary and technical information, confidential research and development information, confidential customer lists and confidential financial and cost information. In addition, Morton freely shared his product development ideas, trade secrets, industry contacts and business plans with Linna.

62. On November 29, 2002, Defendant MAG acquired RTS from RTSUK, and Laitinen, Linna's former colleague at RTS, became MAG's President. Shortly thereafter, Linna introduced MAG to Visions East as a potential system integration services vendor.

63. Linna's introduction led to discussions between Visions East and MAG concerning possibly hiring MAG as an integration vendor once Visions East received either funding or a first order. These discussions were covered by a Confidential Disclosure Agreement between the two companies ("VE-MAG Confidentiality Agreement"). A true copy of the VE-MAG Confidentiality Agreement is attached as Exhibit G.

64. In the VE-MAG Confidentiality Agreement, MAG acknowledged that "Visions has developed certain Proprietary Technology as defined herein with respect to automated

fairing and painting of marine vessel surfaces."  MAG agreed to maintain the confidentiality

of Visions East's confidential information and also agreed that "Nothing in this Agreement

shall constitute a waiver o[r] assignment of any patent rights, copyrights, or trade secrets

rights in the United States or any other foreign country . . ."  (Exhibit G, Section 4).

65.    Section 6 of the VE-MAG Confidentiality Agreement (Exhibit G) provides

under the heading "Injunctive Relief" that:

> Each party hereby acknowledges and agrees that it would be
> difficult to fully compensate the other for damages resulting
> from the breach or threatened breach of the Agreement and,
> accordingly, that disclosing party shall be entitled to temporary
> and injunctive relief, including temporary restraining orders,
> preliminary injunctions and permanent injunctions to enforce
> such provisions without the necessity of proving actual damage
> and without the necessity of posting any bond or other
> undertaking in connection therewith.   This provision with
> respect to injunctive relief shall not, however, diminish the
> disclosing party's right to prevent and recover damages.

66.    In 2002, Morton and Linna met Defendant Pierre Thiger, the President of

Thiger Marine Systems AB ("TMS") at a marine industry trade show in Antibes, France.   In

2003, Fagerdala acquired Thiger's company TMS, which became Fagerdala subsidiary

Defendant FTMS. Thereafter, Thiger contacted Visions East to express FTMS's interest in

becoming an investor in Visions East and a customer for Visions East's VEbot™ System.

67.    On May 2, 2003, Defendant FTMS purchased 22.5% of Visions East common

stock of from Morton for $2 million.  As part of the investment, FTMS demanded and

Visions East agreed to allow FTMS to designate one member of the Visions East's Board of

Directors.  FTMS designated Defendant Thiger and announced that its investment was

motivated by FTMS's confidence in Visions East's patented technology and the possible

application of this technology to FTMS's "sandwich hull system."

68.     On December 19, 2003, Defendant FTMS signed a purchase order for Visions East's VEbot™ System to be installed at Defendant FTMS's Anytek shipyard in Öregrund, Sweden.  This system, which is designed to accommodate vessels up to 54 meters (approximately 178 feet) in overall length, was priced at more than €3 million or approximately $4 million. The site-acceptance test of the system was successfully completed on October 27, 2004.

69.     On June 23, 2003, prior to the FTMS purchase order, MAG entered into a Pre-Study Agreement with Visions East by which Visions East hired MAG, at a cost of €154,000, to conduct a preliminary feasibility study for implementing Visions East's VEbot System for FTMS. A true copy of the Pre-Study Agreement is attached as Exhibit H. In the Pre-Study Agreement, MAG agreed to:

    a.     Assist Visions East in defining customer requirements;

    b.     Identify and procure the necessary elements for Visions East's system;

    c.     Integrate the required components to build and test the customer's system; and

    d.     Perform warranty service for the installed system.

70.     The Pre-Study Agreement, Exhibit H, included a renewed confidentiality obligation that barred MAG from using Visions East's confidential information for five years for any purpose other than the performing the Pre-Study Agreement. Section 6.  The performance of the Pre-Study Agreement required that Visions East's management, including Morton and Linna, share Visions East's confidential information and trade secrets with MAG. Visions East made such disclosures in reliance upon the protections contained

20

in Section 6 of the Pre-Study Agreement.

71.    Prior to entering into the Pre-Study Agreement with Visions East in June 2003, Defendant MAG:

   a. Worked predominantly with food service pick, place and packaging systems;

   b. Had never worked in the marine finishing or refinishing industry;

   c. Had no capability or knowledge to enter the market for automated surface preparation, fairing and painting for the marine industry;

   d. Lacked experience with integrated laser systems in marine applications;

   e. Lacked experience and contacts in the marine coatings industry; and

   f. Had no previous business with the yacht-building industry.

72.    After the pre-study or prototype had been declared successful, MAG then began working with Visions East on FTMS's system, scheduled to be completed on July 14, 2004.

**Linna Acts as MAG's and Fagerdala's "Mole" at Visions East**

73.    While he was a consultant/employee of Visions East, Linna regularly communicated secretly with Defendants MAG and FTMS for their interest, benefit and advantage in preference to those of Visions East.

74.    For example, the Pre-Study Agreement between Visions East and MAG was negotiated in May and June 2003. Visions East's counsel Edwards & Angell ("E&A") wrote the initial draft of the Agreement; however, MAG's counsel Krogerus rewrote much of the agreement. The MAG rewrite deleted important standard protections for Visions East's

interest in the work product that it was paying MAG to develop, it added a "right of first refusal" for MAG in future developments by Visions East, and it barred Visions East from changing systems integrators after the Pre-study.  When sending the revised draft to MAG, Krogerus' cover e-mail boasted of making "fundamental" changes to the agreement. Among other things, the revised agreement (a) sought to dilute Visions East's rights to the Surfmodeler™ Scanning Software ("Surfmodeler™ Software") that MAG had agreed to develop for Visions East at Visions East's expense and (b) gave MAG "the right of first refusal if additional devices start to be made on the basis of the pre-study.  With this, they will be prevented from taking your results and having the actual product work done elsewhere."

75.    On June 11, 2003, MAG's Managing Director Kivelä secretly provided Linna the "uncensored comments" contained in Krogerus' cover e-mail and "proposed changes" to the draft Pre-study agreement.  Linna responded to Kivelä in Finnish: "Not the shitty proposal. I'll stick it to Steve [Morton]."  Kivelä's knowingly exposing Linna to MAG's "uncensored" attorney-client privileged communications, Linna's deprecation of the Visions East E&A draft agreement as "shitty," and his promise to put the "fundamentally" changed pro-MAG Krogerus draft to Morton for his approval, is conclusive evidence of Linna's participation in the conspiracy to steal Visions East's technology.

76.    Visions East's counsel E&A objected to MAG's proposed changes to the Pre-study Agreement.  In a transatlantic conference call that included Morton and E&A in Florida and Linna in Finland, Linna pressured Morton to agree to the Krogerus changes, importuned Morton to ignore and reject his lawyer's objections to the eviscerated Agreement, and falsely represented to Morton that his failure to accept the Agreement

would cause MAG to back out of the Pre-study.  To the contrary, MAG was so eager to conduct the Pre-study that it began work on the study before Visions East agreed to the final terms and signed the Pre-study Agreement dated June 13, 2003.

77.     By way of further example, on June 17, 2003, Defendant Thiger confided secretly to Linna that FTMS had begun negotiations for a dry dock in France and informed Linna that "I see this place as one of the first paint facilities for Visions East.  I mean for us together.  On the other hand, thought that Steve [Morton] wanted the first wheel-based robot to be established in the US."  FTMS, an ostensible customer and minority investor in Visions East, was planning business ventures based on Visions East's proprietary technology that FTMS recognized were at odds with the express wishes of Visions East's management.

78.     Soon after MAG signed the Pre-study Agreement, MAG provided Linna with an office at MAG headquarters in Espoo, Finland.  Rather than work from his home, Linna now purported to be conducting Visions East business from his MAG office adjacent to his old friend and co-conspirator, Laitinen.

79.     In the fall of 2003, Visions East introduced Defendants to its customers at international boat shows in Monaco (Landvik), San Francisco (Ballinger), and Fort Lauderdale (Laitinen and Thiger).  Almost immediately MAG and FTMS sought to take over Visions East, its technology, trade secrets and its customers.

80.     On November 26, 2003, MAG's Chairman Fabritius and Managing Director Kivela sent an e-mail to Morton proposing to fold Visions East into a venture with MAG's FlexMill Division to be called "MAG Marine."  MAG proposed contributing its unpatented FlexMill grinding machine to the new company and for Visions East's to contribute its

patented technology, trade secrets, marine industry experience and customer list.  As with Linna and Laitinen's 2001 handwritten proposal, MAG Marine would take over and manufacture Visions East's VEbot™ fairing and painting system and Visions East would lend its "marketing and sales experience."  Morton rejected this proposal.

81.    Six weeks later, on January 14, 2004, Fagerdala Defendants made a similar proposal.  In an e-mail from Fagerdala Chairman Landvik, FTMS President Thiger and FTMS Sales Manager Sundquist curiously styled "Press Release & Proposal," Fagerdala sought an "understanding" between FTMS and Visions East.  As with the previous Linna and Laitinen 2001 proposal and MAG's 2003 proposals, under the Fagerdala Press Release & Proposal, FTMS would, among other things, take over the implementation of the technology while Visions East would "focus on marketing." Fagerdala's proposal would change Visions East's business plan.  Rather than selling turn-key VEbot™ Systems, FTMS would finance, install and operate VEbot™ Systems and lease them to boat yards. Fagerdala said that "FTMS is willing to consider . . . compensating VISIONS EAST as a result of profits from license agreements with the Yards . . ."  Morton rejected the Fagerdala Press Release & Proposal.

### Defendants Implement Their Takeover Plan

82.    Visions East had now rejected Defendants' three take-over proposals and Visions East's patented VEbot™ System was about to be successfully demonstrated at FTMS's Öregrund boatyard.   The conspirators took a series of steps to implement their plan to take over Visions East's technology and business.

83.    In late 2003, MAG began to secretly solicit an unauthorized sale of the VEbot™ System to sail boat manufacturer Oy Nautor Ab ("Nautor"), falsely claiming it was

doing so on behalf of Visions East and with their approval. Visions East learned about MAG's proposal to Nautor and protested to MAG. Linna then secretly assisted MAG's effort to sell a knock-off of Visions East's VEbot™ System to Nautor by helping prepare and proofread Laitinen's e-mails and presentations.

84.    With secret assistance from Linna and without permission from Visions East, MAG surreptitiously submitted a proposal to Nautor that was cribbed from a past Visions East proposal. On March 12, 2004, Linna informed Morton that Nautor had conditionally accepted MAG's proposal to sell the VEbot™ System but first wanted to tour the Visions East's prototype system undergoing assembly at MAG's Espoo facility.   Visions East rejected MAG's request to tour the Espoo facility because Visions East had not authorized the sale of its VEbot System to Nautor.

85.    On April 14, 2004, MAG e-mailed a formal letter to Visions East that was signed by Chairman Fabritius, Managing Director Kivelä and someone from Marketing. The letter stated: "We have already told to Nautor that VE is our technology and especially marketing partner" and "that customer has done his decision." MAG thus presents as a *fait accompli* the arrangement that Visions East rejected when Linna presented his plan four years earlier and in the "MAG Marine" proposal less than six months before. To force Visions East to accept a marketing and sales support role for the proposed new MAG division, MAG Marine, MAG's letter admonishes Morton: "To avoid this kind of situation in the future we have to make rules for activities in the markets. For this we should have a face to face negotiation as soon as possible."

86.    To draw Visions East into a negotiation, MAG's April 14, 2004, letter dangled the Nautor sale before Visions East. MAG represented that "if Nautor accept VE can be

the supplier." In the belief that MAG pledged to abandon the sale to Nautor, Morton agreed to meet with MAG in Helsinki one week later. During the ensuing week and despite Visions East having rejected MAG's request, MAG demonstrated the FTMS system to Nautor and sealed the sale to Nautor. By the time Morton arrived for his April 22, 2004, meeting with MAG, MAG refused to discuss the Nautor "problem," reneged on its promise to "allow" Visions East to supply its own non-infringing VEbot™ System, and returned to the "MAG Marine" proposal that Visions East had rejected earlier. Realizing he had been tricked into a transatlantic meeting, Morton ended the meeting and changed his itinerary to return to Fort Lauderdale a day early.

87.     Linna tipped off MAG about Morton's early departure and helped MAG force another meeting with Morton. On April 23, 2004, Fabritius and Kivelä showed up uninvited at the Helsinki Airport as Morton was about to board a plane for Miami. Fabritius and Kivelä confronted Morton in a public shouting match in the airport terminal over who would control Visions East's technology and sell it to Nautor.

88.     On approximately May 21, 2004, MAG's chairman and managing director resurrected their demand that Visions East and its technology be rolled into a proposed MAG Marine as MAG's sales arm. Again, Visions East rejected the demand.

89.     On May 31, 2004, Defendant MAG publicly announced that it had agreed to sell a robotic milling and sanding system to sail boat manufacturer Nautor. The delivery included "two robot systems with high accuracy linear track motions and accompany-ing process equipment. . . . [The] [o]rder continues Master Automation Group Oy's success of MAG FlexMill deliveries." www.masterautomationgroup.com-/eng/news/mag_news-e... This public announcement (a) falsely claimed that MAG was an authorized second source

26

of the Visions East patented technology and know-how to the marine industry; (b) confused the market as to the rightful owner of Visions East's technology; (c) delayed and suspended purchasing decisions; and (d) impaired Visions East's sales effort.

90.    FTMS collaborated with MAG on the Nautor sale by providing copies of the computer programs and software plug-ins from Visions East's VEbot™ System installed at FTMS for use by MAG with the system it sold to Nautor.

91.    The conspirators also sought to weaken Visions East for their takeover attempt by delaying FTMS's project.  MAG, with the approval of FTMS, intentionally delayed the completion of Visions East's first delivery to Defendant FTMS for three months (105 days: from July 14, 2004 until October 27, 2004).  This had the desired effect of (a) delaying Visions East's stepped up follow-on marketing activities that would have been boosted by the first successful installation of the VEbot™ System and (b) depriving Visions East of a potential site where Visions East's prospective clients could observe an operational VEbot™ System.

92.    Over the course of the summer of 2004, Visions East took vigorous exception to MAG's unapproved sale of its technology to Nautor and MAG's hostile and unapologetic response.   Rather than stand up for Visions East, Defendant Fagerdala's Landvik and Defendants Thiger and Linna sided with MAG by putting pressure on Morton to accept the theft of its technology and to meet with MAG to accede to its demands. Again Morton refused to meet with MAG unless MAG met certain basic conditions, including discontinuing its unauthorized, infringing sales and marketing of Visions East's technology for MAG's own benefit.

93.    Defendant Thiger sought to negotiate with MAG, purportedly on Visions

27

East's behalf.  On June 10, 2004, Visions East instructed Thiger in writing not to interact with MAG concerning Visions East's business.  In disregard of this instruction, Thiger secretly orchestrated a meeting in August 2004 in which he proposed a Letter of Intent to Morton and attempted to influence Morton to execute the Letter of Intent for a partnership with MAG.   Morton rejected these demands.   Thiger negotiated these proposed agreements with MAG for Visions East without authority from Visions East and in defiance of specific instructions to desist.

### The "Ambush Meeting"

94.    Knowing that Morton had scheduled a visit to FTMS's Anytek shipyard in Öregrund, Sweden, Fagerdala's Landvik and Defendants Thiger and Linna forced a meeting against Morton's wishes in the evening on August 24, 2004.  MAG's President Laitinen, its Managing Director Kivelä and its Chairman Fabritius secretly flew in from Finland while Morton and Linna inspected the progress of the installation of the VEbot™ System at the shipyard.

95.    After a pizza dinner and nearing midnight, Landvik, Thiger and Linna steered Morton into a nearby hotel conference room where they had prearranged the surprise appearance of Fabritius, Kivela and Laitinen ("Ambush Meeting").  MAG demanded that Morton cede Visions East's patented technology and proprietary know-how, including, but not limited to, the Surfmodeler™ Software to MAG, become MAG's marketing arm and allow MAG to solicit Visions East's customers.  MAG, FTMS and Linna demanded that Morton execute a handwritten Letter of Intent that the conspirators were desperate to draft on the spot. The Defendants and their co-conspirators threatened to carry out their plans with or without Morton's agreement and also threatened to drive Visions East out of

business if he did not accede to their demands.  Despite the intense pressure he was being subjected to, Morton rejected this ultimatum.

96.    Defendants intended the confrontation at Anytek shipyard in Öregrund to accomplish for Defendants what Linna and Laitinen had unsuccessfully sought in 2000 and MAG had unsuccessfully sought in 2003 and earlier in 2004, namely the appropriation of Visions East's patented technology, proprietary know-how and customers for MAG and/or Fagerdala Defendants.

97.    On August 26, 2004, Linna, on behalf of FTMS, MAG and Thiger, sent an Instant Message to Visions East's Business Development consultant in which Linna (a) asked whether he would have access to Visions East's new Virtual Private Network (VPN) server; (b) repeated the conspirators' threat that if Morton did not cede Visions East to MAG and Fagerdala, "he will lose it"; and (c) misrepresented that Morton had agreed to the terms demanded by the conspirators at the August 24, 2004, "Ambush Meeting".

98.    On August 30, 2004, MAG's Kivelä sent an e-mail to Thiger, Linna, Laitinen, MAG's Fabritius and Morton attaching "our list of issues should be mentioned in our co-operation agreement.  This is mostly what we already agreed last week." Among other things the document styled "MAG-VE Cooperation Issues," would have (a) given MAG an exclusive over Visions East's technology; (b) positioned MAG as the "only manufacture for VE in marine industry"; (c) relegated Visions East to the status of MAG's "Supplier/Marketing company"; and (d) merged the Visions East's "customer database into MAG's "joint" possession."  This was by now the fifth iteration of essentially same proposal, but now packaged as a "done deal."

99.    Contrary to the statement in Kivelä's e-mail, Visions East had agreed to none

of these terms, and in fact had consistently rejected them. In a September 1, 2004, e-mail, Morton again rejected the Defendants' proposals in general and the MAG-VE Cooperation proposal in particular.  Morton refused to buckle to Defendants' threats and intimidation tactics.

100.   In spite of Morton's rejection of the MAG-VE Cooperation proposal, on September 3, 2004, MAG sent Visions East and Visions East's lawyers a document styled a Letter of Intent.  Among other things the Letter of Intent (a) implemented the MAG-VE Cooperation proposals and (b) included a provision whereby Visions East would forgive MAG's infringing sale to Nautor "in consideration of being able to use the Nautor sale as a reference in its [Visions East's] own business activities."  On September 9, 2004, Visions East again rejected the proposals and suspended further negotiations.

101.   During the MAG and FTMS's 2004 assault on Visions East, Linna had multiple communications with Laitinen, Thiger, Kivelä and others at MAG, FTMS and Fagerdala that disclosed Visions East's confidential legal strategies and confidential marketing plans, marketing communications and vendor relationships.  During the 2004 assault, Linna surreptitiously received information from MAG and FTMS that Linna did not disclose to Visions East.  In addition, Linna used his personal relationship with Morton to advise MAG and FTMS about how to deal with Morton and Visions East for the benefit of MAG and FTMS and to the detriment of Visions East.

### Linna Comes In from the Cold, Rejoins Laitinen at MAG

102.   In late 2004, Defendant Linna began secret discussions with Laitinen about announcing his resignation from Visions East to openly join MAG.  In preparation for his impending resignation Linna:

    a.    Requested proprietary information from Visions East about, among other things, Visions East's pending bids to customers and the identity of Visions East's preferred and prospective suppliers under the false pretense that he would use these to further Visions East's business;

    b.    Secretly collected and accumulated Visions East's proprietary information, marketing materials and customer lists from Visions East's computers, and transferred and saved Visions East's proprietary information and marketing materials on one or more of his computers;

    d.    Secretly posted certain of these marketing materials on his own password-protected personal computer server; and

    e.    Made available Visions East's marketing materials on his personal server to prospective customers Linna solicited on behalf for Defendants MAG and/or FTMS. These customers included prospective customers that Linna knew (i) were on Visions East's customer list, and/or (ii) were being solicited by Visions East.

103. On February 16, 2005, Linna abruptly resigned from Visions East without advance notice.

104. Within a few weeks of his resignation, Linna rejoined his former colleague Laitinen at MAG as Sales Manager of MAG's new "Marine Division," echoing MAG's earlier 2003 MAG Marine proposal, but without Visions East. Upon joining MAG, Linna stepped up his efforts to convert and misappropriate Visions East's patented technology, proprietary know-how and customers for MAG as he had begun prior to his resignation and as

Defendants had threatened at the Ambush Meeting.

105.   Linna quickly began offering the VEbot™ System on behalf of MAG to Visions East's customers and others by (a) creating false and misleading MAG promotional materials including photographs of Visions East's patented VEbot™ System installed at the FTMS boat yard; (b) falsely representing the VEbot System as MAG's unpatented "FlexMill" milling and grinding machine; (c) directly targeting and soliciting Visions East clients from Visions East's confidential customer list that Linna misappropriated; (d) falsely claiming MAG had acquired the rights to do so; and (e) marketing MAG's FlexMill as a knock-off Visions East's VEbot™ System with all the VEbot™ System's patented features and functionality.

## Defendants Continue to Carry Out Ambush Meeting Threats

106.   Since Visions East rejected Defendants' forced takeover attempt on August 24, 2004, Defendants have jointly carried out their actions to drive Visions East out of business.  These concerted actions and individual actions in furtherance of their conspiracy include representations of a MAG takeover of Visions East's technology, patent infringement, and unfair competition by false advertising and by interfering with Visions East's customers and potential customers.

### MAG Trumpets Its Fictitious Friendly Takeover of Visions East

107.   On August 30, 2004, less than a week after Morton rejected the conspirators demands at the Ambush Meeting in Sweden, MAG's Laitinen e-mailed Vincenzo Poerio ("Poerio") at the yacht builder Azimut-Benetti in Viareggio ("Benetti") to whom Morton had introduced to Laitinen, stating:

I am very pleased to inform that Master Automation Group OY

> (MAG) and Visions East Inc (VE) has decided to sign a co-operation agreement concerning robotic milling, fairing and painting systems in the marine industry.  VE will be global supplier and marketing company for MAG's technology and MAG will be manufacturer.
>
> I strongly believe that combination of VE's excellence in marine coating technologies, efforts in marketing/sales and MAG's robotics expertises we can provide you leading edge technologies for today and the future.

Laitinen's August 30, 2004, e-mail to Benetti was a complete fabrication by MAG.

108.   On August 30, 2004, Laitinen sent the same false e-mail to German yacht builder Blohm + Voss ("B+V").

### Willful Patent Infringement

109.   MAG and FTMS have begun production and integration of robotic preparation, fairing and painting systems for marine vessel applications using Visions East's patented technology and have offered systems for sale to U.S.-based companies.

110.   In April 2005, MAG offered to sell the VEbot™ System to Fitzgerald Shipyard ("Fitzgerald"), Chelsea, Massachusetts.  MAG represented that its system was able to perform computer-controlled fairing and sanding.

### Unfair Competition/False Advertising

111.   MAG and FTMS have both published false and misleading advertisements and generated publicity that claims Visions East technology as their own.

112.   With its acquisition of RTS from RTSUK, MAG purportedly acquired the FlexMill a milling Robotic System ("FlexMill"). Linna has developed MAG advertisements in which MAG represents that its "FlexMill robot system will adjust to meet customer requirements. This flexibility combined with the ability to handle nearly unlimited number of

process tools makes FlexMill a strong partner for the production."

113.   MAG directly targeted the FlexMill to the marine industry with Visions East technology, an industry it did not solicit prior to its relationship with Visions East.  MAG has created and distributed a PowerPoint presentation of the FlexMill titled "Large Robotic Milling System" and coded "ENG ver" ("FlexMill PowerPoint").  The FlexMill PowerPoint presentation falsely describes MAG as the "technology forerunner in the marine industry." MAG's FlexMill PowerPoint presentation also describes the FlexMill as a computer-controlled robotic system for preparing, mapping, fairing and painting marine vessels in terms and schematics that parrot Visions East's patents.  In fact, FlexMill is incapable of performing in the manner described by MAG without infringing Visions East's patents.

114.   Specifically, the first PowerPoint slide (after the title slide) lists the unique combination of functional elements of Visions East's system ("system function slide").  On the following substantive slide the presentation depicts "MAG FlexMill, concept design," an iconic illustration of the lay-out of the Visions East system to carry out these functions ("system lay-out slide").

115.   MAG's FlexMill PowerPoint presentation also highlights the VEbot™ System sold to FTMS, by depicting the VEbot System installed at FTMS in the following false and misleading sequence of slides (a) RTS Robotics' installation plug and mold equipment in Chesapeake, Virginia; (b) MAG's installation of plug and mold equipment at Robocam, Oy, in Finland and SSPA in Göteborg, Sweden; (c) three slides of text and photos of Visions East's VEbot™ System; and (d) MAG's infringing knock-off installation of its FlexMill system at Nautor.

116.   The FlexMill PowerPoint presentation also falsely claims among "MAG

FlexMill advantages":

- Various processes are very easy to adapt to FlexMill robot system

- MAG has several different processes to offer FlexMill robot system if regquested [sic]

- Spraying high viscosity materials, reverse engineering etc.

("MAG advantages slide").   The "MAG advantages slide" does not represent MAG advantages, but the features and advantages of Visions East's patented technology.

117.   MAG's FlexMill PowerPoint presentation is false and misleading because, among other things (a) it falsely claims that it is the "technology forerunner in the Marine industry" when in fact (a) it fails to disclose that neither the Virginia, the Robocam, nor the SSPA projects involved the technology depicted in the "system function slide" and the "system lay-out slide"; (b) it falsely claims that the technology depicted in the system function slide and the system lay-out slide is MAG's, not Visions East's; (c) it falsely claims that the FTMS project was MAG's, not Visions East's; (d) it falsely claims that the technology of the FTMS project was MAG's, not Visions East's; (e) it falsely claims that the technology of the Nautor project was MAG's, not Visions East's; (f) it fails to disclose to MAG's potential customers, the target audience for the FlexMill PowerPoint presentation, that purchasing MAG FlexMill for the applications depicted in the PowerPoint presentation would expose those customers to potential patent infringement liability; and (g) it falsely claims Visions East's technology as in the "MAG advantages slide."

118.   MAG has distributed its FlexMill PowerPoint presentation in a number of versions throughout the world and in the U.S.

119.   In MAG's presentation to Fitzgerald, of Chelsea, Massachusetts, MAG falsely

represented that it already had installed a system in Virginia.

120.    FTMS has published a false and misleading article in the on-line edition

*European Boatbuilder* magazine that falsely claims ownership interest in Visions East's

technology.  Under the title *Processes: Fagerdala Thiger Marine System*, and described as

an "interesting Swedish initiative," FTMS states in the February 2005 issue:

> Fagerdala Thiger's robotic cell at the Öregrund Shipyard in
> Sweden. US company Visions East originally developed the
> technology for simply fairing and painting superyachts, but this
> Swedish operation has taken it several stages further, making
> use of it to produce hybrid steel/composite monocoque boat
> structures.

http://www.ibinews.com/ibinews/ebb/tech_fager.html

> Marketed as the Fagerdala Thiger Marine System, the
> revolutionary approach to vessel construction makes use of
> both metal fabrication and composite sandwich technology to
> form a hybrid structure. Moreover, at Öregrund much of the
> process is to be handled by a sophisticated robotic cell, which
> comprises two large robots that run on rails on either side of a
> large work area. These robots will mill, fill, fair and paint as
> required. And the cell can even change the robots' tool heads
> automatically, so that they can be left to carry on working
> overnight if necessary.

*Id.*

> Supplied by Visions East, the subject of a feature in the
> October 2005 issue of European Boatbuilder, this installation is
> claimed to be the first of its kind anywhere in the world. It is
> essentially a joint-venture project between the yard and Visions
> East, which first developed its robotic system to fair and paint
> big yachts.

*Id.*

121.    FTMS's statements are false and misleading in representing that:

   ▪   FTMS has rights to market Visions East's System as the "Fagerdala
       Thiger Marine System;"

36

- The "Fagerdala Thiger Marine System" . . ." comprises two large robots that run on rails" and will mill, fill, fair and paint;" and

- FTMS's "Fagerdala Thiger Marine System" is a product of a joint venture between Visions East and FTMS.

122.   FTMS's article on the *European Boatbuilder* Website goes on to solicit inquiries for purchases of the Fagerdala Thiger Marine System that incorporate Visions East's technology as its own:

> When combined with automated hull painting and finishing systems, it is estimated that the manpower requirements for boat construction will be halved with the Fagerdala Thiger Marine System — despite the need for higher caliber and more expensive technicians. Even so, the cost savings are expected to be substantial and more than enough to justify the investment costs.
>
> &ast; &ast; &ast;
>
> For more on . . . the Fagerdala Thiger Marine System, contact Percy Sundquist, marketing director, Fagerdala Thiger Marine Systems, Box 1164, 13 127 Nacka Strand, Sweden.

123.   *European Boatbuilder* is distributed throughout the world and in the U.S.

124.   Defendant FTMS had an article similar to the *European Boatbuilder* article published in the March 2005 issue of *Boat International* magazine, again claiming Visions East's technology as its own.

125.   On September 22, 2004, upon the completion of the VEbot™ System's installation at FTMS, Defendant Fagerdala issued a press release posted on its Website. The press release announced that FTMS would attend the Monaco Yacht Fair that week. The press release also described the VEbot™ System and gave credit to Visions East for its development.  Barely two months later, on November 4, 2004, FTMS issued another press release announcing its participation at Project 2004 in Amsterdam, "an international

37

seminar for construction, management & operation of luxury yachts." FTMS's press release still posted on its Website states that "on this occasion we will present our Robotic Yacht Manufacturing System," without mention of Visions East. No FTMS press release has mentioned Visions East since then, in spite of further announcements that it would exhibit at other boat shows.

126. Defendant Thiger also engaged in misrepresentations about Visions East. Under the European Orgalime SE01 protocol applicable to the installation of electronic and mechanical robotic systems, Visions East completed the installation of its VEbot™ System at FTMS machine on October 27, 2004. Nevertheless, subsequent to October 2004, Thiger misrepresented to potential clients of Visions East that he was soliciting on behalf of MAG that the FTMS system had not been completed, was not operational and had not yet been commissioned.

<u>Interference with Visions East Customers</u>

127. Linna, MAG and FTMS have interfered with Visions East's customers and potential customers before and after Linna's return to MAG.

*MAG's 2003 Solicitation of Benetti*

128. In November 2003, Visions East paid for Linna and Laitinen to travel to Italy to solicit Italian yacht builder Benetti's business for Visions East. After this trip, Laitinen secretly solicited Benetti's business for MAG, offering a system incorporating Visions East's technology. At the November 2004 Monaco Boat Show, an Italian client disclosed to Visions East that MAG was competing with them by offering the Italian client the Visions East's system after Visions East introduced the client to MAG.

*MAG's 2004 Solicitation of Blohm + Voss*

129.    Visions East made a proposal to Blohm & Voss ("B+V") in early 2004 for the sale of its VEbot™ System.  B+V is the world's largest yacht builder.  At the May 2004 SEAS2004 Superyacht Technology Trade Show in Nice, France, B+V informed Visions East that MAG had recently solicited their business for a MAG copy of the VEbot™ System.

130.    On November 18, 2004, Linna e-mailed Visions East in his purported capacity as an employee and officer of Visions East and requested highly sensitive, proprietary details of Visions East's proposal to B+V.  Linna sought details of Visions East's price, delivery schedule, the identities of the systems integrator and other suppliers, Visions East's methods and processes and other details of the system Visions East proposed to B+V.  Linna's request for details of Visions East's proposal to B+V was not in furtherance of any business interest of Visions East, but was under false pretenses in the interests of MAG's secret proposal to deliver a knock-off of Visions East's VEbot™ System and its proprietary know-how to B+V.

131.    On November 18, 2004, Visions East responded to Linna and provided him with its proprietary information regarding its proposal to B+V including pricing, integrators, suppliers and other terms.  Linna and MAG have subsequently used Visions East's proprietary information in MAG's proposal to B+V.

*Linna's 2004 Solicitation of Alstom*

132.    On December 29, 2004, a little more than a month before he resigned, Linna secretly e-mailed Jean-Paul Luzet ("Luzet") at the Alstom Chantier de L'Atlantique, a shipyard in St. Nazaire, France.  Without authority from Visions East, Linna provided Luzet with the passcode to his personal Web server and invited Luzet to view Visions East's

VEbot™ System promotional materials.

133.    Prior to Linna's resignation in early 2005, Linna provided a direct conduit to MAG and FTMS regarding Visions East's marketing activities. Since Linna's resignation, MAG, Linna and FTMS have stepped up their direct solicitations of Benetti, B+V, and Alstom.   In addition, Defendants have offered their copy of the VEbot™ System to Fitzgerald Shipyard.

### Defendants' Cover-Up

134.    The Defendants took numerous steps to conceal their conspiracy from Visions East.

135.    Throughout the period that Linna acted as a consultant to Visions East and as a salaried employee, he maintained two separate e-mail accounts, "tarmolinna@-kolumbus.fi" and tarmoverno@hotmail.com, for communications with his co-conspirators as well as with prospective clients he solicited on behalf of MAG.   Linna used his kolumbus.fi e-mail account to avoid leaving his conspiratorial e-mails on Visions East's server.

136.    On the day Linna resigned from Visions East, February 16, 2005, Visions East immediately reminded Linna of his obligation to return Visions East's laptop and desktop computers assigned to him and to not delete any data.   After numerous delays and evasions, Linna returned the computers to Visions East.

137.    An examination of Linna's computers by a computer forensics expert hired by Visions East has revealed that, between the time he submitted his resignation and the time he returned the computers to Visions East, Linna took the following  actions:

a.    At approximately 9:00 a.m. on the morning of February 17, 2005, the day after he sent his resignation to Visions East, Linna used his desktop

40

computer to burn to CD 509 files and 44 subfolders in a "Visions East\Projects\Fagerdala" directory folder.

b.     Immediately thereafter, between 9:19 a.m. and 1:13 p.m., on February 17, 2005, Linna accessed approximately 543 documents, images, and other data files were accessed on the Laptop computer, and "burned" an indeterminate number of the documents, images and data onto CDs.

c.     Between approximately 5:47 and 5:52 p.m. on February 17, 2005, Linna uninstalled ten software programs from his desktop computer;

d.     On February 18-19, 2005, Linna accessed approximately 999 files on his laptop computer.

e.     At 8:04 p.m. on February 20, 2005, Linna used two different CD burning programs on his desktop computer to burn CD's.

f.     On the morning of February 22, 2005, Linna installed the "Clean Disk Security" software program on his laptop computer. The Clean Disk Security program is designed to eradicate the contents and traces of files that remain after the files have been deleted by the user from a computer's hard drive.

g.     On the morning of February 23, 2005, Linna ran the "RegCleaner" software program on his laptop computer. The RegCleaner program is designed to remove entries in the Windows system registry that refer to missing or deleted files and software programs. Several hours later, Linna ran the same RegCleaner log registry deletion program on the desktop computer.

h.     On the afternoon of February 23, 2005, Linna installed on his desktop computer the same Clean Disk Security data eradication program the he

previously had installed on the laptop computer.

i.    At 9:47 and 11:50 p.m. on February 23, 2005, Linna ran the Clean Disk Security data eradication program on Visions East's desktop and laptop computers.

138.    The Clean Disk Security data eradication program overwrote data on the hard drives of the two computers with random binary code, and left more than 65,000 sequentially numbered blank files that were devoid of any data on the hard drives of the desktop and laptop computers.

139.    Linna has withheld the CD's burned from the two computers from Visions East. Linna's activities prior to the return of Visions East's two computers and withholding of the CDs establish that (a) Linna stole Visions East's proprietary information; (b) destroyed Visions East's proprietary information; and (c) attempted and, to some extent may have succeeded, in covering up his conspiratorial activities.

140.    Linna has taken other steps to conceal the conspiracy. Within weeks of resigning from Visions East, Linna sent a mass e-mail offering MAG's FlexMill for sale to Visions East's customer list. Linna used the "blind copy" addressing mode to obscure the identities of other addressees on his mass mailing.

141.    On December 29, 2004, Linna used his secret e-mail account to refer a Visions East client to Linna's personal server for information about Visions East's system and requested the client to keep Linna's personal server secret.

142.    On May 20, 2005, during a Visions East Board Meeting, Thiger falsely denied knowledge of Linna's current employment to protect the ongoing conspiracy.

### CAUSES OF ACTION

143.    Visions East and Morton assert the following claims, which unless otherwise specified are brought by Visions East against all Defendants.

### Count 1

### Patent Infringement
(Visions East against MAG)

144.    Visions East hereby incorporates paragraphs 1-144 by reference as if fully set forth herein.

145.    MAG has actual and constructive knowledge of the '139 patent.

146.    MAG's FlexMill system infringes the valid and duly issued '139 patent.

147.    MAG, without authority makes, uses, offers to sell or sells its FlexMill system within the United States or imports into the United States, its FlexMill system in violation of 35 U.S.C. § 271.

**WHEREFORE**, Visions East prays for judgment as follows:

A.    That MAG has willfully infringed the '139 patent;

B.    That MAG, its officers, agents and employees, and those persons and corporations in active concert or participation with any of them, are preliminarily and permanently enjoined, pursuant to 35 U.S.C. § 283, from manufacturing, using, offering to sell, selling or importing its FlexMill system, by that or any other name, and any other product that infringes or induces or contributes to the infringement of the '139 patent;

C.    That Visions East be awarded damages against MAG for infringement and that such damages be trebled pursuant to 35 U.S.C. § 284;

D.    That this case be declared exceptional and Visions East be awarded

attorneys' fees, costs and expenses pursuant 35 U.S.C. § 285; and

E.     That Visions East be granted such other and further relief as this Court deems just and proper.

## Count 2

## Patent Infringement
(Visions East against MAG)

148.   Plaintiff Visions East hereby incorporates paragraphs 1- 147 by reference as if fully set forth herein.

149.   MAG has actual and constructive knowledge of the '221 patent.

150.   MAG's FlexMill system infringes the valid and duly issued '221 patent.

151.   MAG, without authority makes, uses, offers to sell or sells its FlexMill system within the United States or imports into the United States its FlexMill system in violation of 35 U.S.C. § 271.

**WHEREFORE**, Visions East prays for judgment as follows:

A.     That MAG has willfully infringed the '221 patent;

B.     That MAG, its officers, agents and employees, and those persons and corporations in active concert or participation with any of them, are preliminarily and permanently enjoined, pursuant to 35 U.S.C. § 283, from manufacturing, using, offering to sell, selling or importing its FlexMill system, by that or any other name, and any other product that infringes or induces or contributes to the infringement of the '139 patent;

C.     That Visions East be awarded damages against MAG for infringement and that such damages be trebled pursuant to 35 U.S.C. § 284;

D.     That this case be declared exceptional and Visions East be awarded

44

attorneys' fees, costs and expenses pursuant 35 U.S.C. § 285; and

    E.    That Visions East be granted such other and further relief as this Court deems just and proper.

### Count 3

### False Advertising (Lanham Act)
(Visions East against MAG)

    152.    Plaintiff Visions East hereby incorporates paragraphs 1- 151 by reference as if fully set forth herein.

    153.    MAG's advertising of the FlexMill computer-controlled robotic preparation, fairing and painting systems for marine vessels, including its FlexMill PowerPoint presentation, its Website, and the Web and magazine articles it has had published were false and misleading because MAG was not the rightful owner or developer of Visions East's patented computer-controlled robotic preparation fairing and painting systems, and misrepresented the source of its product and the product's technology.

    154.    MAG's FlexMill advertising deceived and/or had the power to deceive purchasers of computer-controlled robotic preparation fairing and painting systems.

    155.    MAG's deception has a material effect on the purchasing decisions of purchasers of computer-controlled robotic preparation fairing and painting systems.

    156.    MAG's misrepresentation of its computer-controlled robotic preparation fairing and painting systems for marine vessels affects interstate commerce.

    157.    Visions East has been injured and has incurred damages and is likely to incur further damages as a result of MAG's false advertising.

    **WHEREFORE**, Visions East prays for judgment as follows:

A.      That MAG's advertising of its FlexMill computer-controlled robotic preparation, fairing and painting systems for marine vessels is false and misleading pursuant to Section 43 of the Lanham Act, 15 U.S.C. § 1525;

B.      That MAG, its officers, agents and employees, and those persons and corporations in active concert or participation with any of them, are preliminarily and permanently enjoined from false and misleading advertising of its FlexMill system, pursuant to 15 U.S.C. § 1116;

C.      That Visions East be awarded damages against MAG for false advertising, that Visions East's damages be trebled, and that the Court declare this an exceptional case and award Visions East its attorneys' fees against MAG  pursuant to 15 U.S.C. § 1117;

D.      That Visions East be granted such other and further relief as this Court deems just and proper.

<div align="center">

**Count 4**

**RICO**

</div>

158.    Plaintiff Visions East hereby incorporates paragraphs 1- 157  by reference as if fully set forth herein.

**A.      RICO DEFENDANTS**

159.    The Fagerdala Defendants, (Defendants FTMS, Fagerdala, and FUSA); Defendant MAG; and Defendants Linna and Thiger (collectively the "RICO Defendants" in this count) have engaged in activities conducted in violation of RICO, 18 U.S.C. § 1961 *et seq.*, particularly 18 U.S.C. § 1964(c).

160.    Defendants MAG and each of the Fagerdala Defendants are corporations capable of holding a legal or beneficial interest in property and, as

such, each constitutes a "person" within the meaning of 18 U.S.C. § 1961(3).

161.   Defendants Linna and Thiger are individuals capable of holding a legal or beneficial interest in property and, as such, each constitutes a "person" within the meaning of 18 U.S.C. § 1961(3).

### B.   THE RICO ENTERPRISE

162.   The RICO Defendants, and others including MAG's law firms, including Krogerus & Co., FTMS's law firm; MAG and FTMS's accounting and investment banking firms; and others as yet unknown, have constituted and continue to constitute an "Enterprise" as defined in 18 U.S.C. § 1961(4).

163.   The RICO Defendants have conducted and are conducting an enterprise consisting of an association-in-fact for the purpose of unlawfully acquiring and exploiting corporations for their intellectual property ("IP"), including their patents trademarks, confidential information, proprietary information and trade secrets (the "IP Conversion Enterprise"). The continuing unit formed by these parties constitutes a RICO enterprise within the meaning of 18 U.S.C. § 1961(4) which is engaged in, or the activities of which affect, interstate and foreign commerce.

164.   The RICO Defendants and other non-party members of the enterprise are each employed by and/or associated with the IP Conversion Enterprise, directly or indirectly through a continuing pattern of racketeering activity and through repeated and continuous use of the U.S. mail and the interstate use of wires in furtherance of their scheme fraudulently to obtain companies, their confidential and proprietary information and their trade secrets and intellectual property through fraud and other unlawful conduct.

### C.   PATTERN OF RACKETEERING ACTIVITY

165.   In their association with and employment by the IP Conversion Enterprise, the RICO Defendants and others, for more than two years, have conducted and participated in the affairs of that Enterprise, directly or indirectly, through a continuing pattern of racketeering prohibited under 18 U.S.C. § 1962(a), 18 U.S.C. § 1962(c), and 18 U.S.C. § 1962(d).

166.   The RICO Defendants have directly and indirectly used income from a pattern of racketeering activity to invest such income in enterprises which are engaged in, and whose activities affect, interstate and foreign commerce in violation of 18 U.S.C. § 1962(a).

167.   In their association with and employment by the IP Conversion Enterprise, the RICO Defendants have engaged in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) that includes (a) the use of U.S. mail in violation of 18 U.S.C. §1342 (b) the use of interstate and international wires in violation of 18 U.S.C. § 1343, (c) interstate and international travel in violations of 18 U.S.C. § 1952 and Florida Statute Title XLVI, Section 836.05.

168.   In their association with and employment by the IP Conversion Enterprise, the RICO Defendants have conspired with each other and others not yet known to violate the provisions 18 U.S.C. § 1962(a) and 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d).

### D.   RICO DEFENDANTS' PREDICATE ACTS

#### a.   18 U.S.C. § 1962(a)

169.   The Fagerdala Defendants have directly and indirectly used income from

a pattern of racketeering activity to invest such income in enterprises, which are engaged in, and whose activities affect, interstate and foreign commerce in violation of 18 U.S.C. § 1962(a). Such investments include, but are not limited to, Fagerdala's investment in FUSA in 1997 and other U.S. and foreign subsidiaries beginning in the 1980s, including its acquisitions of Paclite (2001), Lompoc (2003), Huntsman (2003) and EPS Cement USA (2004), among others, in the U.S; FUSA's investments in its divisions and in other U.S. subsidiaries beginning in 1997, and FTMS's investment in Visions East in 2003.

170. Defendant MAG has directly and indirectly used income from a pattern of racketeering activity to invest such income in enterprises, which are engaged in, and whose activities affect, interstate and foreign commerce in violation of 18 U.S.C. § 1962(a). Such investments include, but are not limited to, MAG's investment in RTS.

    b.    18 U.S.C. § 1962(d)

171. The RICO defendants have conspired to directly and indirectly use income from a pattern of racketeering activity to invest such income in enterprises which are engaged in, and whose activities affect, interstate and foreign commerce in violation of 18 U.S.C. § 1962(d). Such investments include, but are not limited to FTMS's investment in Visions East.

    c.    18 U.S.C. § 1343

172. Each RICO Defendant has used the U.S. Mail in violation 18 U.S.C. § 1343 in furtherance of the RICO Enterprise.

173. Defendant FTMS has used the U.S. Mail in violation 18 U.S.C. § 1343 in

furtherance of the RICO Enterprise on at least the following occasions:

- August 19, 2002 mailed brochure from Stockholm, Sweden, for delivery by U.S. Postal Service in Fort Lauderdale, Florida; and

- December 15, 2004 mailed Project FT19DEC03 Document PO3002-7 from Stockholm, Sweden, for delivery by U.S. Postal Service in Fort Lauderdale, Florida.

174.   Defendant MAG has used the U.S. Mail in violation 18 U.S.C. § 1343 in

furtherance of the RICO Enterprise on at least:

- January 8, 2004 mailed Invoice for "MAG FlexMill System for Robotic painting fairing and milling application" from Espoo, Finland for delivery by U.S. Postal Service in Fort Lauderdale, Florida; and

- June 2, 2004 mailed Invoice for "MAG FlexMill System for Robotic painting fairing and milling application" from Espoo, Finland for delivery by U.S. Postal Service in Fort Lauderdale, Florida.

175.   Defendant Linna has used the U.S. Mail in violation 18 U.S.C. § 1343 in

furtherance of the RICO Enterprise on at least:

- March 29, 2002 mailed self addressed envelopes, Bank of America ("BoA") deposit slips and address labels for BoA Brentwood, Tennessee branch from Helsinki, Finland, for delivery by U.S. Postal Service in Fort Lauderdale, Florida;

- May 5, 2003 mailed Employment Agreement from Espoo, Finland, for delivery by U.S. Postal Service in Fort Lauderdale, Florida; and

- Prior to each of Linna's trips to the U.S. Linna directed Visions East's staff in Fort Lauderdale to mail checks to Linna's bank account in Tennessee.

176.   Defendant Thiger has used the U.S. Mail in violation 18 U.S.C. § 1343 in

furtherance of the RICO Enterprise on at least:

- December 15, 2004 mailed letter agreement from Stockholm, Sweden, for delivery by U.S. Postal Service in Fort Lauderdale, Florida; and

- December 15, 2004 mailed Site Acceptance Test from Stockholm, Sweden, for delivery by U.S. Postal Service in Fort Lauderdale, Florida.

**d.    18 U.S.C. § 1344**

177.    Each RICO Defendant has used interstate or international wires in violation

18 U.S.C. § 1344 in furtherance of the RICO Enterprise.

178.    Defendant Thiger has used interstate or international wires in violation 18

U.S.C. § 1344 in furtherance of the RICO Enterprise on at least the following

occasions:

- August 2004 telephone call between Sweden and Finland with MAG concerning meeting to pressure Morton to allow MAG to steal Visions East's patented Technology;

- August 12, 2004, e-mail from Sweden to Fort Lauderdale to pressure Morton to meet with MAG;

- 2003 to 2004 electronic conference call to Visions East Board of Directors meeting to cast vote against Visions East's consideration of hiring counsel to pursue MAG's conversion of Visions East's patented technology and proprietary know-how by its unauthorized sale to Nautor.

179.    Defendant Fagerdala has used interstate or international wires in violation

18 U.S.C. § 1344 in furtherance of the RICO Enterprise on at least the following

occasions:

- November 30, 2004, Fagerdala's and Landvik's agent Thiger in Sweden telephone call to Morton in Fort Lauderdale pressuring Morton against action against MAG; and

- April 15, 2005, Fagerdala's agent Landvik participated in a conference call to the meeting of Visions East's Board of Directors.

180.    Defendant MAG by its agents has used interstate or international wires in

violation of 18 U.S.C. § 1344 in furtherance of the RICO IP Conversion Enterprise on

at least the following occasions:

- June 11, 2004, MAG by its agent  Krogerus & Co.'s sent international

51

facsimile transmission to Visions East;

- August 3, 2004, MAG by its agent Kivelä rejecting Morton's conditions for meeting but repeating intent to force meeting to pressure Morton of Visions East's patented technology;

- August 16, 2004, MAG by its agent Kivelä in Finland sent fraudulent, false and misleading international emails to Morton in Fort Lauderdale and to Defendants and their agents and co-conspirator, including Landvik in Sweden;

- August 30, 2004, fraudulent, false and misleading e-mail by its agent Laitinen to other Defendants and Morton concerning agreements allegedly entered at the Ambush Meeting;

- August 30, 2004, MAG by its agent Laitinen sent a fraudulent, false and misleading e-mail from Helsinki, Finland to Peorio of Benetti in Viareggio, Italy, falsely claiming that MAG had acquired the rights to Visions East's technology; and

- August 30, 2004, MAG by its agent Laitinen sent a fraudulent, false and misleading e-mail from Helsinki, Finland to Engleskirchen of V+B in Hamburg, Germany, falsely claiming that MAG had acquired the rights to Visions East's technology

181.  Defendant Linna has used interstate or international wires in violation 18 U.S.C. § 1344 in furtherance of the RICO Enterprise on at least the following occasions:

- February 15, 2001, handwritten faxed letter Visions East seeking to misappropriate and convert Visions East's technology from Nashville, Tennessee to Fort Lauderdale, Florida;

- August 26, 2004, fraudulent, false and misleading Instant Messenger communication to Visions East concerning the outcome of the Ambush Meeting and renewing threats against Visions East from Finland to Fort Lauderdale, Florida;

- November 18, 2004, e-mail fraudulently requesting proprietary details of Visions East's bid proposal to B+V on behalf of MAG;

- From 1999 to 2001, Linna sent regular faxes and e-mails and made telephone calls to Morton and Visions East, including but not limited to, draft

agreements and signed final agreements with Visions East, market information, proposals, requests for confidential information from Nashville, Tennessee and Helsinki Finland to Fort Lauderdale, Florida;

- From 2001 to 2003 Linna sent more frequent faxes and e-mails and made telephone calls to Morton and Visions East, including but not limited to, draft agreements and signed final agreements with Visions East, market information, proposals, requests for confidential information from Helsinki Finland to Fort Lauderdale, Florida;

- From May 2003 to February 2005 Linna sent multiple weekly faxes, e-mails and Instant Messenger transmissions and made telephone calls to Morton and Visions East, including but not limited to, draft agreements and signed final agreements with Visions East, requests for payments by international wire transfers, market information, proposals, requests for confidential information from Helsinki, Finland to Fort Lauderdale, Florida;

- From 1999 to 2005 Linna sent multiple international e-mails, Instant Messenger transmissions and faxes and made interstate and international phone calls to Laitinen, Kivelä, Thiger, and others not yet know from the Nashville, Tennessee to Helsinki and Espoo, Finland; from Helsinki and Espoo, Finland to Stockholm, Sweden, Hamburg, Germany; Viareggio, Italy and St. Nazaire, France.

182.    Defendant Thiger has used interstate or international wires in violation 18 U.S.C. § 1344 in furtherance of the RICO Enterprise on at least the following occasions:

- April 2004 electronic conference call to Visions East Board of Directors meeting casting vote against Visions East's consideration of hiring counsel to pursue dispute with MAG;

- From 2003 to 2005 Thiger attended quarterly and special Board meetings by conference call from Espoo, Sweden to Fort Lauderdale, Florida;

- From 2003 to 2005 Thiger sent regular e-mails and made weekly international telephone  calls to Morton from Espoo, Sweden to Fort Lauderdale, Florida;

183.    Defendant Fagerdala, by its agents has used interstate or international wires in violation 18 U.S.C. § 1344 in furtherance of the RICO Enterprise on at least

the following occasions:

- May 2003 to May 2005, Fagerdala's agent Thiger used international wires to participate in quarterly and special meetings of Visions East's Board of Directors; and

- April 15, 2005, and other occasions, Fagerdala's agent Landvik used international wires to participate in a meeting of Visions East's Board of Directors.

### e. 18 U.S.C. § 1952

184. Each of the RICO Defendants has engaged in interstate and international travel in violations of 18 U.S.C. § 1952 and Florida Statutes Section 836.05 in furtherance of the IP Conversion Enterprise.

185. Defendants FTMS and Thiger and their agents have engaged in interstate and international travel in violations of 18 U.S.C. § 1952 and Florida Statutes Title XLVI, Section 836.05 in furtherance of the IP Conversion Enterprise, including but not limited to, in:

- November 2003 Thiger traveled from Sweden to Fort Lauderdale to attend Fort Lauderdale Boat Show;

- May 2005 Thiger traveled from Sweden to Nice, France, to attend Nice Boat Show; and

- May 2005 an FTMS agent traveled from Sweden to London to attend the Cruise/Ferry Boat Show.

186. Defendants Fagerdala by its agents has engaged in interstate and international travel in violations of 18 U.S.C. § 1952 in furtherance of the IP Conversion Enterprise, including but not limited to, the following occasions:

- May 2003 international travel by its agents Landvik and Thiger from Sweden to Finland for meeting with MAG and Visions East;

- September 2003 international travel by its agent Landvik from Sweden

to Monte Carlo, Monaco to attend the Monaco Boat Show;

- October 2003  interstate travel by its agent Ballinger from Michigan to San Francisco, California, to attend the NASMA World Maritime Expo; and

- October 2004 international travel by its agent Frederik van Hoolen from Sweden to the Fort Lauderdale Boat Show.

187.   Defendant MAG by its agent Laitinen has engaged in interstate and international travel in violations of 18 U.S.C. § 1952 in furtherance of the IP Conversion Enterprise, including but not limited to, the following occasions:

- October 2003 travel from Finland to Fort Lauderdale, Florida, to attend Fort Lauderdale Boat Show;

- 2003 from Helsinki, Finland to Viareggio, Italy for introduction to Benetti; and

- August 24, 2004, travel from Finland to Sweden to attend Ambush Meeting.

188.   Defendant Linna has engaged in interstate and international travel in violations of 18 U.S.C. § 1952 in furtherance of the IP Conversion Enterprise, including but not limited to, the following occasions:

- October 2000 from Nashville, Tennessee, to Fort Lauderdale, Florida, to attend Fort Lauderdale Boat Show

- October 2003 travel from Helsinki, Finland, to Fort Lauderdale, Florida, to attend Fort Lauderdale Boat Show; and

- August 21, 2004, travel from Helsinki, Finland, to Öregrund, Sweden, to attend the Ambush Meeting.

189.   Defendant MAG by its agent Laitinen has engaged in interstate and international travel in violations of 18 U.S.C. § 1952 and Florida Statute Title XLVI, Section 836.05 in furtherance of the IP Conversion Enterprise, including but not

55

limited to, the following occasions:

- 2003 from Helsinki, Finland, to Viareggio, Italy, for an introduction to Visions East client Benetti;

- November 2003 travel from Helsinki, Finland, to Fort Lauderdale, Florida, to attend Fort Lauderdale Boat Show; and

- August 21, 2004, travel from Helsinki, Finland, to Öregrund, Sweden, to attend Ambush Meeting.

### f.    18 U.S.C. § 1952 and Florida Statute Section 836.0

190.    Each of the RICO Defendants has engaged in interstate and international extortion in violations of 18 U.S.C. § 1952 and Florida Statutes Section 836.05 in furtherance of the IP Conversion Enterprise.

191.    Defendant Fagerdala by its agents Landvik and Thiger has engaged in interstate and international extortion in violations of 18 U.S.C. § 1952 and Florida Statute Title XLVI, Section 836.05 in furtherance of the IP Conversion Enterprise, including but not limited to, the following occasions:

- May 13, 2003, attendance at Espoo, Finland meeting; and

- August 24, 2004, attendance at Öregrund, Sweden Ambush Meeting.

192.    Defendant MAG by its agents Kivela, Fabritius and Laitinen has engaged in interstate and international travel in violations of 18 U.S.C. § 1952 and Florida Statute Title XLVI, Section 836.05 in furtherance of the IP Conversion Enterprise, including but not limited to, the following occasions:

- August 24, 2005, travel from Helsinki, Finland, to Öregrund, Sweden, to attend Ambush Meeting.

193.    Defendant Linna has engaged in interstate and international travel in violations of 18 U.S.C. § 1952 and Florida Statute Title XLVI, Section 836.05 in

furtherance of the IP Conversion Enterprise, including but not limited to, the following occasions:

- April 2000 interstate fax from Tennessee to Morton in Fort Lauderdale concerning the "cruel" world if Morton does not turn over his technology to Linna and Laitinen;

- June 2003 international telephone calls from Finland to Morton in Fort Lauderdale falsely threatening that MAG would back out of the Pre-study Agreement if Morton followed to his lawyers' advice;

- August 24, 2004, attendance at Öregrund, Sweden, "Ambush Meeting"; and

- August 26, 2004, Instant Messenger transmission threatening that Morton "would lose it [Visions East]" if he did not agreed to Defendants' demands at the Ambush Meeting.

194. Defendant Thiger has engaged in interstate and international travel in violations of 18 U.S.C. § 1952 and Florida Statute Title XLVI, Section 836.05 in furtherance of the IP Conversion Enterprise, including but not limited to, the following occasions:

- May 15, 2003, attendance at Öregrund, Sweden meeting; and

- August 24, 2004, attendance at Öregrund, Sweden Ambush Meeting;

195. Each of the RICO Defendants and/or their agents has (a) transmitted multiple fraudulent, false and misleading solicitations for agreements, draft of agreements and final agreement and correspondence relating to such agreements by interstate and international facsimiles and e-mails; and (b) has made numerous interstate and international telephone calls concerning such agreements, which include, but are not limited to multiple non-disclosure agreements, employment agreements, non-compete agreements, non-solicitation agreements, stock transfer agreements, shareholder

agreements, contractor agreements and/or sales agreement in furtherance of the IP Conversion Enterprise. RICO Defendants and their agents have sent such facsimiles and e-mails and directed such telephone calls to (a) Fort Lauderdale, Florida, from Nashville, Tennessee; Helsinki, and Espoo, Finland; and Stockholm, Sweden; (b) between Helsinki and Espoo, Finland, and Stockholm, Sweden; and (c) between Helsinki and Espoo, Finland, and Manchester, UK.

196.    Each of the Defendants named in this Count has engaged in the commission of two or more of the predicate acts within a period of ten years and each has committed at least one act of such racketeering after October 15, 1970, the effective date of RICO.

197.    Each Defendant in this Count participated in the violation of 18 U.S.C. § 1962(c) in one or more capacities as primary actors and/or agents and representatives of one another and/or their aiders and abettors of one another.

E.    **RICO DEFENDANTS' PATTERN OF RACKETEERING CONTINUES**

198.    The activities of the IP Conversion Enterprise is continuing, as evidenced by the continued solicitation of Visions East's customers and potential customers by fraudulent false and misleading means and by the use of Visions East's converted technology as detailed herein. In the absence of effective legal constraint, such activities will continue in the future, as evidenced by MAG's manifest intent to exploit Visions East's intellectual property, confidential customer base and other confidential information. Defendants are in the process of implementing a plan to use the knowledge of Visions East's technology and business plans and prospects that they have unlawfully acquired to increase their penetration of the computer-

controlled robotic preparation, fairing and painting system and services market and to continue their multi-year acquisition-based growth strategy in that market.

199.   The RICO Defendants' (a) conversion of Visions East's technology by MAG's sale to Nautor and their false and misleading offers to Benetti and B+V prior to the August 24, 2004, Ambush Meeting; (b) threats of reprisals and misappropriation and conversion of Visions East's technology made at the Ambush Meeting; and/or (c) acts of conversion and fraud to carry out their threats by continued false, misleading and fraudulent solicitation of Benetti, B+V and Alstom, constitute threats of repetition extending indefinitely into the future and/or are part of the IP Conversion Enterprise's regular way of doing business.

200.   Additionally or alternatively, the RICO Defendants' (a) attempts to misappropriate and convert Visions East technology over a five year period; (b) consummation of that conversion by MAG's sale to Nautor in 2004; (c) MAG's acquisition of RTS and the FlexMill from RTSUK; and/or (d) Fagerdala's multiple acquisitions in the U.S. over an eight-year period constitute long term continuous conduct in the IP Conversion Enterprise in violation of RICO.

## F.   CONTINUITY AND RELATEDNESS OF PATTERN OF RACKETEERING ACTIVITY

201.   Each of the foregoing acts of racketeering by the Defendants is related, continuous and part of a pattern of conduct pertaining to multiple acquisitions and obtaining Confidential Information, including proprietary information and trade secrets, directed at multiple victims including, but not limited to Visions East, its Shareholders, and continuing over a substantial period of time. In addition, Defendant MAG and Linna operated the IP Conversion Enterprise through mail fraud, wire fraud and interstate and

international travel.  The fraudulent scheme furthered by these acts of racketeering is ongoing and continuous. Defendants have indicated their intent to continue their activities complained of.  Accordingly, Defendants have, and are, engaged in a continuing and related pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5).

### G.   CONDUCT OF ENTERPRISE AFFECTS INTERSTATE AND FOREIGN COMMERCE

202.   The IP Conversion Enterprise engages in, and its activities affect, interstate and foreign commerce, by including, but not limited to, its involvement in (a) U.S. interstate and foreign acquisitions of corporations and their technology; (b) entering and breaching U.S. and foreign commercial agreements; (c) misappropriating U.S. and foreign intellectual property and taking such intellectual property across state lines and across international boundaries; (d) U.S. and foreign false advertising; (e) engaging in U.S. interstate and international communications within the meaning of; (f) interstate and international travel; and extorting and (h) selling and offering for sale computer, robotic and software products in interstate and foreign commerce.

### H.   RICO INJURY

203.   As a direct and proximate result of the Defendants' participation in and conduct of the affairs of the Acquisition Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), Visions East, its shareholders and others as yet unknown have been injured in their business and property.

**WHEREFORE**, Visions East and Morton pray for judgment in its favor against the RICO Defendants as follows:

A.      That a preliminary and a permanent injunction be entered against the RICO Defendants' IP Conversion Enterprise and its conspirator-members enjoining their conspiracy and acts in furtherance thereof;

B.      That Visions East be awarded three-fold the damages they have suffered pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), their cost of suit and reasonable attorneys fees thereon, from the RICO Defendants;

C.      That Visions East be granted such other and further relief as this Court deems just and proper.

### Count 5

### Declaratory Judgment

204.   Plaintiff Visions East hereby incorporates paragraphs 1- 203 by reference as if fully set forth herein.

205.   Visions East entered into non-disclosure agreements with Defendants MAG, FTMS and Linna as a pre-condition to disclosing its technology and confidential information to them.

206.   MAG, Visions East's systems integration vendor, agreed that nothing in the VE-MAG Confidentiality Agreement (Exhibit G) would transfer any of Visions East's intellectual property rights to MAG.

207.   Linna made knowing, material misrepresentations to Morton on behalf of MAG to weaken Visions East's rights under the Pre-study Agreement.

208.   MAG is currently offering Visions East's patented technology for sale, VEbot™ System and know-how as its own.

209.   FTMS, Visions East's customer and investor, took delivery of Visions East's

system subject to the EU's Orgalime protocol.

210.    FTMS is currently offering for sale Visions East's intellectual property, technology and system as its own.

211.    Visions East believes and contends that the intellectual property offered for sale by MAG and FTMS belongs exclusively to Visions East and that neither MAG nor FTMS have any assignment thereof or license thereto.

212.    Visions East has given MAG and FTMS formal notice that they are infringing Visions East's proprietary intellectual property rights and has demanded that they permanently discontinue such infringing activities.

213.    MAG and FTMS have failed to discontinue their infringing activities and have refused to provide any assurances to Visions East that they will do so,

214.    Each Defendant has taken adverse positions on the ownership of, is adverse to Visions East and there exists a genuine case and controversy concerning the intellectual property rights at issue, including, but not limited to Visions East's proprietary know-how, Surfmodeler™ Software, vendors and customer lists.

**WHEREFORE**, Visions East and Morton pray for judgment in its favor against Defendants as follows:

A.    Declaring that Visions East is the rightful and exclusive owner of intellectual property in any form represented in the system it sold to FTMS, including, but not limited to, any intellectual property developed by MAG under the Pre-study Agreement with Visions East; and

B.    That Visions East be granted such other and further relief as this Court deems just and proper.

## Count 6

## Computer Fraud and Abuse
(Visions East against Linna)

215.     Visions East hereby incorporates paragraphs 1-214 by reference as if fully set forth herein.

216.     The computer system on which Visions East's confidential information, trade secrets and proprietary information reside is a computer used in interstate and foreign commerce and communications and consequently is protected under 18 U.S.C. § 1030.

217.     Linna has intentionally accessed and continues to access the password protected portions of Visions East's computer system without Visions East's authorization.

218.     Linna has accessed the password protected portions of Visions East's computer system to take Visions East's Intellectual Property to post it on Linna's server.

219.     Linna's unauthorized access of a protected computer has caused and is continuing to cause damage to Visions East that has amounted to an aggregated loss of at least $5,000 during a one-year period.

220.     Linna's unauthorized access of Visions East's protected computer has harmed and will continue to harm Visions East.  As a result, Visions East has suffered and will continue to suffer losses and irreparable injury in amounts to be determined.

221.     Visions East requested Linna to return Visions East's laptop and desktop computers immediately and without deletion of data.

222.     Linna accessed Visions East's laptop and desktop computers without authority from Visions East to run a data deletion program on both computers.

223.     Linna's delay in returning Visions East's laptop and desktop computers to Visions East and his unauthorized access to Visions East's laptop and desktop computers to delete data caused injury to Visions East.

224.     Visions East's remedy at law is inadequate to compensate for the injuries inflicted by Linna on Visions East.

**WHEREFORE**, Visions East prays for judgment in its favor against Linna as follows:

A.     An award of compensatory damages in an amount to be determined in accordance with the evidence and the law;

B.     Entry of temporary, preliminary and permanent injunctive relief; and

C.     Such other and further relief as this Court deems just and proper.

### Count 7

### Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. 501.201 _et seq._
(Visions East against FTMS, MAG, Linna and Thiger)

225.     Visions East hereby incorporates paragraphs 1-224 by reference as if fully set forth herein.

226.     FTMS, MAG, Linna and Thiger have engaged in unfair competition and unconscionable acts and practices and unfair or deceptive acts or practices in the conduct of FTMS and MAG's businesses ("Deceptive Trade Practices") in violation of Section 501.204 Fla. Stat. (2004). Defendants' Deceptive Trade Practices include but are not limited to numerous false and deceptive statements to consumers.

227.     FTMS has made false and deceptive statements about Visions East's technology and its ownership on its Website and for publication on other Websites and in printed publications.

228.    Thiger was in control of FTMS and approved FTMS's publication of false and deceptive statements.

229.    MAG has made false and deceptive statements about Visions East, Visions East's technology and its ownership on its Website, in the FlexMill PowerPoint presentation, in mass e-mails to Visions East's customer list, in targeted e-mails soliciting Visions East customers and for publication on other Websites and in printed publications.

230.    Linna has made and/or controlled the making of false and deceptive statements by MAG, including but not limited to the preparation and dissemination of the FlexMill PowerPoint presentation.

231.    Customers and potential customers of Visions East have been confused and misled by FTMS, MAG, Linna and Thiger's false and deceptive statements into believing that (a) they were purchasing an authorized Visions East VEbot™ System; (b) FTMS and MAG owned or had authorized access to Visions East's technology and proprietary know-how; and/or (c) that some question existed as to as to the rightful ownership and access to such technology and proprietary know-how.

232.    FTMS, MAG, Linna and Thigers actions have caused and, unless enjoined, will continue to cause irreparable damage to Visions East.

**WHEREFORE**, Visions East prays for judgment in its favor against Defendants FTMS, MAG, Linna and Thiger as follows:

A.    An award of actual damages pursuant to Section 501.211(1) Fla. Stat. (2004) in an amount to be determined in accordance with the evidence and the law;

B.    An award of punitive damages;

C.    Entry of temporary, preliminary and permanent injunctive relief pursuant to

Section 501.211(1), Fla. Stat. (2004);

      D.     An award of Visions East's costs and attorneys' fees pursuant to Sections

501.2105(1) and/or 501.211, Fla. Stat. (2004); and

      D.     Such other and further relief as this Court deems just and proper.

### Count 8

### Misappropriation of Trade Secrets Act, Fla. Stats. 688
(Visions East against MAG and Linna)

    233.     Visions East hereby incorporates paragraphs 1-232 by reference as if fully set forth herein.

    234.     The proprietary information, know-how and work-product (a) resulting from the Pre-Study Agreement and the installation of the VEbot™ System at FTMS, including but not limited to the Surfmodeler™ Software, Safeexper software, drawings, system specifications, 9-axis robot operational techniques, instruction manuals and photographs and (b) Visions East's customer lists, supplier lists, pricing and proposals to customers meet all the prerequisites for protectable trade secrets under Chapter 688, Fla. Stats.

    235.     Defendants MAG and Linna have misappropriated Visions East's trade secrets in violation of Chapter 688, Fla. Stats.

    236.     Visions East has been injured and has incurred damages by reason of MAG and Linna's misappropriation of its trade secrets and is likely to suffer irreparable injury unless MAG and Linna's activities are temporarily restrained, preliminarily enjoined and then permanently enjoined.

    237.     MAG and Linna's misappropriation of Visions East's trade secrets is willful and malicious so as to justify an award of exemplary damages under Section 688.004(2)

Fla. Stat (2004).

**WHEREFORE**, Visions East prays for judgment in its favor against Defendants FTMS, MAG, Linna and Thiger as follows:

A. An award of actual damages pursuant to Section 688.004(1), Fla. Stats. in an amount to be determined in accordance with the evidence and the law;

B. An award of exemplary damages pursuant to Section 688.004(2), Fla. Stat. (2004);

C. Entry of temporary, preliminary and permanent injunctive relief pursuant to Section 688.003, Fla. Stat. (2004);

D. An award of Visions East's costs and attorneys' fees pursuant to Section 688.005; and

E. Such other and further relief as this Court deems just and proper.

## Count 9

### Tortious Interference with Business Relationships

238.    Visions East hereby incorporates paragraphs 1-237 by reference as if fully set forth herein.

239.    Visions East entered into contractual relationships with MAG, FTMS and Linna, including the VE-MAG Confidentiality Agreement dated May 6, 2003, (Exhibit G), the VE-Linna Employment Agreement (Exhibit D), the VE-Linna Non-Competition and Non-Solicitation Agreement (Exhibit E), and the VE-Linna Non-Disclosure and Development Agreement dated May 5, 2003 (Exhibit F) (collectively "the Agreements").

240.    The Agreements provided Visions East with advantageous business relationships and legal rights.

241.    Visions East also had advantageous business relationships, and a reasonable expectation of advantageous business relationships, with existing and potential customers of its proprietary products and services.

242.    Defendants intentionally and unjustifiably interfered with Visions East's existing and potential business relationships by the following acts, among others:

      a.    The acts by Defendant MAG to (1) cause Linna to resign from Visions East, (2) hire Linna, (3) to importune induce or cause Linna to: (i) disclose Visions East's Proprietary information, (ii) compete with Visions East and to enable MAG to compete with Visions East, and (iii) solicit Visions East's customers and potential customers, including, but not limited to Benetti, Blohm+Voss and Alstom;

      b.    The acts by Defendant Linna to (1) aid and abet MAG's misappropriation of Visions East's Proprietary Information, (2) prepare false and misleading advertising, (3) solicit Visions East's customers and potential customers, and (4) convert confidential information and communications on Visions East's laptop computer in Linna's custody;

      c.    The acts by Defendant FTMS to (1) delay completion and commissioning of Visions East's system at FTMS, and (2) misrepresent the status of Visions East's system at FTMS;

      d.    The acts by Thiger to (1) delay completion and commissioning of Visions East's system at FTMS, (2) misrepresent the status of Visions East's system at FTMS, and (3) misrepresent and conceal Linna's active involvement with and employment by MAG in violation of the

VE-Linna Non-Competition and Non-Solicitation Agreement (Exhibit E).

243.    Visions East has been injured and has suffered damages as a result of Defendants' intentional and unjustified interference.

**WHEREFORE**, Plaintiff Visions East prays for judgment in its favor against Defendants as follows:

A.    Temporary, preliminary and permanent injunctive relief barring further tortious interference by Defendants;

B.    Awarding damages to Visions East in an amount to be determined in accordance with the evidence and the law;

C.    Awarding Visions East costs; and

D.    Granting Visions East such other and further relief as this Court deems just and proper.

## Count 10

## Common Law Conspiracy to Induce Breach of Contract

244.    Visions East hereby incorporates paragraphs 1-243 by reference as if fully set forth herein.

245.    Defendants MAG, FTMS, Linna and Thiger, starting while Linna was employed by Visions East and continuing after Linna resigned, engaged in concerted activity such as to form a conspiracy with the common purpose of inducing each other to breach their respective agreements with and contractual obligations to Visions East.

246.    The conspiracy of Defendants and others who are not yet known possessed

peculiar powers of influence, by virtue of their positions as a vendor to, customer of, employee and member of the board of directors of Visions East.

247.    The Defendants used the conspiracy for their own economic gain in pursuit of an unlawful scheme to breach their contracts with and obligations to Visions East and to convert Visions East's intellectual property to themselves, misappropriate and convert Visions East's customers, potential customers and business opportunities to themselves.

248.    Defendants' conspiracy and the resulting induced breaches of multiple contracts caused injury and damages to Visions East.

**WHEREFORE**, Plaintiff Visions East prays for judgment in its favor and against Defendants as follows:

A.    Awarding damages to Visions East against Defendants in amounts to be determined in accordance with the evidence and the law;

B.    Awarding Visions East costs; and

C.    Granting Visions East such other and further relief as this Court deems just and proper.

## Count 11

### Tortious Interference with Contractual Relationship
(Visions East against MAG)

249.    Visions East hereby incorporates paragraphs 1-248 by reference as fully set forth herein.

250.    MAG was and is aware of the existence of the VE-Linna Non-Competition and Non-Solicitation Agreement (Exhibit E) and the VE-Linna Non-Disclosure and Developments Agreement (Exhibit F). In disregard of Visions East's rights and Linna's

obligations under those Agreements, MAG hired Linna and continues to keep him in its employ as its sales manager for, among other things, soliciting Visions East's customers and using Visions East's confidential information to enable MAG to compete against Visions East in the marine industry robotic fairing, sanding, preparing and finishing market.

251.   Plaintiff has been damaged thereby.

**WHEREFORE**, Visions East prays for judgment against Defendant MAG as follows:

A.      Temporary and permanent injunctive relief in accordance with Linna's agreements with Visions East, enjoining MAG from participating in, inducing, encouraging or permitting any violations of the VE-Linna Non-Competition and Non-Solicitation Agreement and the VE-Linna Non-Disclosure and Developments Agreement, including without limitation Linna's solicitation of Visions East's customers and Linna working in pursuit of MAG's or third party's efforts to enter the market for computer controlled robotic preparation, fairing and painting systems for marine vessels;

B.      Awarding of damages in favor of Visions East against MAG;

C.      Awarding costs in favor of Visions East against Linna in an amount to be determined in accordance with the evidence and the law;

D.      Awarding punitive damages in favor of Visions East in an amount to be determined; and

E.      Granting Visions East such other and further relief as this Court deems just and proper.

## Count 12

### Breach of Fiduciary Relationship
(Visions East against FTMS, Thiger)

252.     Visions East hereby incorporates paragraphs 1-251 by reference as if fully set forth herein.

253.     Defendant Thiger, as a Visions East director from 2003 to date, has a fiduciary duty to Visions East and its shareholders.  A director's fiduciary obligation includes a duty of loyalty and obligates the director to avoid fraud, bad faith, usurpation of corporate opportunities and self-dealing.   Corporate directors must also exercise good faith, due care and act in the company's best interests, pursuant to Section 607.0830(1) Fla. Stat. (2004).

254.     Defendant Thiger breached his fiduciary duty to Visions East and failed to exercise good faith and due care and failed to act in Visions East's best interest, in violation of Section 607.0830(1) by, among other things:

> a.     Conspiring with Defendants MAG, Linna, FTMS and Fagerdala and taking actions to secure Visions East's business opportunities for MAG and FTMS;
>
> b.     Conspiring with Defendants MAG, Linna, FTMS and Fagerdala and taking actions to take over Visions East as a Division of MAG; and
>
> c.     Misrepresenting the status of Visions East's installation at FTMS to Visions East's customers and potential customers, including but not limited to Nautor, Benetti, B+V, Alstom and Fitzgerald.

255.   Defendant Thiger's breach of his fiduciary duty to Visions East has damaged

Visions East's business and property, by among other things, lost sales, lost profits, increased costs and diminished capital value.

**WHEREFORE** Plaintiffs Visions East prays for judgment against Thiger as follows:

A.      Awarding compensatory damages to Visions East against Thiger in an amount to be determined in accordance with the evidence and the law;

B.      Awarding punitive damages in favor of Visions East against Thiger in an amount to be determined;

C.      Awarding Visions East's costs; and

D.      Granting Visions East such other and further relief as this Court deems just and proper.

## Count 13

### Breach of Fiduciary Relationship
(Visions East against Linna)

256.      Visions East hereby incorporates paragraphs 1-255 by reference as if fully set forth herein.

257.      From May 5, 2003, until February 16, 2005, Defendant Linna was an employee and officer of Visions East.  Defendant Linna, as a Visions East officer and employee had a fiduciary duty to Visions East.  An officer and employee's fiduciary obligation includes a duty of loyalty, and obligates the officer and employee to avoid fraud, bad faith, usurpation of corporate opportunities and self-dealing.   Linna had the trust and confidence of Visions East and its shareholders.  Linna expressly encouraged and accepted that trust and confidence, which was required by the relationship between Linna and Visions East. Corporate officers and employees must also exercise good faith,

due care, and act in the company's best interests.

258.   Defendant Linna breached his fiduciary duty to Visions East and failed to exercise good faith and due care and failed to act in the best interest of Visions East by, among other things:

      a.   Conspiring with Defendant MAG to weaken Visions East's rights under the June 23, 2003, Pre-study Agreement;

      b.   Conspiring with Defendants MAG, FTMS, Fagerdala and Thiger to secure Visions East's business opportunities for MAG and FTMS;

      c.   Conspiring with Defendants MAG, FTMS, Fagerdala and Thiger to take over Visions East as a Division of MAG; and

      d.   Misrepresenting the ownership of Visions East's technology to Visions East customers and potential customers, including but not limited to Nautor, Benetti, B+V, Alstom and Fitzgerald.

259.   Defendant Linna's breach of his fiduciary duty to Visions East has damaged Visions East's business and property, by among other things, lost sales, lost profits increased costs and diminished capital value.

**WHEREFORE** Plaintiffs Visions East prays for judgment against Linna as follows:

A.   Awarding compensatory damages in favor of Visions East against Thiger in an amount to be determined in accordance with the evidence and the law;

B.   Awarding of punitive damages in favor of Visions East in an amount to be determined;

C.   Awarding Visions East costs; and

D.   Granting Visions East such other and further relief as this Court deems just

74

and proper.

## Count 14

### Breach of Contract
(Visions East against FTMS)

260.    Plaintiff Visions East hereby incorporates paragraphs 1-259 by reference as if fully set forth herein.

261.    Visions East and Defendant FTMS entered into a series of agreements, including Article 6 of the Shareholder Agreement of May 2, 2003 (excerpted as Exhibit I), whereby FTMS agreed not to disclose Visions East's confidential information except in the performance of its duties thereunder.

262.    FTMS breached the confidentiality provisions of his agreements with Visions East by, among other things, providing confidential information to MAG, Fagerdala, and others not yet known without authorization by Visions East management.

263.    FTMS's breaches of its agreement with Visions East have injured and damaged Visions East.

**WHEREFORE** Plaintiff Visions East prays for judgment against Defendant FTMS as follows:

A.      Temporary and permanent injunctive relief in accordance with the agreements, enjoining FTMS from using and disclosing Visions East's confidential information, assisting MAG in soliciting customers and from assisting MAG's or third parties' efforts to enter the market for computer controlled robotic preparation, fairing and painting systems for marine vessels.

B.      Awarding damages in favor of Visions East against FTMS in an amount to be

determined in accordance with the evidence and the law;

      C.     Awarding Visions East costs; and

      D.     Granting Visions East such other and further relief as this Court deems just and proper.

### Count 15

### Breach of Contract
(Visions East against MAG)

264.    Plaintiff Visions East hereby incorporates paragraphs 1-263 by reference as if fully set forth herein.

265.    Visions East and Defendant MAG and its predessors in interest entered into a series of agreements, including the RTS Confidential Disclosure Agreement dated November 12, 1999 (Exhibit C), the VE-MAG NDA (Exhibit G), and the Pre-Study Agreement (Exhibit H) whereby MAG, its predessors and its officers and employees agreed not to use or disclose Visions East's confidential information for purposes other than the objectives of the respective agreements.

266.    MAG breached the confidentiality provisions of his agreements with Visions East by, among other things, using and disclosing Visions East's confidential information to others, without authorization by Visions East management, to facilitate their entry into the market for computer controlled robotic preparation, fairing and painting systems for marine vessels, and to unlawfully and unfairly compete with Visions East.

267.    MAG breached the non-solicitation provisions of his agreements with Visions East by:

        a.     Preparing the FlexMill PowerPoint presentation and other closely

related and similar PowerPoint slide shows and sending them to
customers and potential customers of Visions East;

b.      Soliciting and obtaining a contract for MAG to sell and install a
computer controlled robotic preparation, fair and painting system to
Nautor; and

c.      Soliciting Benetti, B+V, Alstom and Fitzgerald.

268.    MAG's breaches of his agreements with Visions East have injured and
damaged Visions East.

**WHEREFORE** Plaintiff Visions East prays for judgment against Defendant MAG as
follows:

A.      Temporary and permanent injunctive relief in accordance with the
agreements, enjoining MAG from using and disclosing Visions East's confidential
information to compete with Visions East and soliciting its customers and from working in
pursuit of MAG's or third partys' efforts to enter the market for computer controlled robotic
preparation, fairing and painting systems for marine vessels.

B.      Awarding damages in favor of Visions East against MAG in an amount to be
determined in accordance with the evidence and the law;

C.      Awarding Visions East costs; and

D.      Granting Visions East such other and further relief as this Court deems just
and proper.

## Count 16

### Breach of Contract
(Visions East against Linna)

77

269.   Plaintiff Visions East hereby incorporates paragraphs 1-268 by reference as if fully set forth herein.

270.   Visions East and Defendant Linna entered into a series of agreements, including the VE-Linna Non-Competition and Non-Solicitation Agreement (Exhibit E) and the VE-Linna Non-Disclosure and Development Agreement (Exhibit F), whereby Linna agreed not to compete with Visions East for a period of two years following termination of his employment with Visions East, not to solicit Visions East's customers for a period of two years following termination of his employment with Visions East, and not to use Visions East's confidential information.

271.   Linna breached the confidentiality provisions of his agreements with Visions East while still employed by Visions East by, among other things, providing confidential information to MAG, FTMS and Thiger without authorization by Visions East management.

272.   Linna breached the non-competition provisions of his agreements with Visions East by his acceptance of employment by MAG within weeks of his resignation from Visions East in February 2005 for the purpose of leading MAG's effort to enter the market for computer controlled robotic preparation, fairing and painting systems for marine vessels in competition with Visions east.

273.   Linna breached the non-solicitation provisions of his agreements with Visions East by:

   a.   Preparing the FlexMill PowerPoint presentation and other closely related and similar PowerPoint slide shows and sending them to customers and potential customers of Visions East;

b.      Soliciting and obtaining a contract for MAG to sell and install a computer controlled robotic preparation, fair and painting system to Nautor; and

c.      Soliciting Benetti, B+V, Alstom and Fitzgerald.

274.    Linna's breaches of his agreements with Visions East have injured and damaged Visions East.

**WHEREFORE** Plaintiff Visions East prays for judgment against Defendant Linna as follows:

A.      Temporary and permanent injunctive relief in accordance with the agreements, enjoining Linna from using Visions East's confidential information, competing with Visions East and soliciting its customers and from working in pursuit of MAG's or third party's efforts to enter the market for computer controlled robotic preparation, fairing and painting systems for marine vessels.

B.      Awarding damages in favor of Visions East against Linna in an amount to be determined in accordance with the evidence and the law;

C.      Awarding Visions East costs; and

D.      Granting Visions East such other and further relief as this Court deems just and proper.

## Count 17

### Fraud
(Morton against FTMS and Thiger)

275.    Plaintiff Morton hereby incorporates paragraphs 1-274 by reference as if fully set forth herein.

276.    Defendants FTMS and Thiger made certain representations to Morton to induce Morton to sell FTMS 22.5% of Visions East common stock to FTMS.  The representations included the following:

        a.    On or before May 2, 2003, Defendant Thiger represented to Morton that FTMS's stock purchase was for investment in Visions East; and

        b.    On or before May 2, 2003, Defendant Thiger represented to Morton that FTMS's investment would help its growth and development in marine robotics.

277.    Defendants FTMS and Thiger's representations were false.

278.    Defendants FTMS and Thiger knew that the representations were false at the time they were made.

279.    Defendants FTMS and Thiger owed Morton a duty of good faith and fair dealing in negotiating FTMS's purchase of Visions East shares from Morton.

280.    Defendants FTMS and Thiger 's duty of good faith and fair dealing included the following:

        a.    Disclosure to Morton that FTMS and Thiger were conspiring with MAG and Linna to misappropriate and convert to themselves Visions East's technology intellectual property, customers and business opportunities

80

as their own;

b.      Disclosure to Visions East that MAG and FTMS intended to compete with Visions East in the manufacture and sale of computer controlled robotic preparation, fairing and painting systems for marine vessels as soon as Defendants learned Visions East's technology, intellectual property and customers;

c.      Disclosure to Visions East that Thiger considered FTMS's interest in Visions East secondary to his interest in his "investment in Öregrund," FTMS's shipyard at which Visions East's system was installed; and

d.      Disclosure that even before the completion of the installation and commissioning of Visions East's system in Öregrund, Thiger and FTMS would seek to sell the system in competition with Visions East.

281.    The information that FTMS and Thiger withheld from Morton during the negotiations from early 2003 until May 2003 was material, in that disclosure of the information would have caused Morton not have sold his shares to FTMS.

282.    Plaintiff Morton relied upon Thiger's representations in deciding to sell a 22.5% of the outstanding shares of Visions East to FTMS for $2 million.

283.    Plaintiff Morton was injured and damaged by Thiger and FTMS's misrepresentations and material omissions.

**WHEREFORE** Plaintiff Morton prays for judgment against FTMS and Thiger as follows:

A.      Ordering the return of FTMS's shares of Visions East to Morton by FTMS and Thiger;

B.      Awarding compensatory damages in favor of Morton against FTMS and Thiger in an amount to be determined in accordance with the evidence and the law;

C.      Awarding punitive damages in favor of Morton against FTMS and Thiger in an amount to be determined; and

D.      Granting Visions East such other and further relief as this Court deems just and proper.

### Count 18

### Unjust Enrichment (Alternative)
(Visions East and Morton against each Defendant)

284.      Visions East hereby incorporates paragraphs 1-283 by reference as fully set forth herein.

285.      Defendants MAG, FTMS, Fagerdala, Linna and Thiger knowingly benefited and continue to unjustly benefit from the conduct alleged herein.  Defendants have accepted the benefit of their fraudulent and tortious conduct, and never compensated Visions East for their unauthorized sale of Visions East's VEbot™ System to Nautor and other possible purchasers as yet unknown.

286.      Defendants have been unjustly enriched to the detriment of Visions East.

287.      Visions East's remedy at law is inadequate to compensate for the injuries inflicted by Defendants on Visions East.

**WHEREFORE**, Visions East prays for judgment against Defendant MAG as follows:

A.      Ordering each Defendant to disgorge its ill-gotten gains;

B.      Awarding Visions East and Morton the Defendants' disgorged ill-gotten gains; and

82

C.    Granting Visions East such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs Visions East and Morton hereby demand a trial by jury for all issues triable to a jury.

Dated: July 28, 2005                              Respectfully submitted,

*Scott Edgett* #576719

                                                  *for* Peter C. Commette (#350133)
L. Peter Farkas                                   LAW OFFICES OF
Robert H. Morse                                   PETER M. COMMETTE, PA
FARKAS + MORSE LLP                                1323 Southeast Third Avenue
1101 30th Street NW                               Fort Lauderdale, Florida 33316
Washington, D.C. 20007

202.337.7200                                      954-764-0005

*Counsel for Plaintiffs Visions East, Inc., and*
*John Stephen Morton*

## VERIFICATION

DECLARATION OF JOHN STEPHEN MORTON

I, John Stephen Morton, declare as follows in verification of the foregoing Complaint:

     1.    I am President of Visions East, Inc. ("Visions East"), plaintiff in this matter, as well as a plaintiff in my personal capacity.

     2.    I make this declaration upon personal knowledge except as stated on information and belief, and as to those matters I believe them to be true.

     3.    I have reviewed the foregoing Complaint and declare based on personal knowledge that the factual statements therein as to matters in which I am personally involved are true and correct.  I also declare that I am informed and believe based on the sources within and outside Visions East that all other factual statements in the Complaint are true and correct.

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT.  EXECUTED THE 28th DAY OF JULY 2005 AT FORT LAUDERDALE, FLORIDA.

John Stephen Morton

# EXHIBIT A

US006365221B1

(12) **United States Patent**
Morton

(10) Patent No.: **US 6,365,221 B1**
(45) Date of Patent: **Apr. 2, 2002**

(54) **COMPUTER CONTROLLED METHOD AND APPARATUS FOR FAIRING AND PAINTING OF MARINE VESSEL SURFACES**

(75) Inventor: **John Stephen Morton**, Fort Lauderdale, FL (US)

(73) Assignee: **Visions East, Inc.**, Ft. Lauderdale, FL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/447,973**

(22) Filed: **Nov. 23, 1999**

(51) Int. Cl.[7] .......................... **B05C 13/00**; B32B 35/00
(52) U.S. Cl. ........................................ **427/140**; 427/142
(58) Field of Search ................................. 427/140, 142

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,498,414 A | 2/1985 | Kiba et al. | ................. | 118/663 |
| 4,532,148 A | 7/1985 | Vecellio | ................. | 427/31 |
| 4,599,967 A | * 7/1986 | Murphy et al. | ................. | 118/72 |
| 4,649,858 A | * 3/1987 | Sakai et al. | ................. | 118/697 |
| 4,693,664 A | * 9/1987 | Schweiker | ................. | 414/735 |
| 4,986,664 A | * 1/1991 | Lovoi | ................. | 356/376 |

| | | | | |
|---|---|---|---|---|
| 5,067,085 A | * 11/1991 | Wenzel et al. | ......... | 364/474.06 |
| 5,336,304 A | 8/1994 | Andoc | ................. | 106/18.32 |
| 5,571,312 A | 11/1996 | Andoc | ................. | 106/18.32 |
| 5,737,227 A | 4/1998 | Greenfield et al. | ...... | 364/464.1 |
| 5,947,051 A | * 9/1999 | Geiger | ................. | 114/313 |
| 5,979,001 A | * 11/1999 | Marrero | ................. | 15/53.1 |
| 5,997,951 A | * 12/1999 | Hein | ................. | 427/299 |
| 6,189,473 B1 | * 2/2001 | Appel et al. | ................. | 114/222 |

OTHER PUBLICATIONS

Pike, Capt. Bill, "Special Ops", *Power& Motoryacht*, Sep. 1999, pp. 96–101.
Barry, Christopher, "CAD/CAM and Fiberglass Tooling", *Professional Boatbuilder*, Oct/Nov. 1999, p102.

* cited by examiner

*Primary Examiner*—Shrive P. Beck
*Assistant Examiner*—Jennifer Kolb Michener
(74) *Attorney, Agent, or Firm*—Stanley J. Yavner

(57) **ABSTRACT**

A computer controlled method utilizing robots for the fairing and painting of marine vessel surfaces comprising the steps of analyzing the vessel hull and/or superstructure for imperfections; applying a fairing compound to the imperfections; smoothing the imperfections into alignment with the hull and/or superstructure; and applying a final paint finish to the hull and/or superstructure.

**4 Claims, 4 Drawing Sheets**





**FIG. 1**



FIG. 2



FIG. 3



FIG. 4A

FIG. 4B

FIG. 4C

FIG. 4D

FIG. 4A

FIG. 4B

FIG. 4C

FIG. 4D

3
4

correct the detected imperfections in a marine vessel's hull or superstructure by utilizing spraying equipment to apply the compound.

Another object of the invention is to use robots to sand the fairing compound once it has been applied to the vessel in order to achieve a smooth surface by use of a milling or sanding head.

A still further object of the invention is to remove, from the work area, the fairing compound dust created by the sanding process by a vacuum tube or other similar cleaning means.

A still further object of the invention is to use robots to apply the final paint coat to the vessel surface by utilizing spraying equipment to apply the paint.

A still further object is to provide moveable means for the robots for the purpose of allowing the robots complete access to the vessel's hull and superstructure surfaces.

Another object of the invention is to provide the robots with interchangeable heads for accomplishing the tasks of analyzing the hull for imperfections, applying fairing compound, sanding the hull and painting.

The above objects and advantages of the present invention will become apparent from the following description and appended claims, taken in conjunction with the accompanying drawings which show by way of example some preferred embodiments of the invention.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a plan view of a vessel located in the operational area of the automated fairing system and approximate layout of said system according to the present invention;

FIG. 2 is a perspective view of the automated fairing system including a gantry mounted robot, according to a preferred embodiment;

FIG. 3 is an elevational side view illustrating a track mounted fairing robot and a gantry mounted robot as utilized in the automated fairing system and method according to the present invention; and

FIGS. 4A–4D are perspective views of the various heads to be used in conjunction with the robots according to the present invention.

## DETAILED DESCRIPTION OF INVENTION

Referring to the drawings, and more particularly FIG. 1 thereof, an automated fairing system 10 is shown which includes a controller 12 for directing the movement of robots 14. Said controller is capable of receiving various electrical input signals for initiating the operation of the robots 14 in accordance with a preprogrammed sequence of operation. The robots 14 are located on parallel tracks 16 for movement along the longitudinal axis of the marine vessel 18. The vessel 18 is situated in the operational area of the robots 14, between the tracks 16, allowing said robots complete access along the length of the vessel 18.

FIG. 2 represents a perspective view of an alternative embodiment of the system 10, in which the robots 14 on tracks 16 can be seen working on the vessel 18 in conjunction with a gantry 20 and gantry mounted robot 22, said gantry 20 and gantry mounted robot 22 are also controlled by the controller 12. According to the alternative embodiment, the gantry 20 would have the capability of linear movement 24 up and down the longitudinal axis of the vessel 18 and the robot 22 on the gantry 20 is would have side to side movement and telescoping means 35 to raise or

lower to the work surface. As stated in the description of FIG. 1, this invention operates with, and the apparatus thereof includes, robots 14 (FIG. 1), without a gantry 20. Additionally, when using gantry 20, various alternative structures are operative within the bounds of this invention, such as when the "legs", as are shown in FIG. 2, or with "legs" as shown but suspending the gantry from above.

As can be seen in FIG. 3, the robots, 14 and 22, are hydraulically operated units which include a base 30, a primary arm 32, a secondary arm 34 and a wrist 36 that terminates in a support head 38, which interlocks with any one of the interchangeable tools 50, 60, 70 and 80. The controller 12 and the base 30, the primary arm 32, the secondary arm 34, the wrist 36, the support head 38 and the interchangeable tools 50, 60, 70, and 80 are operatively connected for achieving the end result of movement of the interchangeable tools 50, 60, 70, and 80 in a desired manner.

FIGS. 4A–4D illustrate the various interchangeable tools 50, 60, 70, and 80 as utilized in the automated fairing system 10. The optional analyzer tool 50 in FIG. 4A is used for analyzing the vessel's surface 19, through the use of surface mapping laser or radar 53, This tool is affixed using a connective means 51 which interlocks with wrist 36. The analyzing process may be accomplished with the analyzing means attached to the base 30 of the robots 14 and 22 rather than at the end of the secondary arm 34.

The fairing compound application tool 60 in FIG. 4B, employs a spray nozzle 62 supplied with compressed air 64 and fairing compound 66 through hoses 65 and 67 respectively. The tool is affixed using a connective means 61 that interlocks with the wrist 36.

FIG. 4C portrays an interchangeable sanding tool 70 useable for sanding the areas treated with fairing compound 66. The tool uses a means for sanding 72 in conjunction with a vacuum hose 74 for the removal of the toxic dust created from smoothing the fairing compound 66. A hood 76 encloses the sanding means 72 and the vacuum hose 74 the vacuum hose projecting through the tool 70 and within the hood 76, proximate sanding means 72, which is not shown in the drawing of FIG. 4C for the sake of clarity, but is to be understood that way, as previously described herein. The hood 76 is used to prevent the dust from escaping and is also used to enhance the suction capability of the vacuum 74. The sanding tool 70 is interchangeably affixed to the wrist 36 by a connective means 71. Also, usable for cleaning the surfaces, analyzed and treated with fairing compound 66, are various alternative means; e.g. a water-blasting means is used in one of the tools, but this requires sufficient connections for handling water, and this potentially requires a drying means for use after the water-blasting or power-washing. When water-blasting is used for cleaning, the pressure is adjusted for the size of the vessel (less for a yacht, than for a large ship). Furthermore, particularly with large ships, the present invention method involves only the steps of positioning the vessel, cleaning with water-blasting, and analyzing for imperfections or contours before repairing and/or painting.

An interchangeable painting tool 80 is shown in FIG. 4D, a perspective view. Paint 86 is applied through a spray nozzle 82 that is supplied by hoses 85 and 87 with compressed air 84 and paint 86 respectively. The painting tool 80 is interchangeably affixed to the wrist 36 by a connective means 81.

It will be understood that the preferred embodiments of the present invention has been disclosed by way of example and that other modifications and alterations may occur to

US 6,365,221 B1

5

those skilled in the art without departing from the scope and spirit of the appended claims.

What is claimed is:

1. A computer-implemented method for fairing and painting the entire hull and/or superstructure of a marine vessel, utilizing a robot system which includes multiple robots positioned on moveable means and having arms provided with various attachments, moveable about various control axes, comprising the steps of:

   A. Positioning said marine vessel so as to provide said robots access to said hull and superstructure;

   B. Analyzing said vessel's hull and superstructure for imperfections, wherein this analyzing step includes utilizing lasers, affixed to the robots, in a surface mapping system;

   C. Applying a fairing compound to said imperfections;

   D. Sanding said fairing compound in alignment with said hull and/or superstructure;

   E. Removing any compound dust generated by the sanding process; and

   F. Painting said hull and/or superstructure.

2. A computer-implemented method for fairing and painting the entire hull and/or superstructure of a marine vessel, utilizing a robot system which includes multiple robots positioned on moveable means and having arms provided with various attachments, moveable about various control axes, comprising the steps of:

   A. Positioning said marine vessel so as to provide said robots access to said hull and superstructure;

   B. Analyzing said vessel's hull and superstructure for imperfections, wherein this analyzing step includes utilizing radar, affixed to the robots, in a surface mapping system;

   C. Applying a fairing compound to said imperfections;

   D. Sanding said fairing compound in alignment with said hull and/or superstructure;

   E. Removing any compound dust generated by the sanding process; and

   F. Painting said hull and/or superstructure.

3. A computer-controlled method for finishing at least the entire hull of a marine vessel, involving a computer for

6

directing the movement of robots, said robots positioned on movable means, such as a gantry, tracks and/or a gantry-tracks combination, each of said robots having a base, a primary arm, a secondary arm and a wrist terminating in a support head, and various tools attachable to said wrists or said bases, the method comprising the steps of:

   (a) positioning said marine vessel, relative to said robots, so that said robots are operatively accessible to surfaces defined by said marine vessel;

   (b) attaching and using an analyzer tool on each of said robots for analyzing the surfaces of said marine vessel to detect contours and imperfections, wherein this analyzing step includes the production of a surface map by the use of lasers attached to said robots;

   (c) attaching and using a surface sensing tool on each of said robots for preparing said surfaces for painting; and

   (d) attaching and using a painting tool on each of said robots for painting said surfaces.

4. A computer-controlled method for finishing at least the entire hull of a marine vessel, involving a computer for directing the movement of robots, said robots positioned on movable means, such as a gantry, tracks and/or a gantry-tracks combination, each of said robots having a base, a primary arm, a secondary arm and a wrist terminating in a support head, and various tools attachable to said wrists or said bases, the method comprising the steps of:

   (a) positioning said marine vessel, relative to said robots, so that said robots are operatively accessible to surfaces defined by said marine vessel;

   (b) attaching and using an analyzer tool on each of said robots for analyzing the surfaces of said marine vessel to detect contours and imperfections, wherein this analyzing step includes the production of a surface map by the use of radar attached to said robots;

   (c) attaching and using a surface sensing tool on each of said robots for preparing said surfaces for painting; and

   (d) attaching and using a painting tool on each of said robots for painting said surfaces.

*    *    *    *    *

# EXHIBIT B

US006562139B2

(12) **United States Patent**
Morton

(10) Patent No.: **US 6,562,139 B2**
(45) Date of Patent: **May 13, 2003**

(54) **COMPUTER CONTROLLED APPARATUS FOR FAIRING AND PAINTING OF MARINE VESSEL SURFACES**

(75) Inventor: **John Stephen Morton**, Ft. Lauderdale, FL (US)

(73) Assignee: **Visions East, Inc.**, Ft. Lauderdale, FL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/035,261**

(22) Filed: **Jan. 3, 2002**

(65) **Prior Publication Data**

US 2002/0064596 A1 May 30, 2002

**Related U.S. Application Data**

(62) Division of application No. 09/447,973, filed on Nov. 23, 1999, now Pat. No. 6,365,221.

(51) Int. Cl.[7] ........................................ **B05C 11/02**
(52) U.S. Cl. ...................... **118/670**; 118/695; 118/697; 118/44; 118/70; 118/72
(58) Field of Search ............................ 118/676, 44, 679, 118/695, 697, 713, 72, 640, 70

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,498,414 A | 2/1985 | Kiba et al. | 118/663 |
| 4,532,148 A | 7/1985 | Vecellio | 427/31 |
| 4,599,967 A | 7/1986 | Murphy et al. | 118/72 |
| 4,649,858 A | 3/1987 | Sakai et al. | 118/696 |
| 4,693,664 A | 9/1987 | Schweiker | 414/735 |
| 4,830,882 A | * 5/1989 | Ichinose et al. | 118/300 |
| 4,986,664 A | 1/1991 | Lovoi | 356/376 |
| 5,067,085 A | 11/1991 | Wenzel et al. | 364/474.06 |
| 5,336,304 A | 8/1994 | Andoe | 106/15.05 |
| 5,394,654 A | * 3/1995 | Shimbara et al. | 451/10 |
| 5,571,312 A | 11/1996 | Andoe | 106/18.32 |
| 5,737,227 A | 4/1998 | Greenfield et al. | 364/464.1 |
| 5,858,111 A | * 1/1999 | Marrero | 134/6 |
| 5,947,051 A | 9/1999 | Geiger | 114/313 |
| 5,979,001 A | 11/1999 | Marrero | 15/53.1 |
| 5,997,951 A | 12/1999 | Hein | 427/299 |
| 6,096,132 A | * 8/2000 | Kaiba et al. | 118/629 |
| 6,189,473 B1 | 2/2001 | Appel et al. | 114/222 |

OTHER PUBLICATIONS

Pike, Capt. Bill "Special Ops" Power & Motoryacht, Sep. 1999, pp. 96–101.
Barry, Christopher, "CAD/CAM and Fiberglass Tooling", Professional Boatbuilder, Oct./Nov. 1999, P 102.

* cited by examiner

*Primary Examiner*—Richard Crispino
*Assistant Examiner*—George R Koch, III
(74) *Attorney, Agent, or Firm*—Stanley J. Yavner

(57) **ABSTRACT**

An apparatus for finishing marine vessel surfaces including track-mounted robots, movable relative to the vessel being finished. The robots are controlled by a computer, with each robot having a plurality of tools attachable to the robots both for mapping the surface contours of the vessel and for painting or otherwise finishing the surface.

**1 Claim, 4 Drawing Sheets**





FIG. 1

Case 0:05-cv-61264-MGC   Document 1   Entered on FLSD Docket 08/01/2005   Page 95 of 145



**FIG. 2**

**Exhibit C**

FROM : PERFORMANCE PRINT          PHONE NO. : 954 462 2244          Nov. 04 1999 06:03PM P2

Visions East, Inc. Confidential Disclosure Agreement



**SW 33RD ST.      FORT *LAUDERDALE, FL 33315*   USA**

## CONFIDENTIAL DISCLOSURE AGREEMENT

This Confidential Disclosure Agreement ("Agreement") is made and entered into as of this day  12th  of  Dec  ,1999, by and between **VISIONS EAST, Inc.**, a Florida corporation, having its principal place of business at 275 S. W. 33rd. Street, Ft. Lauderdale, Florida (hereinafter referred to as "Disclosor") and RTS  , a  Plc  having its principal place of business located at  Espoo, Finland  ,(hereinafter referred to as "Disclosee")

### RECITALS

**WHEREAS,** Disclosor has developed certain Proprietary Technology with respect to automated fairing of marine vessel, which Proprietary Technology represents and is maintained as a trade secret and confidential information of Disclosor; and

**WHEREAS,** Disclosor is interested in entering into a business relationship with Disclosee for the sale of various hardware and software components and installation and the implementation of a system for the utilization of same, relating to said Proprietary Technology; and

**WHEREAS,** Disclosee is in the business of designing and utilizing the various hardware and software components desired by Disclosor; and

**WHEREAS,** Disclosor is willing to disclose the Proprietary Technology to Disclosee, but desires to maintain all rights in and control over the Proprietary Technology so disclosed to Disclosee, and to protect the confidentiality of the

1

Visions East, Inc. Confidential Disclosure Agreement

Proprietary Technology by preventing the unauthorized use and dissemination thereof without the Disclosor's prior consent.

**NOW, THEREFORE**, in consideration of the Proprietary Technology Disclosee will receive for the purpose referenced above, Disclosor and Disclosee hereby agree as follows:

**Section 1. Proprietary Technology.** For the purpose of this Agreement, the term "Proprietary Technology" shall mean technical information and materials related to the above identified subject matter, including, without limitation, patent disclosures, patent applications, structures, models, techniques, processes, technical information, software, programs, knowledge, data, ideas, discoveries, drawings, documents, records formulas and other information, whether or not similar to the foregoing, which is related in any manner, directly or indirectly, to the design, implementation and/or manufacture of Disclosor's products and services, disclosed orally or in writing, or otherwise provided by Disclosor to Disclosee, or obtained or acquired by Disclosee through observation or examination of such information and/or materials.

**Section 2. <u>Confidentiality.</u>** Disclosee shall preserve in trust as confidential and shall not use, directly or indirectly, or allow to be used, any Proprietary Technology except as necessary in connection with the implementation of the Proprietary Technology by Disclosee and shall not reveal, report, publish, transfer, disclose or permit disclosure of such Proprietary Technology to any person other than authorized employees of Disclosee who are bound by written agreements with Disclosee to similarly maintain such Proprietary Technology in confidence. Disclosee hereby agrees to identify, upon request from Disclosor, those persons to whom such Proprietary Technology was disclosed.

**Section 3. <u>Confidentiality Exceptions.</u>**

(a)     Disclosee, and any and all of its representatives, affiliates, agents and assignees, shall be bound by the confidentiality obligations imposed by this Agreement with respect to the Proprietary Technology until and except to the extent that such Proprietary Technology:

(i)     is already known by Disclosee at the time of the disclosure by the Disclosor; or

2

Visions East, Inc. Confidential Disclosure Agreement

    (ii)    is a matter of public knowledge at the time of such disclosure; or

    (iii)   later becomes a matter of public knowledge after such disclosure, through no disclosure or breach of Disclosee;or

    (iv)   is independently made available to the undersigned by a third party who legally has the right to disclose such information, is not under a secrecy obligation, contractual or otherwise, to Disclosor with respect thereto, did not obtain such information from Disclosee and did not impose an obligation of confidence on Disclosee.

(b)    Provided, however, that for any of the exceptions set forth in subsection 3 (a) to apply, Disclosee must provide Disclosor with written notice of the existence of such exception within sixty (60) days from: (1) the date of disclosure of Disclosor, or (2) the date of Disclosee's first knowledge of information leading to a claim under subsection 3 (a) (iii) above, or (3) the date of a later disclosure of a third party. Such prior notice shall be operative only if it contains a complete description of all or part of the Proprietary Technology which Disclosee believes is subject to an exception set forth above in subsection 3 (a) and all other reasonable evidence supporting applicability of such exception. No disclosure of Proprietary Technology shall be allowed until Disclosor receives a prior notice as herein specified and Disclosor provides Disclosee with an acknowledgment of its receipt of such notice and its satisfaction with the content of the notice, which acknowledgment shall not be unreasonably withheld.

(c)    For purposes of the provisions of this paragraph, specific disclosures made to the Disclosee with respect to products, operation conditions, formulas and other similar matters shall not be deemed to be within any of the foregoing exceptions solely by the fact of their inclusion within general technical disclosures in the public domain or in the possession of Disclosee. Any combination of specific factors related to the Proprietary Technology shall not be deemed to be within any of the foregoing exceptions solely because any or all of such singular factors are in the public domain or in the possession of Disclosee; only if the combination of such factors in itself and



FROM : PERFORMANCE PRINT          PHONE NO. : 954 462 2244          Nov. 04 1999 06:05PM P5

Visions East, Inc. Confidential Disclosure Agreement

the principle of their combined operation are the public domain or in the possession of Disclosee shall such combination of factors itself be subject to the exceptions specified herein.

**Section 4. No Waiver of Assignment Rights.** Nothing in this Agreement shall constitute a waiver of assignment of any patent rights, copyrights or trade secrets rights in the United States or any foreign country that Disclosor may wish to obtain or enforce on all or portions of the Proprietary Technology.

**Section 5. Tangible Items.** Disclosee hereby agrees to deliver to Disclosor, promptly upon termination of the business relationship, or at any time prior thereto upon request from Disclosor, all documents and materials of any kind provided to the Disclosee for purposes discussed above, including any copies or duplicates thereof, and further including, without limitation, all writings, recordings, drawings, models, samples, photographs, files, accounts, records, documents, sketches, designs, diagrams, plans, blueprints, specifications, manuals, books, forms, notes, reports, memoranda, studies, data, calculations, catalogues, compilations of information, correspondence and all abstracts, and summaries of the foregoing whether in hard copy or machine readable form, all instruments, tools and equipment, and all other physical items which describe, depict, contain, constitute, reflect, record or are otherwise related to the Proprietary Technology and any other business of Disclosor, whether of public nature or not, and whether or not prepared or acquired by Disclosee (collectively, "Tangible Items."). All such Tangible Items shall at all times remain the sole and exclusive property of Disclosor.

**Section 6. Injunctive Relief.** Disclosee hereby acknoledges and agrees that it would be difficult to fully compensate Disclosor for damages resulting from the breach or threatened breach of the Agreement, and, accordingly, that Disclosor shall be entitled to temporary and injunctive relief, including temporary restraining orders, preliminary injunctions and permanent injunctions to enforce such provisions without the necessity of proving actual damages and without the necessity of posting any bond or other undertaking in connnection therewith. This provision with respect to injunctive relief shall not, however, diminish Disclosor's right to claim and recover damages.

**Section 7. Severable Provisions.** The provisions of the Agreement are severable and if any one or more provisions may be determined to be illegal or otherwise unenforceable, in whole or in part, the remaining provisons, and any partially-

4



Visions East, Inc. Confidential Disclosure Agreement

unenforceable provisions to the extent enforceable, shall nevertheless be binding and enforceable.

**Section 8. Agreement Assignment.** This Agreement may not be assigned by the Disclosee without the Disclosor's written consent, which shall not be unreasonably withheld.

**Section 9. Governing Law.** This Agreement shall be interpreted in accordance with the laws of the State of Florida and may not be modified, except in writing by the parties hereto. Any actions brought to enforce or interpret this Agreement shall be brought only in a court of competent jurisdiction located in the State of Florida. Disclosee agrees that service of process may be made upon it by personal service to any officer of the Disclosee, or any employee of Disclosee's at the address indicated in Section 12. DISCLOSEE AGREES TO PERSONAL JURISDICTION IN THE STATE OF FLORIDA.

**Section 10. Captions.** The section captions are inserted only as a matter of convenience and reference, and in no way define, limit or describe the scope of this Agreement or the intent of any provision hereof.

**Section 11. Entire Agreement.** This Agreement contains the entire agreement of the parties relating to the subject matter hereof, and the parties hereto have made no agreements, representations or warranties relating to the subject matter of this Agreement that are not set forth herein. No modification of this Agreement shall be valid unless made in writing and signed by the parties hereto.

**Section 12. Notice.** Any note of demand required or permitted to be given hereunder shall be in writing and shall be deemed effective upon the personal delivery thereof or by facsimile transmission or, if mailed, forty-eight (48) hours after having been deposited with Federal Express International Priority Service, postage prepaid and addressed to the party to whom it is directed at the address set forth below:



Visions East, Inc. Confidential Disclosure Agreement

If to Disclosor:  **Mr. John Stephen Morton, President**
**Visions East, Inc.**
**275 SW 33rd Street**
**Ft. Lauderdale, Florida 33315**
**USA**

If to Disclosee:  Robotic Technology Systems
Sinimaentie 10 B, FIN-02630
Espoo, Finland

Attention: Tarmo Linna

Either party may change the address to which such notices are to be addressed by giving the other party notice in the manner herein set forth.

**Section 13. Counterparts.** This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which shall constitute the same instrument.

**IN WITNESS WHEREOF**, Disclosor and Disclosee hereto execute this Agreement by a duly authorized representative with full rights, power and authority to enter and perform this Agreement.

Visions East, Inc.

By: _John S. Morton_          By: _____

Name: JOHN S. MORTON          Name: Tarmo Linna

Title: President          Title: Deputy Managing Director

Date: 11-4-99          Date: 12 Nov, 1999

Section 14. Duration: This agreement shall remain in effect for a period of twelve (12) months, unless extended by agreement of both parties hereto.

# EXHIBIT D

PMD/MMK032803
211025v2

## VISIONS EAST, INC.
## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT ("Agreement") is made as of this 5th day of May, 2003 by and between **VISIONS EAST, INC.**, a Florida corporation and its affiliates and subsidiaries (collectively the "Company") and **TARMO LINNA** (the "Executive").

The parties are entering into this Agreement in order to set forth the terms and conditions under which the Executive shall be employed by the Company.

NOW, THEREFORE, the parties hereto, intending to be legally bound hereby, and in consideration of the mutual covenants contained herein, agree as follows:

1.      <u>Employment</u>.  The Company hereby agrees to employ the Executive and the Executive hereby accepts employment on the terms and conditions set forth herein.

2.      <u>Employment at Will</u>.  The Executive and the Company understand and agree that the Executive is an employee at will, and that the Executive may resign, or the Company may terminate the Executive's employment, at any time and for any or for no reason.  Nothing in this Agreement or any Related Agreements (as hereinafter defined) shall be construed to alter the at-will nature of the Executive's employment, nor shall anything in this Agreement or any Related Agreements be construed as providing the Executive with a definite term of employment.

3.      <u>Position</u>.  During the Executive's employment with Company, the Executive shall serve as Vice President, Technology.   The Executive shall perform those duties generally required of persons in the position of Vice President, Technology as well such other duties, not inconsistent with this Agreement, as the <u>President and/or</u> Board of Directors of the Company (the "Board") may from time to time direct.  The Executive shall report and be responsible to the ~~Board~~<u>President</u>.

4.      <u>Scope of Services</u>.  The Executive agrees to devote the Executive's full business time (which shall involve forty (40) hours per week or more as needed) and attention, skills and best efforts to the performance of the Executive's duties hereunder and shall not, during the Executive's employment by the Company, without the prior written approval of the Board, be employed by or otherwise engaged in any other business activity requiring any of the Executive's time, *provided* that the Executive may, to the extent not otherwise prohibited by this Agreement, devote such amount of time as does not interfere or compete with the performance of the Executive's duties under this Agreement to any one or more of the following activities: (i) investing the Executive's personal assets in such manner as will not require services to be rendered by the Executive in the operation of the affairs of the companies in which investments

are made; or (ii) engaging in charitable activities, including serving on the Boards of Directors of charitable organizations.

5.    Salary, Compensation and Benefits.

5.1    Base Salary.  During the Executive's employment, the Company agrees to pay, and the Executive agrees to accept, as the Executive's salary for all services to be rendered by the Executive hereunder, a salary at an annual rate of Eighty Five Thousand Dollars ($85,000.00) ("Base Salary"), payable at the same time that the Company pays its employees generally.  The Base Salary is subject to annual increases in the sole discretion of the Board.

5.2    Stock Option.  For services previously rendered to the Company and subject to the terms and conditions of the Non-Qualified Stock Option Agreement (the "Agreement") substantially in the form attached hereto as Exhibit A, Executive shall be granted an Option to purchase up to 444,444 shares of the Company's common stock par value $0.001 per share (the "Option Shares").  The Option Shares shall vest in accordance with, and is subject to the terms of, the Option Agreement.

5.2    Performance Bonus.  Executive shall not be entitled to receive a performance bonus, unless otherwise approved by the Board.

5.3    Incentives, Savings and Retirement Plans.  The Executive shall also be entitled to participate in all incentive stock option, savings, and retirement plans, policies and programs made available by the Company to executive-level employees generally ("Plans").

5.4    Fringe Benefits.  During the Executive's employment with the Company, the Executive shall be entitled to the benefits of such group medical, travel and accident, short and long-term disability and term life insurance, if any, as the Company shall make generally available from time to time to executive-level employees.

5.5    Reimbursement.  The Company shall reimburse the Executive (or, in the Company's sole discretion, shall pay directly), upon presentation of vouchers and other supporting documentation as the Company may reasonably require, for reasonable out-of-pocket expenses incurred by the Executive relating to the business or affairs of the Company or the performance of the Executive's duties hereunder, including, without limitation, reasonable expenses with respect to entertainment, travel and similar items, *provided* that the incurring of such expenses shall have been approved in accordance with the Company's regular reimbursement procedures and practices in effect from time to time.

5.6    Vacation.  In addition to statutory holidays, the Executive shall be entitled to [three (3) weeks] paid vacation each calendar year during the Executive's employment, accruing ratably each month.

5.7    Withholding.  The Company may withhold from the Executive's compensation all applicable amounts required by law. *a₁ 05.05.03*

5.8     Taxes. Executive, not Company shall be solely responsible for paying all required federal, state and, local, value added and other taxes related to any consideration provided under this Agreement, that may be imposed by any jurisdiction within or without the United States for the transactions associated with this Agreement, excluding any taxes based on Company's income.

6.     Employment Termination.

The Executive's employment under this Agreement may be earlier terminated as follows:

6.1 Termination For Cause.   At the election of the Company, the Executive's employment with the Company may be terminated for Cause (as defined below) immediately upon written notice by the Company to the Executive. "Cause" shall mean the Executive's: (i) dishonesty of a material nature (including, but not limited to, theft or embezzlement of Company funds or assets); (ii) conviction of, or guilty plea or no contest plea, to a felony charge or any misdemeanor involving moral turpitude, or the entry of a consent decree with any governmental body; (iii) noncompliance in any material respect with any laws or regulations, foreign or domestic, affecting the operation of the Company's business; (iv) violation of any express direction or any rule, regulation or policy established by the Board that is consistent with the terms of this Agreement, if such violation is likely to have a material adverse effect on the Company; (v) material breach of this Agreement or material breach of the Executive's fiduciary duties to the Company; (vi) gross incompetence, gross neglect, or gross misconduct in the performance of the Executive's duties; (vii) repeated and consistent failure to be present at work during normal business hours except during vacation periods or absences due to temporary illness; or (viii) abuse of alcohol or drugs which interferes with the Executive's performance of his duties.  With respect to those circumstances of Cause set forth in the preceding clauses (iii) through (viii) that are reasonably susceptible to cure, Cause shall only exist where the Company has provided the Executive with written notice of the alleged problem and the Executive has failed to cure such condition to the satisfaction of the Company within ten (10) business days.

6.2.   Death or Disability.   The Executive's employment with the Company shall terminate upon the Executive's death or, at the election of the Company by written notice to the Executive, upon the Disability of the Executive.   As used in this Agreement, the term "Disability" shall mean the inability or failure of the Executive to perform the essential functions of the position with or without reasonable accommodation as a result of a mental or physical disability for a period of ninety (90) or more days (whether or not consecutive) during any twelve (12) months, all as determined in good faith by the Board of Directors of the Company.

6.3.   Termination Without Cause.   The Company may terminate the Executive's employment with the Company at any time for any reason or for no reason at the date specified in the notice by written notice to the Executive.

7.     **Effect of Termination**.

*QL 05.05.03*

7.1.    Termination for Cause.  In the event of a termination for "Cause" under Section 6.1, the Executive shall be entitled to no severance or other termination benefits, or any other benefits (except for any health insurance benefits as required by applicable law).

7.2.    Termination for Death or Disability.  If the Executive's employment is terminated by death or Disability pursuant to Section 6.2, the Company shall pay to the Executive or the Executive's estate the compensation which would otherwise be payable to the Executive up to the thirtieth (30th) day following the day as of which the Executive's employment is terminated.

7.3.    Termination Without Cause.  In the event Executive's employment is terminated by the Company without Cause pursuant to Section 6.3, the Company shall pay the Executive an amount equal to two (2) months Base Salary ("Severance") to be paid over a like number of months consistent with the Company's normal payroll schedule.  All payments are expressly conditioned upon the Executive's compliance with the terms of the surviving provisions of this Agreement and all other agreements to which the Company and the Executive are parties.

8.    Related Agreements.   The Executive is executing on the date hereof a Noncompetition and Nonsolicitation Agreement, a Nondisclosure and Development Assignments Agreement and the Option Agreement (all, as amended from time to time, being collectively referred to as the "Related Agreements").

9.    Executive's Representations and Warranties.   The Executive represents and warrants that the Executive is not a party to any other employment, non-competition, or other agreement or restriction which could interfere with the Executive's employment with the Company or the Executive's or the Company's rights and obligations hereunder and that the Executive's acceptance of employment with the Company and the performance of the Executive's duties hereunder will not breach the provisions of any contract, agreement, or understanding to which the Executive is party or any duty owed by the Executive to any other person.

10.    Waivers and Amendments.  The respective rights and obligations of the Company and the Executive under this Agreement may be waived (either generally or in a particular instance, either retroactively or prospectively, and either for a specified period of time or indefinitely) or amended only with the written consent of a duly authorized representative of the Company and the Executive.

11.    Successors and Assigns.  The provisions hereof shall inure to the benefit of, and be binding upon, the Company's successors and assigns.

12.    Entire Agreement.  This Agreement and the Related Agreements constitute the full and entire understanding and agreement of the parties with regard to the subjects hereof and supersede in their entirety all other or prior agreements, whether oral or written, with respect thereto.

13.    Notices.  All demands, notices, requests, consents and other communications required or permitted under this Agreement shall be in writing and shall be personally delivered or sent by facsimile machine (with a confirmation copy sent by one of the other methods

4    DeltaView comparison of iManageDeskSite://172.16.8.25/PMB/211025/2 and iManageDeskSite://172.16.8.25/PMB/211025/3. Performed on 4/1/2003.

authorized in this Section), reputable commercial overnight delivery service (including Federal Express and U.S. Postal Service overnight delivery service) or, deposited with the U.S. Postal Service mailed first class, registered or certified mail, postage prepaid, as set forth below:

              If to the Company, addressed to:

                    Visions East, Inc.
                    1600 W. State Road 84
                    Suite 5
                    Ft. Lauderdale, Florida 33315
                    Fax:  954-522-1665

              with a copy to:

                    Edwards & Angell, LLP
                    One North Clematis Street
                    Suite 400
                    West Palm Beach, Florida 33401
                    Attention: Mark M. Kamp, Esq.
                    Fax:  561-655-8719

       If to the Executive, to the address set forth on the signature page of this Agreement or at the current address listed in the Company's records.

       Notices shall be deemed given upon the earlier to occur of (i) receipt by the party to whom such notice is directed; (ii) if sent by facsimile machine, on the day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) such notice is sent if sent (as evidenced by the facsimile confirmed receipt) prior to 5:00 p.m. Eastern Time and, if sent after 5:00 p.m. Eastern Time, on the day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) after which such notice is sent; (iii) on the first business day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) following the day the same is deposited with the commercial courier if sent by commercial overnight delivery service; or (iv) the fifth day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) following deposit thereof with the U.S. Postal Service as aforesaid.  Each party, by notice duly given in accordance therewith, may specify a different address for the giving of any notice hereunder.

       14.    Governing Law.  This Agreement shall be construed and enforced in accordance with and governed by the laws of Florida (without giving effect to any conflicts or choice of laws provisions thereof that would cause the application of the domestic substantive laws of any other jurisdiction).

       15.    Consent to Jurisdiction

          (a)    EACH OF THE PARTIES HERETO HEREBY CONSENTS TO THE JURISDICTION OF ALL STATE AND FEDERAL COURTS LOCATED IN BROWARD COUNTY, FLORIDA, AS WELL AS TO THE JURISDICTION OF ALL COURTS TO

WHICH AN APPEAL MAY BE TAKEN FROM SUCH COURTS, FOR THE PURPOSE OF ANY SUIT, ACTION OR OTHER PROCEEDING ARISING OUT OF, OR IN CONNECTION WITH, THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY, INCLUDING, WITHOUT LIMITATION, ANY PROCEEDING RELATING TO ANCILLARY MEASURES IN AID OF ARBITRATION, PROVISIONAL REMEDIES AND INTERIM RELIEF, OR ANY PROCEEDING TO ENFORCE ANY ARBITRAL DECISION OR AWARD. EACH PARTY HEREBY EXPRESSLY [WAIVES ANY AND ALL RIGHTS TO BRING ANY SUIT, ACTION OR OTHER PROCEEDING IN OR BEFORE ANY COURT OR TRIBUNAL OTHER THAN THE COURTS DESCRIBED ABOVE AND COVENANTS THAT IT SHALL NOT SEEK IN ANY MANNER TO RESOLVE ANY DISPUTE OTHER THAN AS SET FORTH IN THIS SECTION OR AS PROVIDED IN THE NONDISCLOSURE AND DEVELOPMENTS AGREEMENT, OR TO CHALLENGE OR SET ASIDE ANY DECISION, AWARD OR JUDGMENT OBTAINED IN ACCORDANCE WITH THE PROVISIONS HEREOF.

(b)    EACH OF THE PARTIES HERETO HEREBY EXPRESSLY WAIVES ANY AND ALL OBJECTIONS IT MAY HAVE TO VENUE, INCLUDING, WITHOUT LIMITATION, THE INCONVENIENCE OF SUCH FORUM, IN ANY OF SUCH COURTS. IN ADDITION, EACH OF THE PARTIES CONSENTS TO THE SERVICE OF PROCESS BY PERSONAL SERVICE OR ANY MANNER IN WHICH NOTICES MAY BE DELIVERED HEREUNDER IN ACCORDANCE WITH SECTION 13 OF THIS AGREEMENT.

16.    <u>Equitable Remedies</u>.  The parties hereto agree that irreparable harm would occur in the event that any of the agreements and provisions of this Agreement were not performed fully by the parties hereto in accordance with their specific terms or conditions or were otherwise breached, and that money damages are an inadequate remedy for breach of this Agreement because of the difficulty of ascertaining and quantifying the amount of damage that will be suffered by the parties hereto in the event that this Agreement is not performed in accordance with its terms or conditions or is otherwise breached.  It is accordingly hereby agreed that the parties hereto shall be entitled to an injunction or injunctions to restrain, enjoin and prevent breaches of this Agreement by the other parties and to enforce specifically such terms and provisions of this Agreement, such remedy being in addition to and not in lieu of, any other rights and remedies to which the other parties are entitled to at law or in equity.

17.    <u>Waiver of Jury Trial</u>.    EACH OF THE PARTIES HERETO HEREBY VOLUNTARILY AND IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION OR OTHER PROCEEDING BROUGHT IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

18.    <u>Severability; Titles and Subtitles; Gender; Singular and Plural; Counterparts; Facsimile</u>.

(a)    In case any provision of this Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby. *Ai OS.OS.OJ*

(b)    The titles of the sections and subsections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

(c)    The use of any gender in this Agreement shall be deemed to include the other genders, and the use of the singular in this Agreement shall be deemed to include the plural (and vice versa), wherever appropriate.

(d)    This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together constitute one instrument.

(e)    Counterparts of this Agreement (or applicable signature pages hereof) that are manually signed and delivered by facsimile transmission shall be deemed to constitute signed original counterparts hereof and shall bind the parties signing and delivering in such manner.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first above specified.

COMPANY:                                    EXECUTIVE:

**VISIONS EAST, INC.**

By: _Bur Morton_                            _____
Name: Steve Morton                          Tarmo Linna
Title: PRESIDENT                            Address:        Vermonrinne 8 B
                                                            FIN-00370
                                                            Helsinki, FINLAND

## EXHIBIT E

PMD/MMK032803
210689v1

## NONCOMPETITION AND NONSOLICITATION AGREEMENT

This NONCOMPETITION AND NONSOLICITATION AGREEMENT ("Agreement"), made as of this 5 day of _May_, 2003 by and among **VISIONS EAST, INC.**, a Florida corporation, and its affiliates and subsidiaries (collectively the "Company"), and the employee whose name is below his/her signature line below (the "Employee").

## RECITALS

WHEREAS, the Employee has significant knowledge and experience in the Company's business and intimate knowledge of its customers, processes, trade secrets and/or other business information and the Company needs to protect its commercial good will and other assets; and

WHEREAS, as a material inducement for the Company to enter into an employment agreement with Employee, Employee has agreed to execute this Agreement.

NOW THEREFORE, in consideration of the foregoing, the agreements set forth below the parties' desire to preserve the value inherent in the Company for their mutual benefit and the benefit of the Purchasers, and for other valuable consideration (the receipt of which the Employee hereby acknowledges), the Employee, intending to be legally bound hereby, agrees with the Company as follows:

1. Definitions.

"Competing Business" shall mean any one or more of the following: (i) the development, manufacturing, selling, leasing and provision of consulting services related to the automated equipment and processes for the marine coatings industry; (ii) any other business in which the Company engages on or before the Termination Date; or (iii) any other business in which the Company develops an intention to engage on or before the Termination Date, and (a) for which the Company prepared an existing business plan or study on or before the Termination Date or (b) for which the Board of Directors of the Company commissioned a business plan or study on or before the Termination Date.

"Employment Agreement" means the employment agreement among the Company and Employee dated of even date herewith.

"Person" shall mean an individual, partnership, corporation, limited liability company, association, trust, joint venture, unincorporated organization and any government, governmental department or agency or political subdivision thereof.

"Protected Territory" shall mean worldwide.

"Termination Date" shall mean the date the Employee ceases to be employed by the Company or its Subsidiaries. *Ri 05.05.03*

2.    Term.  The term of this Agreement shall be for a period commencing on the date hereof and ending 24 months after the Termination Date ("Term").

3.    Noncompetition.  During the Term hereof, the Employee agrees that Employee will not, singly, jointly, or as a partner, member, employee, agent, officer, director, stockholder (except as a holder, for investment purposes only, of not more than five percent of the outstanding stock of any company listed on a national securities exchange, or actively traded in a national over-the-counter market), equity holder, lender, consultant, independent contractor, or joint venturer of any other Person, or in any other capacity, directly or beneficially:  own, manage, operate, join, control, or participate in the ownership, management, operation or control of, or permit the use of his name by, or work for, or provide consulting, financial or other assistance to, or be connected in any manner with, a Competing Business anywhere in the Protected Territory before the Termination Date.

4.    Nonsolicitation.  During the Term hereof, the Employee agrees that Employee shall not:

(i)    employ, retain or engage (as an employee, consultant, or independent contractor), or induce or attempt to induce to be employed, retained or engaged, any person who is or was during the Term of this Agreement, an employee, consultant or independent contractor of the Company;

(ii)   induce or attempt to induce any Person who, as of the Effective Date or at any time thereafter during the Term of this Agreement, is an employee, consultant, or independent contractor of the Company to terminate his or her employment or other relationship with the Company; or

(iii)  induce or attempt to induce any Person who is a customer of the Company or who otherwise is a contracting party with the Company, as of the Effective Date or at any time thereafter during the Term of this Agreement to terminate any written or oral agreement or understanding or other relationships with the Company.

5.    Waivers and Amendments.  The respective rights and obligations of the Company and the Employee under this Agreement may be waived (either generally or in a particular instance, either retroactively or prospectively, and either for a specified period of time or indefinitely) or amended only with the written consent of a duly authorized representative of the Company and the Employee.

6.    Successors and Assigns.  The provisions hereof shall inure to the benefit of, and be binding upon, the Company's successors and assigns.

7.    Entire Agreement.  This Agreement constitutes the full and entire understanding and agreement of the parties with regard to the subjects hereof and supersedes in their entirety all other or prior agreements, whether oral or written, with respect thereto.  *Ri 05.05.03*

PMB PMB 210689 1/PDJCOMO

8.    Notices.   All demands, notices, requests, consents and other communications required or permitted under this Agreement shall be in writing and shall be personally delivered or sent by facsimile machine (with a confirmation copy sent by one of the other methods authorized in this Section), reputable commercial overnight delivery service (including Federal Express and U.S. Postal Service overnight delivery service) or, deposited with the U.S. Postal Service mailed first class, registered or certified mail, postage prepaid, as set forth below:

If to the Company, addressed to:

Visions East, Inc.
1600 West State Road 84, Suite 5
Fort Lauderdale, Florida 33315
Attention: President
Fax: 954-522-1665

with a copy to:

Edwards & Angell, LLP
One North Clematis Street, Suite 400
West Palm Beach, Florida 33401
Attention: Mark M. Kamp, Esq.
Fax: 561-655-8719

If to the Employee, to the address set forth on the signature page of this Agreement or at the current address listed in the Company's records.

Notices shall be deemed given upon the earlier to occur of (i) receipt by the party to whom such notice is directed; (ii) if sent by facsimile machine, on the day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) such notice is sent if sent (as evidenced by the facsimile confirmed receipt) prior to 5:00 p.m. Eastern Time and, if sent after 5:00 p.m. Eastern Time, on the day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) after which such notice is sent; (iii) on the first business day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) following the day the same is deposited with the commercial courier if sent by commercial overnight delivery service; or (iv) the fifth day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) following deposit thereof with the U.S. Postal Service as aforesaid. Each party, by notice duly given in accordance therewith may specify a different address for the giving of any notice hereunder.

9.    Governing Law.   This Agreement shall be construed and enforced in accordance with and governed by the laws of the State of Florida (without giving effect to any conflicts or choice of laws provisions thereof that would cause the application of the domestic substantive laws of any other jurisdiction).   *RJ 05.05.03*

10.   Consent to Jurisdiction

(a)   EACH OF THE PARTIES HERETO HEREBY CONSENTS TO THE JURISDICTION OF ALL STATE AND FEDERAL COURTS LOCATED IN BROWARD COUNTY, FLORIDA, AS WELL AS TO THE JURISDICTION OF ALL COURTS TO WHICH AN APPEAL MAY BE TAKEN FROM SUCH COURTS, FOR THE PURPOSE OF ANY SUIT, ACTION OR OTHER PROCEEDING ARISING OUT OF, OR IN CONNECTION WITH, THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY, INCLUDING, WITHOUT LIMITATION, ANY PROCEEDING RELATING TO ANCILLARY MEASURES IN AID OF ARBITRATION, PROVISIONAL REMEDIES AND INTERIM RELIEF, OR ANY PROCEEDING TO ENFORCE ANY ARBITRAL DECISION OR AWARD. EACH PARTY HEREBY EXPRESSLY WAIVES ANY AND ALL RIGHTS TO BRING ANY SUIT, ACTION OR OTHER PROCEEDING IN OR BEFORE ANY COURT OR TRIBUNAL OTHER THAN THE COURTS DESCRIBED ABOVE AND COVENANTS THAT IT SHALL NOT SEEK IN ANY MANNER TO RESOLVE ANY DISPUTE OTHER THAN AS SET FORTH IN THIS SECTION OR AS PROVIDED IN THE NONDISCLOSURE AND DEVELOPMENTS AGREEMENT, IF ANY, OR TO CHALLENGE OR SET ASIDE ANY DECISION, AWARD OR JUDGMENT OBTAINED IN ACCORDANCE WITH THE PROVISIONS HEREOF.

(b)   EACH OF THE PARTIES HERETO HEREBY EXPRESSLY WAIVES ANY AND ALL OBJECTIONS IT MAY HAVE TO VENUE, INCLUDING, WITHOUT LIMITATION, THE INCONVENIENCE OF SUCH FORUM, IN ANY OF SUCH COURTS. IN ADDITION, EACH OF THE PARTIES CONSENTS TO THE SERVICE OF PROCESS BY PERSONAL SERVICE OR ANY MANNER IN WHICH NOTICES MAY BE DELIVERED HEREUNDER IN ACCORDANCE WITH SECTION 8 OF THIS AGREEMENT.

11.   Equitable Remedies. The parties hereto agree that irreparable harm would occur in the event that any of the agreements and provisions of this Agreement were not performed fully by the parties hereto in accordance with their specific terms or conditions or were otherwise breached, and that money damages are an inadequate remedy for breach of this Agreement because of the difficulty of ascertaining and quantifying the amount of damage that will be suffered by the parties hereto in the event that this Agreement is not performed in accordance with its terms or conditions or is otherwise breached. It is accordingly hereby agreed that the parties hereto shall be entitled to an injunction or injunctions or other equitable relief to restrain, enjoin and prevent breaches of this Agreement by the other parties and to enforce specifically such terms and provisions of this Agreement, such remedy being in addition to and not in lieu of, any other rights and remedies to which the other parties are entitled to at law or in equity. The Company and the Employee agree that the covenants set forth in this Agreement shall be enforced to the fullest extent permitted by law. Accordingly if, in any judicial proceedings, a court shall determine that such covenant is unenforceable for any reason, including, without limitation, because it covers too extensive a geographical area or survives too long a period of time, then the parties intend that such covenant shall be deemed to cover only such maximum geographical area and maximum period of time, if applicable, and/or shall otherwise be deemed to be limited in such manner, as will permit enforceability by such court. In the event that any one or more of such covenants shall, either by itself or together with other covenants be adjudged

*au' 05.05.03*

to go beyond what is reasonable in all the circumstances for the protection of the interests of the Company and its shareholders, but would be adjudged reasonable if any particular covenant or covenants or parts thereof were deleted, restricted, or limited in a particular manner, then the said covenants shall apply with such deletions, restrictions, or limitations, as the case may be. The Company and the Employee further agree that the covenants set forth in this Agreement are reasonable in all circumstances for the protection of the legitimate interests of the Company and its shareholders.

12.     Waiver of Jury Trial.     EACH OF THE PARTIES HERETO HEREBY VOLUNTARILY AND IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION OR OTHER PROCEEDING BROUGHT IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

13.     Severability; Titles and Subtitles; Gender; Singular and Plural; Counterparts; Facsimile.

(a)     In case any provision of this Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby.

(b)     The titles of the sections and subsections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

(c)     The use of any gender in this Agreement shall be deemed to include the other genders, and the use of the singular in this Agreement shall be deemed to include the plural (and vice versa), wherever appropriate.

(d)     This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together constitute one instrument.

(e)     Counterparts of this Agreement (or applicable signature pages hereof) that are manually signed and delivered by facsimile transmission shall be deemed to constitute signed original counterparts hereof and shall bind the parties signing and delivering in such manner.

$\mathcal{N}_i$ 05.05.03

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first above written.

COMPANY:

VISIONS EAST, INC.

By: _____
Name: _STEVE MORTON_
Title: _PRESIDENT_

EMPLOYEE:

_____

Print Name: Tarmo Linna

Address:
Vermonrinne 8 B
FIN-00370 Helsinki
FINLAND

- 6 -

PMB_PMB_210689_1/PDICOMO

# EXHIBIT F

MMK/032803
210753v1

## NONDISCLOSURE AND DEVELOPMENTS AGREEMENT

NONDISCLOSURE AND DEVELOPMENTS AGREEMENT (the "Agreement") dated as of this 5ᵗʰ day of  May , 2003 by and between **Visions East, Inc.**, a Florida corporation, with an address at 1600 West State Road 84, Suite 5, Ft. Lauderdale, FL  33315 (collectively with any of its subsidiaries, subdivisions or affiliates, the "Company"); and **Tarmo Linna** ("Recipient") with an address at Vermonrinne 8 B, FIN-00370 Helsinki, FINLAND.

### WITNESSETH:

WHEREAS, the Company and/or one of its Affiliates may enter into a business relationship with Recipient and/or an Affiliate; as further described herein, and possesses certain Confidential Information (as herein defined), which has been or may be disclosed to Recipient;

NOW THEREFORE, the parties agree as follows:

1.      For purposes of this Agreement, "Confidential Information" means all information, data and knowledge disclosed to the Recipient by the Company concerning the organization, business, technology or finances of the Company or of any third party that the Company is under an obligation to keep confidential, including, but not limited to, trade secrets and other proprietary ideas or confidential information respecting inventions (whether or not patentable), patents, patent applications (under any divisions, continuations, in-whole or in part, patents issuing thereon and issues thereof) products, designs, sketches, plans, calculations, prototypes, models, formulas, specifications, procedures, discoveries, improvements, charts, diagrams, graphs, writings, methods, know-how, techniques, systems, processes, hardware, software, firmware, code, software programs, works of authorship, records, studies, trade practices, customer lists, projects, plans and proposals, whether in written, electronic, magnetic, optical, or any other form.

"Affiliate" shall mean, with respect to an individual, the members of his or her immediate family or any entity directly or indirectly controlled by such individual, and with respect to any entity, any person or entity controlling, controlled by or under common control with, such entity.

2.      From time to time, the Company has disclosed to Recipient, and following the execution of this Agreement may continue to disclose to Recipient, Confidential Information. The Confidential Information includes, but is not limited to, information relating to the Company's development, manufacturing, consulting, selling and leasing services and equipment for automated marine coating systems.

3.      All Confidential Information disclosed to Recipient by the Company shall remain the property of the Company.

*ℓ₁ˀ 05.05.03*

4.      Recipient shall use the Confidential Information only for the purposes described in this Agreement and shall not use the Confidential Information or assist others to use the Confidential Information for any other purposes and shall not publish or otherwise disclose the Confidential Information or any part thereof to any other person, firm or corporation; provided, however, that the obligation not to disclose the Confidential Information shall not apply to any of the following information: (a) information that Recipient can demonstrate by written records is already known to Recipient; (b) information that Recipient receives from a third party without restriction or without breach of this Agreement; (c) information that is approved for release by the written authorization of the Company; or (d) information that is or becomes publicly known other than through a knowing or wrongful act of Recipient.

5.      If, at any time, Recipient shall make, conceive, discover or reduce to practice any invention, modification, discovery, design, development, improvement, method, process, formula, data, technique, know-how, secret or intellectual property right whatsoever or any interest therein (whether or not patentable or registrable under copyright or similar statutes or subject to analogous protection or whether or not such developments are in process or reduced to practice) (all of which are hereinafter collectively termed "Developments") that results from disclosure of the Confidential Information by the Company, such Developments and the benefits thereof shall immediately become the sole and absolute property of the Company.  Recipient agrees to promptly disclose to the Company each such Development; hereby assigns any rights Recipient may have in such Developments and all patents and patent applications arising from such Developments, to the Company without compensation.  In the event that any inventions arising from such Developments are by operation of applicable state law excluded from this assignment, Recipient agrees that the Company shall have a non-exclusive, fully paid license to use for all purposes any inventions within the scope of the Company's actual and anticipated business but not assigned to the Company under this Section 5.

6.      At the request and cost of the Company, Recipient agrees to promptly sign, execute, make and do all such deeds, documents, acts and things as the Company and its duly authorized agent may reasonably require in order to:

(a)      apply for, obtain, register and vest in the name of the Company alone (unless the Company otherwise directs) letters patent, copyrights, trademarks or other analogous protection in any country throughout the world and when so obtained or vested to renew and restore the same; and

(b)      defend any judicial, opposition or other proceedings in respect of such applications and any judicial, opposition or other proceedings or petitions or applications for revocation of such letters patent, copyright, trademark or other analogous protection.

- 2 -

relief by any court of appropriate jurisdiction

If the Company is unable, after reasonable effort, to secure Recipient's signature on any application for letters patent, copyright or trademark registration or other documents regarding any legal protection relating to a Development, whether because of Recipient's physical or mental incapacity, unknown whereabouts, lack of cooperation or for any other reason whatsoever, Recipient hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as agent and attorney-in-fact, to act for and on Recipient's behalf and to execute and file any such application or applications or other documents and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent, copyright or trademark registrations or any other legal protection thereon with the same legal force and effect as if executed by Recipient.

7. Recipient understands and agrees that the Company shall determine, in its sole and absolute discretion, whether an application for patent, for copyright, for mask work registration, or for any other intellectual property right shall be filed on any Development which is assigned to Company under this Agreement, and whether such an application shall be prosecuted or abandoned prior to issuance or registration.

8. Recipient hereby represents to the best of Recipient's knowledge, that except for those obligations identified and fully described in the space provided below, Recipient has no present obligation to assign to any client, or any other non-Company person, corporation or firm, any Developments covered by Section 5.

9. Recipient acknowledges that all works of authorship and all mask works that fall within the scope of the Recipient's employment agreement are owned by the Company and are works made for hire. Accordingly, Recipient agrees to assign and hereby assigns to the Company any and all copyrights and mask work registration rights, and all other mask work rights in all material prepared by Recipient during the term of any consulting or employee agreement which relates to the business of the Company, or to the Company's actual or anticipated research or development, or which was prepared with equipment, supplies, facilities, or know-how of Company.

10. Upon conclusion of the engagement of Recipient or upon request of the Company, all Confidential Information delivered to Recipient by the Company or any of its representatives shall be returned to the Company promptly, together with all copies thereof made by Recipient or anyone acting on behalf of Recipient, and any other documents or tangible material reflecting Confidential Information prepared by Recipient (including notes) shall simultaneously be either turned over to the Company or destroyed.

11. Recipient shall exercise the highest degree of care in safeguarding the Confidential Information from disclosure or dissemination that Recipient uses in safeguarding any confidential information. *AL; 05.05.03*

12. Recipient understands and acknowledges that failure to comply with the terms of this Agreement may cause irreparable harm to the Company in such a way that the Company could not be adequately compensated by monetary damages. Each party therefor agrees that a breach or a threatened breach of this Agreement may appropriately be restrained by injunctive relief by any court of appropriate jurisdiction.

13. In the event that the Recipient is requested or required (by oral questions, interrogatories, requests for information or documents subpoena, civil investigative demand or similar process) to disclose any Confidential Information, the Recipient will provide the Company with prompt notice of such request(s) so that the Company may seek an appropriate protective order and/or waive compliance with the provisions of this Agreement.

14. This Agreement shall inure to the benefit of and be binding upon the parties and their respective successors and assigns and legal representatives.

15. This Agreement does not constitute the promise or intention of either party to buy, sell or market any products or services or to enter into any type of arrangement or agreement. All Confidential Information shall remain the sole and exclusive property of the Company at all times. No license is granted to the Recipient either directly or indirectly by this Agreement nor are any rights of ownership in Confidential Information granted by this Agreement. The Recipient shall not appropriate, for its use or the use of others, any such designs, specifications, samples or drawings, nor shall the Recipient, nor cause a third party to, disassemble, reverse-engineer or reverse-design any of such Confidential Information.

16. This Agreement and the Assignment of Concept and Non-Disclosure Agreement represents the complete understanding of the parties with respect to the Confidential Information, and supersedes all previous agreements between the parties.

17. This Agreement is governed by the laws of Florida applicable to contracts made and to be performed in Florida, and all actions that may arise at law and/or in equity arising from this Agreement may be brought in the courts of Florida or the United States District Court for the Southern District of Florida.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

COMPANY:                               RECIPIENT:

Visions East, Inc.

By: _____        _____
                                       Tarmo Linna

Name: _____
Title: _____

# EXHIBIT G

|  |  |  |
|---|---|---|
| Visions East, Inc. | Confidential Disclosure Agreement<br>12/15/2002 | 1(6) |

This Mutual Confidential disclosure Agreement ("Agreement") is made and entered into as of this day of _15_ of _Dec_ , 2002 by and between Master Automation Oy a Espoo corporation, having its principal place of business at Sinimäentie 10 B, Espoo, Finland (hereafter referred to as "MAG") and Visions East, Inc., a Florida corporation having its principal place of business at 1600 West State Road, Ft. Lauderdale, Florida, USA (Hereafter referred to as "Visions")

### Recitals

WHEREAS, MAG has developed certain Proprietary Technology as defined herein with respect to robotics machining with off-line programming and adaptive sensor Technology, which Proprietary Technology represents and is maintained as a secret and confidential information of MAG, and

WHEREAS, Visions has developed certain Proprietary Technology as defined herein with respect to automated fairing and painting of marine vessel surfaces, which Proprietary Technology represents and is maintained as a secret and confidential information of Visions, and

WHEREAS, MAG and Visions are interested in entering into a business relationship with each other for the sale of various hardware and software components and installation and the implementation of a system for the utilization of same, relating to each party's Proprietary Technology; and

WHEREAS, MAG and Visions are in the business of designing and utilizing the various hardware and software components desired by the other; and

WHEREAS, each party is willing to disclosure its Proprietary Technology to the other, but desires to maintain all rights in and control over the Proprietary Technology so disclosed, and so protect the confidentiality of the proprietary Technology by preventing the unauthorized use and dissemination thereof without the disclosing party's prior consent.

NOW, THEREFORE, in consideration of the mutual agreements and covenants contained herein, and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby covenant and agree as follows:

Confidential Disclosure Agreement                    2(6)

**Visions East, Inc.**                    12/15/2002

Section 1. Proprietary Technology.

For the purpose of this Agreement, the term "Proprietary Technology" shall mean technical information and materials related to the above identified subject matter, whether or not any such Proprietary Technology is specifically identified as Proprietary Technology and regardless of whether such Proprietary Technology qualifies as a "trade secret" under applicable Law, including, without limitation, patent applications, structures, models, techniques, processes, technical information, software, programs, knowledge, data, ideas, discoveries, drawings, documents, records, formulas and other information, whether or not similar to the foregoing, which is related in any manner, direct or indirect, to the design, implementation and/or manufacture of the disclosing party's products and services, disclosed orally or in writing, or otherwise provided by the disclosing party to the other party, or obtained or acquired by the other party through observation or examination of such information and/or materials.

Section2: Confidentiality.

Both parties shall preserve in trust as confidential and shall not use, directly or indirectly, or allow to be used, any of the other's Proprietary Technology except as necessary in connection with the implementation of the Proprietary Technology, and shall not reveal, report, publish, transfer, disclose or permit disclosure of such Proprietary Technology to any person other than each party's own authorized employees who are bound by written agreements to similarly maintain such Proprietary Technology in confidence. Both parties hereby agree to identify, upon request from the other, those persons to whom such Proprietary Technology was disclosed.

Section 3.      Confidentiality Exceptions.

(a)      Each party, and any and all of its representatives, affiliates, agents and assignees shall be bound by the confidentiality obligations imposed by this Agreement with respect to the other party's Proprietary Technology except where such Proprietary Technology:

                i. Is already known by the other party at the time of the disclosure by the disclosing party; or

                ii. Is a matter of public knowledge at the time of such disclosure; or

                iii.Later becomes a matter of public knowledge after such disclosure, though no disclosure or breach of the other party; or

                iv. Is independently made available to the undersigned by third party who legally has the right to disclose such information, is not under a secrecy obligation, contractual or otherwise, to the disclosing party with respect thereto, did not obtain such information from the other party and did not impose an obligation of confidence on the other party.

                v. Is or becomes public by the issuance of a patent or a publication of a patent application by any official patent of a recognized government.

Confidential Disclosure Agreement                    3(6)
Visions East, Inc.                    12/15/2002

(b)     Provided, however, that for any of the exceptions set forth in subsection 3 (a) to
apply, the other party must provide the disclosing party with written notice of the
existence of such exception within sixty (60) days from (1) the date of disclosure
of the disclosing party, or (2) the date of the other party's first knowledge of
information leading to a claim under subsection 3 (a) iii above, or (3) the date of a
later disclosure of a third party. Such prior notice shall be operative only if it
contains a complete description of all or part of the Proprietary Technology which
the other party believes is subject to an exception set forth in subsection 3 (a)
and all other reasonable evidence supporting applicability of such exception.  No
disclosure of Proprietary Technology shall be allowed until the disclosing party
receives a prior notice as herein specified and provides the other party with an
acknowledgment of its receipt of such notice and its satisfaction with the content
of the notice, which acknowledgment shall not be unreasonably withheld.

(c)     For purpose of the provisions of this paragraph, specific disclosures made to the
other party with respect to products, operations, formulas and other similar
matters shall not be deemed to be within any of the foregoing exceptions solely
by the fact of their inclusion within general technical disclosure in the public
domain or in the possession of the other party. Any combination of specific
factors related to the Proprietary Technology shall not be deemed to be within
any of the foregoing solely because any or all such singular factors are in the
public domain or in the possession of the other party; only if the combination of
such factors in itself and principle of their operation are the public domain or in
the possession of the other party shall such combination of factors itself to the
exceptions specific herein.


Section 4.     No Waiver of Assignment Rights.

Nothing in this Agreement shall constitute a waiver of assignment of any patent rights,
copyrights or trade secrets rights in the United States or any other foreign country that
either party may wish to obtain or enforce on all or portions of its Proprietary
Technology; furthermore, nothing in this Agreement shall limit or bar the publication of a
patent application, by issuance or otherwise, anywhere in the world, in the regular
course of moving that application toward issuance, on a party's own proprietary
Technology.


Section 5.     Tangible Items.

Each party hereby agrees to deliver to the other promptly upon termination of the
business relationship, or any time prior thereto request from the disclosing party, all
documents and materials of any kind for purpose discussed above, including any copies
or duplicates thereof, and further including without limitation all writing, recording,
drawings, models, samples, photographs, files, accounts, records, documents, sketches,
designs, diagrams, plans, blueprints, specifications, Manuals, books, forms, notes,
reports, memoranda, studies, data, calculations, catalogues, compilations of information,
correspondence and all abstracts, and summaries of the foregoing whether in hardcopy
or machine readable form, all instruments, tools and equipment, and all other physical
items which describe, depict, contain, constitute, reflect, record or are otherwise related
to the Proprietary Technology and any other business of the disclosing party, whether of



Confidential Disclosure Agreement                    4(6)

Visions East, Inc.                    12/15/2002

public nature or not, and whether or not prepared or acquired by the other party ( collectively, "Tangible Items"). All such Tangible Items shall at all times remain the sole and exclusive property of the disclosing party. All Tangible Items and other materials and information returned to a party hereunder shall be accompanied by a certificate signed by an executive officer of the returning party which states that all such Tangible Items, materials and information have been returned to the first party.

Section 6.     Injunctive relief.

Each party hereby acknowledge and agrees that it would be difficult to fully compensate the other for damages resulting from the breach or threatened breach of the Agreement, and, accordingly, that disclosing party shall be entitled to temporary and injunctive relief, including temporary restraining orders, preliminary injunctions and permanent injunctions to enforce such provisions without the necessity of proving actual damage and without the necessity of posting any bond or other undertaking in connection therewith. This provision with respect to injunctive relief shall not, however, diminish the disclosing party's right to prevent and recover damages.

Neither party hereto shall be liable for any inadvertent or unauthorized disclosure or use of Proprietary Technology provided that (1) it uses the same degree of care in safeguarding such Proprietary Technology as its own Proprietary Technology of like importance; and (2) upon discovery of such inadvertent or unauthorized disclosure or use of such Proprietary Technology, it shall promptly endeavor to prevent any further inadvertent or unauthorized disclosure or use.

Section 7.     Severable Provisions.

The provisions of the Agreement are severable and if any one or more provisions may be determined to be illegal or otherwise unenforceable, in whole or in part, the remaining provisions, and any partially unenforceable provisions to the extent enforceable, shall nevertheless be binding and enforceable.

Section 8.     Agreement Assignment.

This Agreement may not be assigned by either party without the other's written consent, which shall not be unreasonably withheld.

Confidential Disclosure Agreement  5(6)
Visions East, Inc.  12/15/2002

Section 9.  Governing Law; Dispute Resolution.

 9.1 Governing Law; Language.  This Agreement and its interpretation and enforcement shall be governed by the laws of the State of Florida without reference to its principles of conflicts of laws.  The language of this Agreement shall be English.

 9.2 Initial Dispute Resolution.  Any dispute or controversy (each, a "Dispute") that arises out of or in connection with this Agreement shall first be referred, by written notice thereof, to the chief executive officer (each, a "Senior Representative") of each party to this Agreement.  The Senior Representatives shall use their best efforts to resolve the Dispute within twenty (20) days of their receipt of such notice.  The joint written decision of the Senior Representatives regarding a Dispute shall be binding upon both of the parties to this Agreement.  If the Senior Representatives are unable to resolve a Dispute in accordance with this Section 9.2, then the Dispute shall be resolved in accordance with Section 9.3 of this Agreement.

 9.3 Binding Arbitration.  Subject to the provisions of Section 9.2 hereof, any Dispute, including, without limitation, a Dispute regarding the validity or existence of this Agreement or this Section 9.3, shall be resolved by binding arbitration which shall occur in The Hague, Netherlands.  Any such arbitration proceeding shall be conducted in the English language by one arbitrator (the "Arbitrator") pursuant to the rules of the International Chamber of Commerce ("ICC"), except that, unless the parties agree in writing otherwise:

  (a)  the Arbitrator shall prepare a final report regarding his decisions in connection with the resolution of the Dispute and submit such report to the parties hereto for signature within twenty one (21) days after the initiation of the arbitration proceedings; and

  (b)  each party hereto shall pay its own legal and other fees and expenses and one-half of all other costs and expenses associated with any such arbitration (including, without limitation, the fees and expenses of the Arbitrator and any ICC costs) unless the Arbitrator otherwise determines.

The Arbitrator's decision regarding the Dispute shall be final and binding on each of the parties to this Agreement in all respects.  Each party hereto may take all steps necessary to enforce the Arbitrator's decision regarding the Dispute, including, without limitation, the filing of such decision with a court of competent jurisdiction.

Section 10.  Captions.

The section captions are inserted only as a matter of convenience and reference, and in no way define, limit or describe the scope of this Agreement or the intent of any provision hereto.

Confidential Disclosure Agreement          6(6)
Visions East, Inc.                         12/15/2002

Section 11.    Entire Agreement.

This Agreement contains the entire agreement of the parties relating to the subject matter hereto, and the parties hereto have made no agreements, representations or warranties relating to the subject matter of this Agreement that are not set forth herein. No modification of this Agreement shall be valid unless made in writing and signed by the parties hereto.



Section 12.    Notice.

Any notice of demand required or permitted to be given hereunder shall be in writing and shall be deemed effective upon the personal delivery thereof or by facsimile transmission or, if mailed, forty-eight (48) hours after having been deposited with Federal Express International Priority Service, postage prepaid and address to the party to whom it is directed at the address set forth below.

If to MAG:                          Mr. Mika Laitinen, President
                                    Master Automation Group Oy
                                    Sinimäentie 10 B
                                    FIN-02630 ESPOO
                                    Finland

If to Visions East, Inc.:           Mr. Steve Morton, President
                                    Visions East, Inc.
                                    1600 West State Road, Suite #5
                                    Fort Lauderdale, FL 33315
                                    USA

Section 13. Agreement Term.  "The term of this Agreement shall be one (1) year. The provisions of this Agreement shall remain in effect during the term and for a period of 5 years following the expiration or termination of this Agreement for any reason.

Either party may change the address to which such notice are to be addressed by giving the other party notice in the manner herein set forth.

Section 14.    Counterparts.  This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but of which shall constitute the same instrument.

IN WITNESS WHEREOF, MAG and Visions hereto execute this Agreement by a duly authorized representative with full rights, power and authority to enter and perform this Agreement

Master Automation Group Oy.                VISIONS EAST, INC.

By: _____             By: _____

Name: MARTTI KIVELA                       Name: STEVE MORTON

Title: MANAGIN DIRECTOR                    Title: President

Date: 2 - 6 - 2003                         Date: 1 - 9 - 03

# EXHIBIT H

Visions East                    Contract Agreement                    1(26)

## CONTRACTOR AGREEMENT

THIS CONTRACTOR AGREEMENT (this "Agreement") is made and entered into as of the __23__ day of June, 2003 by and between Visions East, Inc., a Florida corporation ("Client"), and Master Automation Group Oy, a corporation organized and existing under the laws of Finland ("Contractor").

NOW, THEREFORE, in consideration of the foregoing premises, the mutual covenants, agreements, representations and warranties hereinafter set forth and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

### 1. Engagement.

Client hereby engages Contractor, and Contractor hereby accepts such engagement, to perform a pre-study of a computer-controlled robotic system for fairing and painting marine vessel surfaces as described on Attachment 1 attached hereto (the "Pre-study").

The parties agree that it is possible but not definite that as a result of the Pre-study, certain deliverables (each a "Deliverable") might be created as set forth in clause 2 of this Agreement.

Additional services shall be agreed in separate written agreements entered into from time to time by the parties. Neither party shall have any right, title or interest in or to the other party's patents, copyrights, trademarks, trade secrets or other proprietary rights, and both parties hereby reserve all rights in and to their respective intellectual property.

### 2. Deliverables

The following Deliverables shall be created during the Pre-study:

(i)     Results of the Pre-study, which set forth the technical and functional specifications of the robotic painting, fairing, spraying and milling application as such application has been set forth in Attachment 1 of this Agreement; and

(ii)    A beta version of the Surfmodeller Software.

The parties acknowledge and agree that pursuant to clause 6 of this Agreement, the Client shall only receive title and ownership to the Deliverables exclusively set forth in this clause 2 and any and all underlying rights, including without limitation proprietary rights, and intellectual property rights to any and all software,

Visions East                     **Contract Agreement**                     2(26)

business, processes, know-how, information, expertise and corresponding knowledge and tangible and intangible property, from which the Deliverables are derived from shall remain the sole and exclusive property of the Contractor and all right, title and interest thereto shall remain solely and exclusively vested in the Contractor.

### 3. Term.

The term of Contractor's engagement by Client ("Term") shall commence on the date of this Agreement and shall end when the Pre-study has been completed by the Contractor or this Agreement is terminated with written notification thereof by either of the parties. Either party may terminate this Agreement at any time by giving at least forty-five (45) days' prior written notice of termination to the other party. The Client shall be responsible to commence the Contractor reasonable documented costs resulting from termination of this Agreement by the Client, if Client terminates this Agreement and the termination is not attributable to Contractor's breach of material term of this Agreement.

### 4. Duties.

Contractor and Client have reviewed Attachment 1 and have determined each party's responsibility in regard to the Pre-Study. Each party is responsible for the tasks assigned to such party as set forth in this Agreement and Attachment 1. Tasks not assigned to one party shall be discussed by the parties and assigned to either Contractor or Client as mutually agreed to by the parties.

In the event the Client desires the Contractor to undertake any tasks, which have not been mutually agreed to by the parties as set forth in this Agreement and Attachment 1 as the responsibility of the Contractor, the Contractor may, at the request of Client, undertake such tasks subject to a separate statement of work (such an "SOW"), provided that such SOW shall be subject to the terms and conditions of this Agreement and shall be signed by both parties. Contractor shall not be required to commence work pursuant to an SOW until both parties have signed such SOW. The SOW shall set forth the agreed project to be undertaken, the Deliverables to be produced, the time frame and milestones for the work and whether such work shall be performed by Contractor on a time and materials basis as according to the Contractor's then current price list as amended from time to time or a fixed fee basis.

Contractor shall use its best efforts and devote all reasonable business time and effort to performing the Pre-study. The Contractor shall provide Client with status

Visions East                 Contract Agreement                 3(26)

The text of this document is too faded and degraded to reliably transcribe. The following section heading is legible:

## 5.    Compensation

**Vision East**          **Contract Agreement**          4(26)

Each party shall pay all taxes (including, but not limited to, taxes based upon its income, but not the taxes based on the other party's income) or levies imposed on it under applicable laws, regulations and tax treaties as a result of this Agreement and any payments made hereunder (including those required to be withheld or deducted from payments) and shall furnish evidence of such paid taxes as is sufficient to enable the other party to obtain any credits available to it.

Client shall pay all undisputed invoices issued by Contractor within thirty (30) days after receipt of such invoice. In the event that the Client fails to pay the Fee within fourteen (14) after written notification thereof by the Contractor, the Contractor shall have the right to suspend any and all tasks it has undertaken in the execution of this Agreement.
Any undisputed invoice not paid by its due date shall be subject to interest for late payment equal to an annual rate of sixteen percent (16%).

For the purposes of this Agreement the Client may only dispute a payment or invoice if the Client were to be able to show evidence and grounds for such dispute.

Until such time that the Client has effected all undisputed payments in full due to the Contractor under this Agreement, the Deliverables and all related materials including without limitation any and all status reports shall be deemed Confidential Information of the Contractor.

**6. Confidential Information.**

Each party ("Receiving party" for the purposes of this Section 6) shall not disclose to third parties nor use for any purpose other than for the proper fulfilment of the purpose of this Agreement any technical, financial or commercial information ("Information") received from the other party ("Disclosing party") in whatever form under or in connection with this Agreement without the prior written permission of the Disclosing party. The above mentioned limitations shall not apply to — Information which:

(a)  was in the possession of the Receiving party prior to disclosure hereunder; or

(b)  was in the public domain at the time of disclosure or later became part of the public domain without breach of the confidentiality obligations herein contained; or

(c)  was disclosed by a third party without breach of any obligation of confidentiality owed to the Disclosing party; or

(d)  was independently developed by personnel of the Receiving party having no

access to the Information.

(e) was disclosed pursuant to law or a court order provided that the other party is provided reasonable prior written notice to allow the Disclosing Party to object to such disclosure or obtain a protective order regarding the disclosure of the Information.

Each party shall limit access to Information to those of its personnel for whom such access is reasonably necessary for the proper performance of this Agreement. Such personnel shall be bound by confidentiality obligations not less restrictive than those provided for in this Agreement.

Notwithstanding the foregoing, neither party shall be liable to the other for any unauthorized disclosure of Information if it can be established that it has exercised the same degree of care, however not less than reasonable care, in protecting the Information from such disclosure as it exercises in respect of its own confidential information and business secrets.

The provisions of this Clause 6 shall bind the parties for a period of five (5) years from the date of disclosure of any item of Information regardless of any earlier termination, expiry or fulfillment of this Agreement.

Without prejudice to the generality of the foregoing, each party agrees not to use any of the Information or technology of the other party for any use or purposes except those expressly specified in this Agreement.

The parties acknowledge that money damages would be an inadequate remedy for the injuries and damage that would be suffered by the Disclosing Party in the case of breach of this Section 6. Therefore, the Disclosing Party, besides any other remedies it may have at law or in equity, shall be entitled to injunctive relief (without the requirement for filing a bond) to enforce the provisions of this Section 6. The Receiving Party's duties and obligations under this Section 6 shall survive the termination or cancellation of this Agreement. The Receiving Party's liability for any breach of this Section 6 shall not be subject to any limitation of liability provision contained elsewhere in this Agreement.

Upon request of the Disclosing Party, or upon termination or expiration of this Agreement, the Receiving Party shall promptly destroy or deliver to the Disclosing Party the Information and any notes, extracts or other reproductions in whole or in part relating thereto, without retaining any copy thereof. In the event of destruction, an officer of the Receiving Party shall certify that all Information has been destroyed.

SW
JK

Visions East                    Contract Agreement                    6(26)

7.    Ownership of Deliverables; Acceptance.

The Deliverables as set forth in Section 2 and Attachment 1 shall become the sole property of the Client after the Pre-study has been completed and the Client has paid the final configured invoice to the Contractor. Notwithstanding the foregoing, the Contractor shall be free to use for any purpose any and all gained know-how and residual information resulting from the Pre-study provided that the same is deposited in the enabled memory of the persons working on the Pre-study and the Contractor shall not disclose the Deliverables to any third parties in contrast to the following paragraph.

Once the Contractor has completed the Pre-study it shall render the Deliverables available to Client for acceptance.  Contractor shall not render the Deliverables available for access and viewing by any third party, without the prior written consent of the Client, which consent may be withheld in Client's sole and exclusive discretion subject to timely and proper payment of any and all configured invoices.  Client shall have thirty (30) days from the date the Deliverables are made available to Client, to test and accept the Deliverables.

Exclusive of any other remedy and recourse, the Client may reject the Deliverables delivered to the Client by the Contractor, in the event that during the acceptance test undertaken by the Client on the Deliverables, the Client proves that the Deliverables do not materially conform to the specifications set forth in this Agreement and Attachment 1. Such rejection shall only be available to the extent that the Deliverables have not in any way been amended, altered, tampered with or changed after the Deliverables have been delivered to the Client for testing and acceptance.

The Client shall be solely responsible for conducting any and all acceptance testing that it desires to undertake on the Deliverables and the Client shall be solely responsible for any and all costs relating thereto.

The Deliverables shall be deemed accepted by the Client upon (i) the Client issuing to the Contractor written notification thereof; (ii) the Client not notifying the Contractor within the acceptance period of material non-conformance of the deliverables; or (iii) the Client commences production or commercial use of the Deliverables, whichever of these alternatives (i),(ii) or (iii) is occurred first. The Contractor shall be entitled to send its final invoice for the Deliverables after the Deliverables have been accepted pursuant to this paragraph.

8.    Subcontractors.

Vision Ent                    Contract Agreement                    7(26)

The Contractor shall not subcontract all or any portion of the Pre-study to be performed under this Agreement without the prior written consent of Client in each instance. Client reserves the right to reasonably accept or reject any proposed subcontractor. Any part of the Pre-study performed for Contractor by a permitted subcontractor must be performed pursuant to a written subcontract (a "Subcontract") between the Contractor and such subcontractor. Contractor shall deliver a copy of each executed Subcontract to Client within five (5) days after the execution thereof, excluding such information of the Contractor that the Contractor in his sole discretion and good faith deems unnecessary to be disclosed to the Client.

9.    Warranties.

Contractor represents and warrants that: (i) Contractor's performance under this Agreement shall not violate: (x) any applicable treaty, compact, law, rule, ordinance, regulation or order, (b) any contracts with third parties, or (c) the rights of any person or entity in or to any existing patent, trademark, trade name, copyright, trade name, license or other proprietary or similar right available in the public domain; (ii) neither the Deliverables nor Client's use thereof shall misappropriate, violate or infringe the rights of any party in or to any patent, trademark, trade name, copyright, trade name, license or other proprietary or similar right; (iii) Contractor is the lawful owner or licensee of any software programs or materials to be used by Contractor in its performance of the Pre-study; and (iv) the Pre-study shall be performed by Contractor in a professional and workmanlike manner.

THE FOREGOING WARRANTIES SET FORTH THE ENTIRE LIABILITY OF THE CONTRACTOR WITH REGARD TO THE SUBJECT MATTER HEREOF AND THE WARRANTIES ARE IN LIEU OF ALL OTHER REPRESENTATIONS, WARRANTIES AND CONDITIONS EXPRESS OR IMPLIED.

10.    Notices.

No notice or other communication shall be deemed given unless sent in any of the manners, and to the persons, as specified in this Section 9. All notices and other communications hereunder shall be in writing and shall be deemed given: (i) upon receipt if delivered personally or if mailed by registered or certified mail upon receipt requested and postage prepaid; (ii) at noon on the date after dispatch if sent by a nationally recognized overnight courier; or (iii) upon the completion of a facsimile transmission (which is confirmed by telephone or by a statement generated by the transmitting machine). In any case, such notice shall be delivered

Visions East                    Contract Agreement                    8(26)

to the parties at the addresses or facsimile numbers as specified below (or at such other address or facsimile number for a party as shall be specified by like notice):

**If to Client:**
Visions East, Inc.
1600 West State Road 84, Suite 5
Ft. Lauderdale, Florida 33315
Attention: Chief Executive Officer
Facsimile: +1 954-522-1665
Telephone: +1 954-522-1445

**If to Contractor:**
Master Automation Group Oy
Sinkilantie 16B
02600 Espoo, Finland
Attention: Chief Executive Officer
Facsimile: +358 0 201 553 536
Telephone: +358 0 201 356 524

**With a copy to:**
Edwards & Angell, LLP
One North Clematis Street, Suite 400
West Palm Beach, Florida 33401
Attention: Mark M. Kemp
Facsimile: +1 561-655-8719
Telephone: +1 561-833-7700

11.    **Independent Contractor.**

Contractor shall at all times be an independent contractor and nothing in this Agreement shall at any time be construed so as to create the relationship of employer and employee, principal and agent, partnership or joint venture as between Contractor and Client. Contractor shall have the entire charge, control and supervision of its performance under this Agreement. Without prejudice to the terms and conditions of this Agreement, neither party shall have any authority to bind the other party to any contractual or other obligation whatsoever. Neither party shall in any manner be answerable or accountable for: (i) any violation by the other party of any federal, state or local laws, regulations, ordinances, rules or orders; or (ii) for any injury, loss or damage arising from or out of any act or omission of the other party.

12.    **Indemnification.**

Contractor shall indemnify, defend and hold harmless Client from and against: (i) any damage to real or tangible personal property, and (ii) any personal injury or death caused by the willful misconduct or gross negligence of Contractor's employees or agents in connection with the provision of services pursuant to this Agreement.

Client shall indemnify, defend and hold harmless Contractor from and against: (i) any damages to real or tangible personal property; or (ii) any personal injury or death caused by the willful misconduct or gross negligence of Client's employees or agents in connection with Contractor's provision of services pursuant to this Agreement.

The foregoing indemnification obligations shall be provided from the indemnifying party to the indemnified party, provided that the indemnified party: (i) notifies the indemnifying party in writing promptly after learning of any such claim; (ii) turns over to the indemnifying party all responsibilities and control with respect to such claim; (iii) will not agree to the settlement of any such claim, demand, action or suit prior to a judgment thereon without the prior written consent of indemnifying party and (iv) fully cooperates with the indemnifying party, at the indemnifying party's expense, in the defense thereof. The indemnified party shall have the right to participate in such defense through its own counsel at its sole expense.

Notwithstanding what has been stated above, in no event shall Contractor be responsible (whether within the indemnification given in this Section 12 or otherwise) for claims or damages incurred by the Client, which are caused by or attributable to:

(a)   use of the Deliverables for a purpose different than the purpose for which they were designed; or

(b)   Contractor's compliance with the Client's requirements or other instructions related to the Deliverables or service of the Contractor; or

(c)   the modifications, or customizations, made to the Deliverables by the Client or a third party without the prior written authorization of Contractor; or

(d)   any of the Client's products, the Client's or third party software, hardware, products or other materials; or

(e)   the Client continuing to use or distribute the Deliverables or parts thereof, by whatever means or in any form, after Contractor has instructed the Client to the contrary.

### 13. Governing Law; Venue

This Agreement and the respective rights and obligations of the parties hereto shall be governed by and construed in accordance with the laws of the Netherlands, without regard to its conflicts of laws provisions.

Vinious East                          Contract Agreement                          10(26)

Any dispute, controversy or claim arising out of or relating to this Agreement or the breach, termination or invalidity thereof shall be finally settled by arbitration in accordance with the arbitration rules of the Dutch Central Chamber of Commerce by one arbitrator. The Parties shall jointly agree on the arbitrator and if failing to so agree within fourteen days of a demand being made, the Dutch Central Chamber of Commerce will appoint him. The arbitration shall be held in Hague, Netherlands and the arbitral proceedings shall be conducted in the English language.

**14.   Successors and Assigns**

Neither party may assign or transfer this Agreement or any rights or obligations hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld. Subject to the foregoing, this Agreement and the terms, covenants, provisions and conditions hereof shall be binding upon, and shall inure to the benefit of, the respective heirs, successors and assigns of the parties hereto.

**15.   Severability.**

If any provision of this Agreement is held to be invalid or unenforceable for any reason, such provision shall be conformed to prevailing law rather than voided, if possible, in order to achieve the intent of the parties and, in any event, the remaining provisions of this Agreement shall remain in full force and effect and shall be binding upon the parties hereto.

**16.   Jury Trial**

THE PARTIES HERETO HEREBY KNOWINGLY AND VOLUNTARILY WAIVE ANY RIGHT WHICH EITHER OR BOTH OF THEM WILL HAVE TO RECEIVE A TRIAL BY JURY WITH RESPECT TO ANY CLAIMS, CONTROVERSIES OR DISPUTES WHICH WILL ARISE OUT OF THIS AGREEMENT OR THE SUBJECT MATTER HEREOF.

**17.   Limitation of Damages.**

Irrespective of any other provision of this Agreement, the maximum aggregate amount of money damages for which party may be liable to the other party under this Agreement shall in aggregate be limited to one hundred (100) percent of the Fee actually paid by the Client to the Contractor under this Agreement.

Vision East                    Contract Agreement                    11(26)

The above-set limitation of liabilities shall not be applied to either party in events of breach of Section 6 (Confidential Information) and Section 12 (Indemnification) or to any damages caused by willful misconduct or gross negligence.

UNDER NO CIRCUMSTANCES WILL EITHER PARTY BE LIABLE TO THE OTHER FOR ANY SPECIAL, INDIRECT, CONSEQUENTIAL, EXEMPLARY OR PUNITIVE DAMAGES BASED ON ANY THEORY OF CONTRACT, TORT, STRICT LIABILITY, NEGLIGENCE OR OTHERWISE, EVEN IF SUCH PARTY HAS BEEN ADVISED OF, OR SHOULD HAVE KNOWN OF, THE POSSIBILITY OF SUCH DAMAGES.

The Contractor states that it shall adhere to any and all mandatory employment legislation enforceable in Finland.

**18.   Compliance with Law.**

Both parties agree that they shall at all times fully comply with all laws, statutes, ordinances, rules, regulations and orders applicable to the services performed under this Agreement.

**19.   Entire Agreement.**

This Agreement embodies the entire agreement and understanding of the parties hereto with respect to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings, oral or written, relating to said subject matter.

**20.   Enumeration and Headings.**

The enumeration and headings contained in this Agreement are for convenience of reference only and shall not control or affect the meaning or construction of any of the provisions of this Agreement.

**21.   Counterparts.**

This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all of which shall together constitute one and the same agreement.



Vision East                    Contract Agreement                    12(26)

**22.    No Employment Agreement**

CONTRACTOR HEREBY EXPRESSLY ACKNOWLEDGES AND AGREES THAT THIS AGREEMENT IS NOT, AND WILL NOT UNDER ANY CIRCUMSTANCES BE DEEMED TO BE, A CONTRACT OF EMPLOYMENT BETWEEN CLIENT AND CONTRACTOR.

**23.    Waiver.**

All rights available to either party under this Agreement or any other document delivered hereunder or in connection herewith, or allowed it by law or equity, are and shall be cumulative and may be exercised separately or concurrently and from time to time without waiver of any other remedies. Neither party shall be deemed to have waived any right, power or privilege under this Agreement unless such waiver shall have been expressed in a written instrument signed by the waiving party. The failure of either party hereto to enforce any provision of this Agreement shall in no way be construed as a waiver of such provision or a right of such party to thereafter enforce such provision or any other provision of this Agreement.

**24.    Construction.**

Unless the context of this Agreement otherwise clearly requires: (i) references in this Agreement to the plural include the singular, the singular the plural, the masculine the feminine, the feminine the masculine and the part the whole; and (ii) the word "or" shall not be construed as exclusive and the word "including," "includes," and "included" shall not be construed as limiting.

**25.    Names.**

Neither party shall use the other party's or any of the other party's affiliates' names, marks, logos or other designations for any reason without the other party's express prior written consent in each instance; and all such names, marks, logos and other designations of the other party shall at all times be and remain the sole and exclusive property of the referent party.

**26.    Amendment.**

This Agreement may not be amended or modified in any manner except by a written agreement signed by each of the parties hereto.

Visions East                    Contract Agreement                    13(26)

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Agreement as of the day and year first above written.

CLIENT:

VISIONS EAST, INC.

By: _____

Name: STEVE MORTON

Title: President

CONTRACTOR:

MASTER AUTOMATION GROUP OY

By: _____

Name: KARTTI KIVELÄ

Title: MD

# EXHIBIT I

**VISIONS EAST, INC.**

SHAREHOLDERS AGREEMENT

May 2, 2003

5.4     <u>Compliance with Laws, Contracts, Licenses and Permits, Notice of Proceedings</u>. The Company and its Subsidiaries will (a) comply in all material respects with all applicable laws and regulations wherever its business is conducted, (b) comply with the provisions of its Charter and by-laws, (c) comply in all material respects with all agreements and instruments by which it or any of its properties may be bound, (d) comply with all applicable decrees, orders, and judgments and (e) comply in all material respects with all required approvals, permits and licenses. If any authorization, consent, approval, permit or license from any officer, agency or instrumentality of any government shall become necessary or required in order that any of the Company or its Subsidiaries may fulfill any of its obligations hereunder, the Company and its Subsidiaries will promptly take or cause to be taken all reasonable steps within its power to obtain such authorization, consent, approval, permit or license and furnish the Investors with evidence thereof.

## ARTICLE 6

## <u>CONFIDENTIALITY</u>

6.1     <u>Confidentiality</u>. Under no circumstances and at no time during or after the term of this Agreement will a Holder directly or indirectly, disclose, divulge, render or offer any knowledge or information with respect to the affairs or plans of the Company, except in the course of the proper performance of his duties hereunder or unless otherwise in the public domain, and each Holder acknowledges and agrees that any and all such information will be received by him and held in a confidential capacity.

6.2     <u>Enforcement</u>. The Company and each Holder agrees that the covenants set forth in this **Section 6** shall be enforced to the fullest extent permitted by law.

## ARTICLE 7

## <u>MISCELLANEOUS</u>

7.1     <u>Conflicting Charter or By-Law Provisions</u>. Each Holder shall vote his, her or its Company Securities, and shall take all actions necessary, to ensure that the Company's Charter and by-laws do not, from time to time, conflict with the provisions of this Agreement. Each Holder hereby represents and warrants that he, she or it has not granted any proxy and is not a party to or bound by any voting trusts with respect to his, her or its Company Securities, and that he, she or it is not party to or bound by any shareholder agreement or arrangement of any kind with any Person with respect to his, her or its Company Securities inconsistent with the provisions of this Agreement (whether or not such trust, agreement or arrangement is with other holders of Company Securities that are not parties to this Agreement). In addition, no Holder shall grant any proxy or enter into or agree to be bound by any voting trust with respect to his, her or its Company Securities, nor shall any Holder enter into any shareholder agreement or arrangement of any kind with any Person with respect to his, her or its Company Securities, inconsistent with the provisions of this Agreement (whether or not such trust, agreement or arrangement is with other holders of Company Securities that are not parties to this Agreement).

- 12 -

IN WITNESS WHEREOF, the parties hereto have executed this Shareholders' Agreement as of the day and year first above written.

**COMPANY:**

**VISIONS EAST, INC.**

By: _____
         John Stephen Morton, President

**INVESTORS:**

*[Individuals]*                                              *[Entities]*

                                                             FAGREDALL TIGRE MARINE SYSTEM AB
_____                              Name of Entity
Signature

                                                             By: _____
Name:_____                                 Name: _____ THOMAS LINDBERG
                                                             Title: BOARD MEMBER
Date: _____, 2003                                  Date: _____ MAY 2 _____, 2003

IN WITNESS WHEREOF, the parties hereto have executed this Shareholders' Agreement as of the day and year first above written.

**COMPANY:**

**VISIONS EAST, INC.**

By: _____
John Stephen Morton, President

**INVESTORS:**

**[Individuals]**                                      **[Entities]**

_____          _____
Signature                                               Name of Entity

                                                              By:_____
Name:_____          Name:_____
                                                              Title:_____
Date: _____, 2003                  Date: _____, 2003

**FOUNDER:**

By: _____
Name: John Stephen Morton

JS 44    (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Visions East, Inc. <br> John S. Morton | Fagerdala Thiger Marine Systems, AB; Fagerdala World Foam, AB; Fagerdala USA, Inc.; Master Automation Group, OY; Tarmo Linna <br> Pierre Thiger |

MAGISTRATE JUDGE
BROWN

| (b) County of Residence of First Listed Plaintiff    Broward <br> (EXCEPT IN U.S. PLAINTIFF CASES) | County of Residence of First Listed Defendant _____ <br> (IN U.S. PLAINTIFF CASES ONLY) <br> NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE <br> TRACT OF LAND INVOLVED. |
|---|---|

05-61264

(c)  Attorney's (Firm Name, Address, and Telephone Number)

Peter C. Commette, Law Offices of Peter M. Commette
1323 Southeast Third Avenue, Fort Lauderdale FL 33316
954-764-0005
(see attachment)

Attorneys (If Known)

0:05CV61264-Cooke/Brown

(d) Check County Where Action Arose:  □ DADE   □ MONROE   ☑ BROWARD   □ PALM BEACH   □ MARTIN   □ ST. LUCIE   □ INDIAN RIVER   □ OKEECHOBEE  HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

| | |
|---|---|
| □ 1  U.S. Government <br> Plaintiff | ☑ 3  Federal Question <br> (U.S. Government Not a Party) |
| □ 2  U.S. Government <br> Defendant | □ 4  Diversity <br> (Indicate Citizenship of Parties in Item III) |

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                          and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | □ 1 | □ 1 | Incorporated or Principal Place <br> of Business In This State | □ 4 | □ 4 |
| Citizen of Another State | □ 2 | □ 2 | Incorporated and Principal Place <br> of Business In Another State | □ 5 | □ 5 |
| Citizen or Subject of a <br> Foreign Country | □ 3 | □ 3 | Foreign Nation | □ 6 | □ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| □ 110 Insurance <br> □ 120 Marine <br> □ 130 Miller Act <br> □ 140 Negotiable Instrument <br> □ 150 Recovery of Overpayment <br> & Enforcement of Judgment <br> □ 151 Medicare Act <br> □ 152 Recovery of Defaulted <br> Student Loans <br> (Excl. Veterans) <br> □ 153 Recovery of Overpayment <br> of Veteran's Benefits <br> □ 160 Stockholders' Suits <br> □ 190 Other Contract <br> □ 195 Contract Product Liability <br> □ 196 Franchise | **PERSONAL INJURY** <br> □ 310 Airplane <br> □ 315 Airplane Product <br> Liability <br> □ 320 Assault, Libel & <br> Slander <br> □ 330 Federal Employers' <br> Liability <br> □ 340 Marine <br> □ 345 Marine Product <br> Liability <br> □ 350 Motor Vehicle <br> □ 355 Motor Vehicle <br> Product Liability <br> □ 360 Other Personal <br> Injury | **PERSONAL INJURY** <br> □ 362 Personal Injury - <br> Med. Malpractice <br> □ 365 Personal Injury - <br> Product Liability <br> □ 368 Asbestos Personal <br> Injury Product <br> Liability <br> **PERSONAL PROPERTY** <br> □ 370 Other Fraud <br> □ 371 Truth in Lending <br> □ 380 Other Personal <br> Property Damage <br> □ 385 Property Damage <br> Product Liability | □ 610 Agriculture <br> □ 620 Other Food & Drug <br> □ 625 Drug Related Seizure <br> of Property 21 USC 881 <br> □ 630 Liquor Laws <br> □ 640 R.R. & Truck <br> □ 650 Airline Regs. <br> □ 660 Occupational <br> Safety/Health <br> □ 690 Other <br> **LABOR** <br> □ 710 Fair Labor Standards <br> Act <br> □ 720 Labor/Mgmt. Relations <br> □ 730 Labor/Mgmt. Reporting <br> & Disclosure Act <br> □ 740 Railway Labor Act <br> □ 790 Other Labor Litigation <br> □ 791 Empl. Ret. Inc. <br> Security Act | □ 422 Appeal 28 USC 158 <br> □ 423 Withdrawal <br> 28 USC 157 <br> **PROPERTY RIGHTS** <br> □ 820 Copyrights <br> ☑ 830 Patent <br> □ 840 Trademark <br> **SOCIAL SECURITY** <br> □ 861 HIA (1395ff) <br> □ 862 Black Lung (923) <br> □ 863 DIWC/DIWW (405(g)) <br> □ 864 SSID Title XVI <br> □ 865 RSI (405(g)) <br> **FEDERAL TAX SUITS** <br> □ 870 Taxes (U.S. Plaintiff <br> or Defendant) <br> □ 871 IRS—Third Party <br> 26 USC 7609 | □ 400 State Reapportionment <br> □ 410 Antitrust <br> □ 430 Banks and Banking <br> □ 450 Commerce <br> □ 460 Deportation <br> □ 470 Racketeer Influenced and <br> Corrupt Organizations <br> □ 480 Consumer Credit <br> □ 490 Cable/Sat TV <br> □ 810 Selective Service <br> □ 850 Securities/Commodities/ <br> Exchange <br> □ 875 Customer Challenge <br> 12 USC 3410 <br> □ 890 Other Statutory Actions <br> □ 891 Agricultural Acts <br> □ 892 Economic Stabilization Act <br> □ 893 Environmental Matters <br> □ 894 Energy Allocation Act <br> □ 895 Freedom of Information <br> Act <br> □ 900Appeal of Fee Determination <br> Under Equal Access <br> to Justice <br> □ 950 Constitutionality of <br> State Statutes |
| **REAL PROPERTY** <br> □ 210 Land Condemnation <br> □ 220 Foreclosure <br> □ 230 Rent Lease & Ejectment <br> □ 240 Torts to Land <br> □ 245 Tort Product Liability <br> □ 290 All Other Real Property | **CIVIL RIGHTS** <br> □ 441 Voting <br> □ 442 Employment <br> □ 443 Housing/ <br> Accommodations <br> □ 444 Welfare <br> □ 445 Amer. w/Disabilities - <br> Employment <br> □ 446 Amer. w/Disabilities - <br> Other <br> □ 440 Other Civil Rights | **PRISONER PETITIONS** <br> □ 510 Motions to Vacate <br> Sentence <br> Habeas Corpus: <br> □ 530 General <br> □ 535 Death Penalty <br> □ 540 Mandamus & Other <br> □ 550 Civil Rights <br> □ 555 Prison Condition | | | |

## V. ORIGIN (Place an "X" in One Box Only)

☑ 1 Original Proceeding   □ 2 Removed from State Court   □ 3 Remanded from Appellate Court   □ 4 Reinstated or Reopened   □ 5 Transferred from another district (specify)   □ 6 Multidistrict Litigation   □ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

(Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity)

U.S. Civil Statute: 35 U.S.C. 1 et seq.; Brief Description:  Patent infringement

LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

| VII. REQUESTED IN <br> COMPLAINT: | □ CHECK IF THIS IS A CLASS ACTION <br> UNDER F.R.C.P. 23 | DEMAND $ | CHECK YES only if demanded in complaint <br> JURY DEMAND:  ☑ Yes  □ No |
|---|---|---|---|

| VIII. RELATED CASE(S) <br> IF ANY | (See instructions): | JUDGE | DOCKET NUMBER |
|---|---|---|---|

DATE    7-29-05

SIGNATURE OF ATTORNEY OF RECORD    Scott Edgett for Peter M. Commette, Esq. #350133
#576719

FOR OFFICE USE ONLY

RECEIPT #          AMOUNT  250.00          APPLYING IFP

034887

# CIVIL COVER SHEET ATTACHMENT

1(c) Attorneys

L. Peter Farkas
Robert H. Morse
FARKAS + MORSE LLP
1101 30th Street NW
Washington, D.C.  20007

202.337.7200

✎ AO 120 (Rev. 2/99)

| COMMISSIONER OF PATENTS & TRADEMARKS<br>2121 CRYSTAL DRIVE<br>SUITE 1100<br>ARLINGTON, VA 22201 | REPORT ON THE<br>FILING OR DETERMINATION OF AN<br>ACTION REGARDING A PATENT OR<br>TRADEMARK |
|---|---|

In Compliance with 35 § 290 and/or 15 U.S.C. § 1116 you are hereby advised that a court action has been

filed in the U.S. District Court _____Southern District of Florida_____ on the following   X **Patents** or  ☐ **Trademarks:**

| DOCKET NO.<br>05-61264-CIV-MGC | DATE FILED<br>7/29/05 | U.S. DISTRICT COURT<br>Southern District of Florida |
|---|---|---|
| PLAINTIFF<br>Visions East, Inc. And John Stephen Morton | | DEFENDANT<br>Fagerdala Thiger Marine Systems, AB, et al. |

| | PATENT OR<br>TRADEMARK NO. | DATE OF PATENT<br>OR TRADEMARK | HOLDER OF PATENT OR TRADEMARK |
|---|---|---|---|
| 1 | 6,365,221 | 4/2/02 | Morton |
| 2 | 6,652,139 | 5/13/03 | Morton |
| 3 | | | . |
| 4 | | | |
| 5 | | | |

In the above—entitled case, the following patent(s) have been included:

| DATE INCLUDED | INCLUDED BY<br>☐ Amendment     ☐ Answer     ☐ Cross Bill     ☐ Other Pleading | | |
|---|---|---|---|
| | PATENT OR<br>TRADEMARK NO. | DATE OF PATENT<br>OR TRADEMARK | HOLDER OF PATENT OR TRADEMARK |
| 1 | | | |
| 2 | | | |
| 3 | | | . |
| 4 | | | |
| 5 | | | |

In the above—entitled case, the following decision has been rendered or judgement issued:

| DECISION/JUDGEMENT |
|---|
| |

| CLERK<br>CLARENCE MADDOX | (BY) DEPUTY CLERK<br>Lisa I. Streets | DATE<br>8/1/05 |
|---|---|---|

**Copy 1—Upon initiation of action, mail this copy to Commissioner     Copy 3—Upon termination of action, mail this copy to Commissioner**
**Copy 2—Upon filing document adding patent(s), mail this copy to Commissioner     Copy 4—Case file copy**