UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

**NIGHT BOX FILED**

SEP 21 2005

CLARENCE MADDOX
CLRK, USDC / SDFL / MIA

Case No. 05-CIV-61264-COOKE/BROWN

VISIONS EAST, INC.,
A Florida corporation, and
JOHN STEPHEN MORTON,
an individual,

       **Plaintiffs**

v.

FAGERDALA THIGER MARINE SYSTEMS, AB;
FAGERDALA WORLD FOAM, AB;
FAGERDALA USA, INC.;
MASTER AUTOMATION GROUP, OY;
TARMO LINNA; and PIERRE THIGER,

       **Defendants**

_____/

## PLAINTIFFS' MOTION FOR AMENDMENT OF JUDGMENT AND MEMORANDUM IN SUPPORT

Plaintiffs, Visions East, Inc. and John Stephen Morton, by and through their undersigned counsel, hereby serve their Motion for Amendment of Judgment and Memorandum in Support and state:

1.     This Court issued an Order on September 8, 2005, a copy of which is attached as Exhibit "1."

2.     The Order is very clear in its final paragraph wherein it states in pertinent part:

> The Court...having reviewed the relevant arbitration clauses and the claims in the plaintiff's Complaint finds that the parties must arbitrate these claims, as per the terms of their respective agreements.

Page 1 of 3



3.      One defendant, Tarmo Linna, does not have an agreement which the plaintiffs intend to pursue that provides for arbitration, and plaintiffs will not agree to same. For ease of reference, the subject agreements plaintiff Visions East intends to enforce against Tarmo Linna are attached to Exhibit "2," the Complaint plaintiff intends to pursue in State Court, once the Court amends its Order.

4.      Pursuant to Rule 59, F.R.C.P. (a) and (e), District Court possesses the power the alter or amend a judgment after its entry. Because the Court could not have intended to include Tarmo Linna in its Order granting that "the parties must arbitrate these claims, as per the terms of their respective agreements," when no subject agreement signed between Visions East and Tarmo Linna contemplates arbitration, the Court should amend its Order to reflect that Tarmo Linna is not included in the Court's decision to stay pending arbitration.

5.      Plaintiff has discussed this motion with counsel for Linna in an attempt to reach an agreement, but he does not agree to this motion.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been furnished via U.S.

mail on this ___21 st___ day of September 2005, to:

Leonard Samuels, Esquire
Berger Singerman
Suite 1000
350 East Las Olas Boulevard
Fort Lauderdale, FL 33301

Holiday Russell, Esquire
Holiday Hunt Russell, Chartered
2040 Polk Street
Hollywood, FL 33020

Philip E. Ward, Esquire
401 East Las Olas Blvd., Suite 1710
Fort Lauderdale FL 33301

Respectfully submitted,

PETER M. COMMETTE, P.A.
Attorney for Plaintiffs
1323 Southeast 3rd Avenue
Fort Lauderdale, FL 33316
954/764-0005 Fax: 954/764-1478

By: _____
PETER M. COMMETTE, ESQ.
Florida Bar No. 350133

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### Case No.: 05-CIV-61264-COOKE/BROWN

VISIONS EAST, INC.,
a Florida corporation, and
JOHN STEPHEN MORTON,

     *Plaintiffs,*

*vs.*

FAGERDALA THIGER MARINE SYSTEMS, AB,
a Swedish corporation, *et al.,*

     *Defendants.*

_____/



FILED by _____ D.C.
MGC

SEP - 8 2005

CLARENCE MADDOX
CLERK U. S. DIST. CT.
S.D. OF FLA. - MIAMI

### ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION, GRANTING DEFENDANTS' MOTION TO STAY PROCEEDINGS AND COMPEL ARBITRATION AND DENYING ALL PENDING MOTIONS AS MOOT

     **THIS CAUSE** came before the Court upon Plaintiffs' Motion for Preliminary Injunction [**D.E. 2**], filed July 29, 2005, the Defendant Master Automation Group, OY's ("MAG") Motion to Stay and Compel Arbitration [**D.E. 31**], filed August 18, 2005 and Defendants Fagerdala Thiger Marine Systems, AB, Fagerdala World Foam, AB, Fagerdala USA, Inc., and Pierre Thiger's Motion to Stay Proceedings and Compel Arbitration [**D.E. 65**], filed August 24, 2005. The Court having reviewed the motions and having heard testimony from the parties at the hearing held before the Court on September 6, 2005, it is hereby,

     **ORDERED AND ADJUDGED** that the Plaintiffs' Motion for Preliminary Injunction is **DENIED**.

     It is further,

## EXHIBIT 1

**ORDERED AND ADJUDGED** that the Defendants' respective Motions to Stay

Proceedings and Compel Arbitration are **GRANTED**.   All proceedings in this action are stayed

pending arbitration.  Within thirty (30) days of the entry of this Order, and every sixty (60) day

period thereafter, the parties shall file a joint status report, setting forth the status of the

arbitration proceedings.  Any such report may be filed by one (1) party with the consent of the

other party.

It is further,

**ORDERED AND ADJUDGED** that All Pending motions are **DENIED AS MOOT**.

## *Motion for Preliminary Injunction*

After the Court heard argument from counsel and testimony from the John Morton,

Plaintiff and owner of Co-Plaintiff, Visions East, Inc., it is the Court's finding that the Plaintiffs

failed to demonstrate irreparable harm, which precludes the entry of a preliminary injunction

against the Defendants.

The Court must grant or deny a preliminary injunction based on an assessment of the

following factors: the likelihood of success; (2) irreparable harm if the injunction is not granted;

(3) the balance of the hardships between the parties; and (4) the public interest.  *See Int'l*

*Cosmetics Exchange, Inc. v. Gapardis Health & Beauty, Inc.,* 303 F.3d 1242, 1246 (11th Cir.

2002).  This Circuit has also stated that  " '[a] preliminary injunction is an extraordinary and

drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion'

as to each of the four prerequisites.' " *Siegel v. Lepore,* 234 F.3d 1163, 1176 (11th Cir.

2000)(quoting *McDonald's Corp. v. Robertson,* 147 F.3d 1301, 1306 (11th Cir. 1998)).

The Eleventh Circuit has further stated that irreparable harm or injury is " ' the sin qua

non of injunctive relief.' " *Id.* (quoting *Northeastern Fla. Chapter of the Ass'n of Gen. Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990)).  Where the Court does not find a likelihood of irreparable injury, preliminary injunctive relief is improper.  *See id.* In order to qualify as irreparable, harm or injury must be 'actual or imminent." *Id.*  In determining whether harm is irreparable, courts consider, as one factor, the delay of the movant in seeking relief.  *See e.g., Badillo v. Playboy Entertainment Group, Inc.*,  2004 WL 1013372, at *2 (M.D. Fla. 2004).  "Delay, or too much of it, indicates that a suit or request for injunctive relief is more about gaining an advantage (either a commercial or litigation advantage) than protecting a party from irreparable harm." *Id.*

The testimony of Mr. Morton demonstrated that as early as April 2004, a dispute arose between MAG and Visions East over MAG's solicitation to a potential customer, Oy Nautor Ab. Approximately one (1) month later, Visions East's European counsel threatened injunctive relief against MAG because of its solicitation of this potential customer.  Throughout 2004, Visions East's counsel threatened either an injunction or other legal action against MAG, but never took any action against MAG until the Complaint and instant motion were filed on July 29, 2005, some sixteen (16) months later. Mr. Morton's reason for this delay is that Visions East was attempting to close a deal for its VEbot. The Plaintiffs' own admissions belie any such irreparable harm.  Clearly the harm alleged was not "actual and imminent."  Commercial needs, not irreparable harm to the company, were paramount to Visions East during this time.

It is also not lost on the Court that during this period, Defendant Linna, who worked as an unpaid consultant to Visions East, and is the person alleged to given "trade secrets" to his Co-Defendants, was never fired for allegedly divulging "trade secrets."  Likewise, Mr. Thiger, also a

Page 3 of 5

Co-Defendant, and a member of Visions East's Board of Directors, was allowed to remain as a member of the Board of Directors even though the Plaintiffs maintain that he is also a member of the alleged conspiracy. No such irreparable harm can be found when the Plaintiffs failed to take any action to protect Visions East's interest.

Moreover, the trade secrets the Plaintiffs maintain are confidential, are not confidential. During testimony it was revealed that Visions East has only one customer.[1] The customer lists and vendor lists that the Plaintiffs maintain are confidential, are merely lists of the largest boat and yacht manufacturers. All of the names of these companies are readily available in trade publications. This information is not confidential and cannot be classified as trade secrets or a legally protectable interest. Simply put, the Plaintiffs failed to prove that there exists information that is entitled to the protection afforded by granting a motion for preliminary injunction. Accordingly, the Court concludes that the Plaintiffs have failed to show a likelihood of irreparable injury.

### *Motion to Stay Proceedings and Compel Arbitration*

The Federal Arbitration Act ("FAA") provides that a "written provision in any . . . contract . . . to settle by arbitration" any future controversy arising out of such contract "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. §2. The FAA was designed "to reverse the longstanding judicial hostility to arbitration agreements . . . and to place [them] on the same footing as other contracts." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 24 (1991). The FAA

---

[1]     It is Mr. Morton's position that any entity or individual that Visions East has contacted about the VEbot system, is a customer, whether or not they purchase a system. The Court disagrees with this definition.

embodies a "liberal federal policy favoring arbitration agreements." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983). Any doubts with respect to arbitrability therefore should be resolved in favoring arbitration. *Id.*

With that said, a party can be compelled to arbitrate only those matters that the parties have agreed to arbitrate. *First Options of Chicago Inc. v. Kaplan*, 514 U.S. 938 (1995); *Brandon, Jones, Andall, Zeide, Kohn, Chalal & Musso, P.A. v. Medpartners, Inc.*, 312 F.3d 1349, 1357 (11th Cir. 2002).

The Court having heard the testimony of the Mr. Morton regarding procurement of the arbitration clauses in both the shareholder's agreement and the agreement with MAG and having reviewed the relevant arbitration clauses and the claims in the Plaintiffs' complaint finds that the parties must arbitrate these claims, as per the terms of their respective agreements.

**DONE AND ORDERED** in chambers in Miami, Florida this 𝒳 day of September, 2005.

THE HONORABLE MARCIA G. COOKE
UNITED STATES DISTRICT COURT JUDGE

cc:

*All Counsel of Record*

The Honorable Magistrate Judge Stephen T. Brown

IN THE CIRCUIT COURT FOR THE
SEVENTEENTH JUDICIAL CIRCUIT
IN AND FOR BROWARD COUNTY, FL

**VISIONS EAST, INC.,**
    **A Florida Corporation,**            **CASE NO.**

        **Plaintiff,**

**TARMO LINNA,**                **Complaint For:**
    **An Individual,**             **Breach of Contract**

        **Defendant.**

---

## COMPLAINT

Plaintiff Visions East, Inc. ("Visions East"), alleges against Defendant Tarmo Linna ("Linna") as follows based on information and belief except as to allegations that pertain to Plaintiffs:

### I. THE PARTIES

1.     Plaintiff Visions East is a closely held Florida corporation with its principal place of business at 1600 West State Road 84, Suite 5 Fort Lauderdale, Florida 33315. Visions East is a marine robotics firm engaged in the design and sale of computer controlled systems that provide automated robotic application of coating systems for marine vessels ("VEbot™ System").

2.     Defendant Tarmo Linna ("Linna") is an individual Finnish citizen residing at Vermonrinne 8 B FIN-00370 Helsinki, Finland.  Linna is a robotics engineer and former employee and a corporate officer (Vice President of Robotics) of Visions East.

### JURISDICTION

3.     The matter in controversy exceeds $15,000.

4.     Linna has regularly conducted business in this jurisdiction.  In 2001, he

**EXHIBIT 2**

became an unpaid consultant to Visions East, a Fort Lauderdale corporation with its principal place of business in Fort Lauderdale, and became a full-time salaried employee of Visions East in 2003. He attended the 2000 and 2002 IBEX shows in Fort Lauderdale and the 2003 Fort Lauderdale Boat Show in the Southern District of Florida.  Since 2001, Linna has made numerous telephone calls, sent hundreds of e-mails and has engaged in numerous Instant Messenger transmissions with Visions East officers, employees and consultants located in Fort Lauderdale and sent numerous expense vouchers to Visions East in Fort Lauderdale for payment for expenses incurred on behalf of his employment.

5.    Defendant Linna also has contractually consented to the jurisdiction of and venue in this Court. Specifically, Paragraph 10(a) of the Noncompetition and Nonsolicitation Agreement between Linna and Visions East dated May 5, 2003, upon which the claims against Linna are partially based, provides in pertinent part that:

> EACH OF THE PARTIES HERETO CONSENTS TO THE JURISDICTION OF ALL STATE AND FEDERAL COURTS IN BROWARD COUNTY FLORIDA. . . .

Paragraph 10 (b) of the same Agreement provides in pertinent part that:

> EACH OF THE PARTIES HERETO HEREBY EXPRESSLY WAIVES ANY AND ALL OBJECTIONS IT MAY HAVE TO VENUE, INCLUDING WITHOUT LIMITATON, THE INCONVENIENCE OF SUCH FORUM, IN ANY SUCH COURTS.

The other two subject agreements (Linna's Employment Agreement and his Non Disclosure and Developments Agreement; see paragraph 21, infra) also provide for personal jurisdiction in Florida (see paragraph 9 and 17, respectively).

2

## HISTORY OF VISIONS EAST AND ITS BUSINESS

6.      Plaintiff Visions East was founded in 1994 by John Stephen Morton, its President, board chairman and principal shareholder.  Morton has 28 years of experience in the application of fairing and paint coating systems on new and refitted yacht projects.  Over the last 11 years, Morton has researched, developed and designed the first automated system for preparing, fairing, priming and painting yachts and military and commercial vessels.  This work revolutionized the process of coating marine vessels and has resulted in several U.S. and foreign patents.

7.      Preparation, fairing,1 priming and painting yachts has traditionally been performed manually, using hand tools in a series of repetitive and time-consuming steps. Manual fairing and painting is dangerous work because it is performed by laborers working on temporary scaffolding, wielding heavy, awkward equipment. Workers often become

———————————————

1 Fairing is a process whereby the exterior surface of the hull, or superstructure, of a marine vessel is prepared, primed, filled, sanded, primed and sanded again until an ideally smooth surface is achieved. The vessel's surface is then re-primed in preparation for a mirror-paint finish.  Fairing is costly because the process is dangerous, labor intensive, time consuming and environmentally hazardous. As a result, fairing has traditionally been performed almost exclusively on yachts. Virtually all yachts over 100 feet long and built in the last 20 years undergo this costly process. Fairing of commercial and military vessels has been limited.

3

fatigued, which leads to industrial accidents. Also, skilled, dependable fairing technicians are often in short supply. The work is also messy and unhealthy, generating toxic dust that is hazardous to the environment and to the workers.

8.      Visions East automated the surface preparation, fairing and painting process, making this procedure safer, less labor-intensive, more efficient, more environmentally friendly and more precise than previous methods. In addition, Visions East's computer-controlled robotic process provides consistent, uniform, high-quality coating systems, which are superior to manual methods. The VEbot™ System also extends the life span of the coatings and reduces maintenance costs over time. Its automated process reduces fairing materials, minimizes waste, and conserves weight on vessels. Automation also enables "around-the-clock," "24/7" continuous operation, repeatable uniformity and improved coatings application quality. It also increases efficiencies by significantly reducing labor and material costs, as well as increasing the precision when measuring and mixing coatings, which creates shorter production and delivery times, a reduction in the number of coatings required and a safer, cleaner and healthier work environment.

9.      Visions East's automated process presents economies that make it cost effective for fairing to be applied beyond the limited market segment of high-end yachts. The cost effectiveness of Visions East's process is driving ever-broader application of fairing to commercial and military vessels.

10.     Numerous articles describing Visions East's technology have been published in marine industry publications crediting Visions East with developing and introducing computer-controlled robotic technology to the marine industry. Visions East's technology

has earned it and its inventor Morton honors and acclaim in the industry, including the prestigious "International Superyacht Technology Innovation Award" (ISTIA) for overall innovation in advancing superyacht technology, awarded to Visions East in May 2004 at the Seas2004 Superyacht Technology Trade Show in Nice, France.

11.     Visions East's business is to design and sell custom "turn-key" computer-controlled robotic systems to boat yards around the world for preparing, fairing and painting marine vessel surfaces.

12.     Visions East markets its system in two ways: (a) directly to yacht builders though Morton's personal contacts in the industry and (b) by attending and displaying at U.S. and international trade shows geared toward the marine construction and maintenance industry.  Visions East targets leading yacht-builders and commercial and naval shipyards and worldwide.

13.     Visions East evaluates, selects and contracts with robotics integration companies to assist in the delivery of custom-designed automated systems.  The system configuration may vary based on customer needs.  The systems can include all or some of the basic components (lasers, milling, sanding and painting) and may also incorporate other options, including wireless connectivity to the customer's network or video monitoring for remote monitoring of the system over the Internet.  Visions East determines customer requirements and develops the appropriate solution with assistance from integrator(s) contracted for each specific project.  Visions East also manages the integration effort. Once the system is operational, Visions East may call upon the integrator to maintain the system, assure its proper operation and honor any warranties.

14.     Visions East is a fledgling company having just delivered to its first and only customer as yet the first built VEbot™ system, with numerous other potential customers considering the multimillion dollar contracts for a VEbot™ system.  Therefore, the actions complained of come at a crucial time in the life of Visions East.

### Visions East's Patents

15.     On November 23, 1999, Morton filed his first patent application for marine vessel fairing and painting technology.

16.     On April 2, 2002, the U.S. Patent and Trademark Office ("PTO") granted Morton U.S. Patent No. 6,365,221 ("221 patent").  The '221 patent, entitled Computer Controlled Method and Apparatus for Fairing and Painting of Marine Vessel Surfaces, is assigned to Visions East.

17.     On May 13, 2003, the PTO granted Morton U.S. Patent No. 6,562,139 ('139 patent").  The '139 patent, titled Computer Controlled Apparatus for Fairing and Painting of Marine Vessel Surfaces, is also assigned to Visions East.

18.     The 221 and 139 patents and their issued and pending foreign counterparts represent the culmination of more than a decade's work by Mr. Morton and Visions East to develop the world's first computer-controlled robotic process for preparing, fairing and painting yachts, military ships and commercial vessels.

19.     In addition to its two U.S. patents, Visions East has received eight foreign patents with patents pending in the European Union, Sweden and Finland based on the U.S. priority filing date.

6

### LINNA AND VISIONS EAST

20.    In late 2001, Linna informed Morton that he no longer was working for a robotics company called RTS/ Wright.  Linna agreed to assist Visions East as a part-time, unpaid consultant with the understanding that he would gain equity participation in Visions East and that Visions East would offer him a salaried position once Visions East obtained equity funding. Visions East agreed to this arrangement and Linna began working for Visions East December 2001.

21.    On May 5, 2003, Linna joined Visions East as a full-time, salaried employee and officer with the title of Vice President of Robotic Systems and an annual salary of approximately $100,000.   Morton created Linna's position to assist in Visions East's implementation of Morton's patented technology. As a condition of his employment, Linna entered into the following written agreements with Visions East:

> a.    An Employment Agreement, a true copy of which is attached as Exhibit A;
>
> b.    A Non-Competition and Non-Solicitation Agreement, a true copy of which is attached as Exhibit B. This Agreement, among other things, prohibited Linna from competing with, or accepting employment from, a firm that competes with Visions East for a period of two years after leaving his employment with Visions East;
>
> c.    A Non-Disclosure and Developments Agreement, a true copy of which is attached as Exhibit C; and
>
> d.    A Non-Qualified Stock Option Agreement, granting Linna options to

7

purchase 444,444 shares (5% of the company) in recognition of Linna's prior unpaid consulting work. This agreement is not attached and is not at issue, because Linna has renounced the options.

22.     As a consultant, and later as a salaried employee of Visions East, Linna had unlimited access to Visions East's proprietary and technical information, confidential research and development information, confidential potential customer lists and confidential financial and cost information. In addition, Morton freely shared his product development ideas, confidential information, industry contacts and business plans with Linna.

23.     In late 2004, Defendant Linna began secret discussions with Laitinen about announcing his resignation from Visions East to openly join MAG, a competitor seeking to drive Visions East out of business.

24.     On February 16, 2005, Linna resigned from Visions East.

25.     Within a few weeks of his resignation, or much sooner, Linna rejoined a former colleague of his, Mikah Laitinen, at MAG, as Sales Manager of MAG's new "Marine Division," a competitor of Visions East.  See Composite Exhibit D.

26.     Linna quickly began offering the VEbot™ System on behalf of MAG to Visions East's customers and others by (a) creating false and misleading MAG promotional materials including photographs of VEbot™ System installed at the FTMS boat yard; (b) falsely representing the VEbot System as MAG's unpatented "FlexMill" milling and grinding machine; (c) directly targeting and soliciting Visions East potential customers from Visions East's confidential potential customer data that Linna misappropriated; and (d) marketing

8

MAG's FlexMill as a knock-off Visions East's VEbot™ System with all the VEbot™ System's patented features and functionality.

## Count 1

## Breach of Contract

27.     Plaintiff Visions East hereby incorporates paragraphs 1-27 by reference as if fully set forth herein.

28.     On May 5, 2003, Visions East and Defendant Linna entered into a series of agreements, including the VE-Linna Non-Competition and Non-Solicitation Agreement (Exhibit B) and the VE-Linna Non-Disclosure and Development Agreement (Exhibit C), whereby Linna agreed not to compete with Visions East for a period of two years following termination of his employment with Visions East, and not to use Visions East's confidential information.

29.     Linna breached the confidentiality provisions of his agreements with Visions East while still employed by Visions East by, among other things, providing confidential information to MAG, FTMS and Thiger without authorization by Visions East management.

30.     Linna breached the non-competition provisions of his agreements with Visions East by his acceptance of employment by MAG within weeks of his resignation from Visions East for the purpose of leading MAG's effort to enter the market for computer controlled robotic preparation, fairing and painting systems for marine vessels

9

in competition with Visions East.

31.    Linna breached the non-solicitation provisions of his agreements with Visions East by among other things, soliciting and obtaining a contract for MAG to sell and install a computer controlled robotic preparation, fair and painting system to Nautor.

32.    Linna's breaches of his agreements with Visions East have injured and damaged Visions East.

**WHEREFORE** Plaintiff Visions East prays for judgment against Defendant Linna as follows:

A.    Permanent injunctive relief in accordance with the agreements, enjoining Linna from using Visions East's confidential information, competing with Visions East or working for a competitor and soliciting its potential customers and from working in pursuit of MAG's or any third party's efforts to enter the market for computer controlled robotic preparation, fairing and painting systems for marine vessels.

B.    Awarding damages in favor of Visions East against Linna in an amount believed by plaintiff to be in excess of $15,000 and to be determined in accordance with the evidence and the law;

C.    Awarding Visions East costs; and

D.    Granting Visions East such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiffs Visions East and Morton hereby demand a trial by jury for all issues triable

10

to a jury.

Dated: _____, 2005

Respectfully submitted,

_____

L. Peter Farkas
Robert H. Morse
FARKAS + MORSE LLP
1101 30th Street NW
Washington, D.C. 20007

202.337.7200 Phone
202.337.7808 Fax

Peter M. Commette (#350133)
LAW OFFICES OF
PETER M. COMMETTE, PA
1323 Southeast Third Avenue
Fort Lauderdale, Florida 33316
PMCommette@aol.com
954-764-0005 Phone
954-764-1478 Fax

*Counsel for Plaintiff Visions East, Inc*

11

# EXHIBIT A

PMD/MMK032803
211025v2

**VISIONS EAST, INC.**
**EMPLOYMENT AGREEMENT**

THIS EMPLOYMENT AGREEMENT ("Agreement") is made as of this 5ᵗʰ day of _May_, 2003 by and between **VISIONS EAST, INC.**, a Florida corporation and its affiliates and subsidiaries (collectively the "Company") and **TARMO LINNA** (the "Executive").

The parties are entering into this Agreement in order to set forth the terms and conditions under which the Executive shall be employed by the Company.

NOW, THEREFORE, the parties hereto, intending to be legally bound hereby, and in consideration of the mutual covenants contained herein, agree as follows:

1.    <u>Employment</u>.  The Company hereby agrees to employ the Executive and the Executive hereby accepts employment on the terms and conditions set forth herein.

2.    <u>Employment at Will</u>.  The Executive and the Company understand and agree that the Executive is an employee at will, and that the Executive may resign, or the Company may terminate the Executive's employment, at any time and for any or for no reason.  Nothing in this Agreement or any Related Agreements (as hereinafter defined) shall be construed to alter the at-will nature of the Executive's employment, nor shall anything in this Agreement or any Related Agreements be construed as providing the Executive with a definite term of employment.

3.    <u>Position</u>.  During the Executive's employment with Company, the Executive shall serve as Vice President, Technology.  The Executive shall perform those duties generally required of persons in the position of Vice President, Technology as well as such other duties, not inconsistent with this Agreement, as the <u>President and/or</u> Board of Directors of the Company (the "Board") may from time to time direct.  The Executive shall report and be responsible to the ~~Board~~<u>President</u>.

4.    <u>Scope of Services</u>.  The Executive agrees to devote the Executive's full business time (which shall involve forty (40) hours per week or more as needed) and attention, skills and best efforts to the performance of the Executive's duties hereunder and shall not, during the Executive's employment by the Company, without the prior written approval of the Board, be employed by or otherwise engaged in any other business activity requiring any of the Executive's time, _provided_ that the Executive may, to the extent not otherwise prohibited by this Agreement, devote such amount of time as does not interfere or compete with the performance of the Executive's duties under this Agreement to any one or more of the following activities: (i) investing the Executive's personal assets in such manner as will not require services to be rendered by the Executive in the operation of the affairs of the companies in which investments

_M 05.05.03_

are made; or (ii) engaging in charitable activities, including serving on the Boards of Directors of charitable organizations.

5.     Salary, Compensation and Benefits.

5.1     Base Salary.  During the Executive's employment, the Company agrees to pay, and the Executive agrees to accept, as the Executive's salary for all services to be rendered by the Executive hereunder, a salary at an annual rate of Eighty Five Thousand Dollars ($85,000.00) ("Base Salary"), payable at the same time that the Company pays its employees generally.  The Base Salary is subject to annual increases in the sole discretion of the Board.

5.2     Stock Option.  For services previously rendered to the Company and subject to the terms and conditions of the Non-Qualified Stock Option Agreement (the "Agreement") substantially in the form attached hereto as Exhibit A, Executive shall be granted an Option to purchase up to 444,444 shares of the Company's common stock par value $0.001 per share (the "Option Shares").  The Option Shares shall vest in accordance with, and is subject to the terms of, the Option Agreement.

5.2     Performance Bonus.  Executive shall not be entitled to receive a performance bonus, unless otherwise approved by the Board.

5.3     Incentives, Savings and Retirement Plans.  The Executive shall also be entitled to participate in all incentive stock option, savings, and retirement plans, policies and programs made available by the Company to executive-level employees generally ("Plans").

5.4     Fringe Benefits.  During the Executive's employment with the Company, the Executive shall be entitled to the benefits of such group medical, travel and accident, short and long-term disability and term life insurance, if any, as the Company shall make generally available from time to time to executive-level employees.

5.5     Reimbursement.  The Company shall reimburse the Executive (or, in the Company's sole discretion, shall pay directly), upon presentation of vouchers and other supporting documentation as the Company may reasonably require, for reasonable out-of-pocket expenses incurred by the Executive relating to the business or affairs of the Company or the performance of the Executive's duties hereunder, including, without limitation, reasonable expenses with respect to entertainment, travel and similar items, *provided* that the incurring of such expenses shall have been approved in accordance with the Company's regular reimbursement procedures and practices in effect from time to time.

5.6     Vacation.  In addition to statutory holidays, the Executive shall be entitled to [three (3) weeks] paid vacation each calendar year during the Executive's employment, accruing ratably each month.

5.7     Withholding.  The Company may withhold from the Executive's compensation all applicable amounts required by law. *a ⋅ 05.05.03*

5.8    Taxes.  Executive, not Company shall be solely responsible for paying all required federal, state~~and~~, local, value added and other taxes ~~related to any consideration provided under this Agreement~~, that may be imposed by any jurisdiction within or without the United States for the transactions associated with this Agreement, excluding any taxes based on Company's income.

6.    Employment Termination.

The Executive's employment under this Agreement may be earlier terminated as follows:

6.1 Termination For Cause.   At the election of the Company, the Executive's employment with the Company may be terminated for Cause (as defined below) immediately upon written notice by the Company to the Executive.  "Cause" shall mean the Executive's: (i) dishonesty of a material nature (including, but not limited to, theft or embezzlement of Company funds or assets); (ii) conviction of, or guilty plea or no contest plea, to a felony charge or any misdemeanor involving moral turpitude, or the entry of a consent decree with any governmental body; (iii) noncompliance in any material respect with any laws or regulations, foreign or domestic, affecting the operation of the Company's business; (iv) violation of any express direction or any rule, regulation or policy established by the Board that is consistent with the terms of this Agreement, if such violation is likely to have a material adverse effect on the Company; (v) material breach of this Agreement or material breach of the Executive's fiduciary duties to the Company; (vi) gross incompetence, gross neglect, or gross misconduct in the performance of the Executive's duties; (vii) repeated and consistent failure to be present at work during normal business hours except during vacation periods or absences due to temporary illness; or (viii) abuse of alcohol or drugs which interferes with the Executive's performance of his duties.  With respect to those circumstances of Cause set forth in the preceding clauses (iii) through (viii) that are reasonably susceptible to cure, Cause shall only exist where the Company has provided the Executive with written notice of the alleged problem and the Executive has failed to cure such condition to the satisfaction of the Company within ten (10) business days.

6.2.    Death or Disability.   The Executive's employment with the Company shall terminate upon the Executive's death or, at the election of the Company by written notice to the Executive, upon the Disability of the Executive.   As used in this Agreement, the term "Disability" shall mean the inability or failure of the Executive to perform the essential functions of the position with or without reasonable accommodation as a result of a mental or physical disability for a period of ninety (90) or more days (whether or not consecutive) during any twelve (12) months, all as determined in good faith by the Board of Directors of the Company.

6.3.    Termination Without Cause.   The Company may terminate the Executive's employment with the Company at any time for any reason or for no reason at the date specified in the notice by written notice to the Executive.

7.    **Effect of Termination**.

*Ol, 05.05.03*

7.1.   Termination for Cause.  In the event of a termination for "Cause" under Section 6.1, the Executive shall be entitled to no severance or other termination benefits, or any other benefits (except for any health insurance benefits as required by applicable law).

7.2.   Termination for Death or Disability.  If the Executive's employment is terminated by death or Disability pursuant to Section 6.2, the Company shall pay to the Executive or the Executive's estate the compensation which would otherwise be payable to the Executive up to the thirtieth (30th) day following the day as of which the Executive's employment is terminated.

7.3.   Termination Without Cause.  In the event Executive's employment is terminated by the Company without Cause pursuant to Section 6.3, the Company shall pay the Executive an amount equal to two (2) months Base Salary ("Severance") to be paid over a like number of months consistent with the Company's normal payroll schedule.  All payments are expressly conditioned upon the Executive's compliance with the terms of the surviving provisions of this Agreement and all other agreements to which the Company and the Executive are parties.

8.   Related Agreements.  The Executive is executing on the date hereof a Noncompetition and Nonsolicitation Agreement, a Nondisclosure and Development Assignments Agreement and the Option Agreement (all, as amended from time to time, being collectively referred to as the "Related Agreements").

9.   Executive's Representations and Warranties.  The Executive represents and warrants that the Executive is not a party to any other employment, non-competition, or other agreement or restriction which could interfere with the Executive's employment with the Company or the Executive's or the Company's rights and obligations hereunder and that the Executive's acceptance of employment with the Company and the performance of the Executive's duties hereunder will not breach the provisions of any contract, agreement, or understanding to which the Executive is party or any duty owed by the Executive to any other person.

10.   Waivers and Amendments.  The respective rights and obligations of the Company and the Executive under this Agreement may be waived (either generally or in a particular instance, either retroactively or prospectively, and either for a specified period of time or indefinitely) or amended only with the written consent of a duly authorized representative of the Company and the Executive.

11.   Successors and Assigns.  The provisions hereof shall inure to the benefit of, and be binding upon, the Company's successors and assigns.

12.   Entire Agreement.  This Agreement and the Related Agreements constitute the full and entire understanding and agreement of the parties with regard to the subjects hereof and supersede in their entirety all other or prior agreements, whether oral or written, with respect thereto.

13.   Notices.  All demands, notices, requests, consents and other communications required or permitted under this Agreement shall be in writing and shall be personally delivered or sent by facsimile machine (with a confirmation copy sent by one of the other methods

4   DeltaView comparison of iManageDeskSite://172.16.8.25/PMB/211025/2 and iManageDeskSite://172.16.8.25/PMB/211025/2. Performed on 4/1/2002.

authorized in this Section), reputable commercial overnight delivery service (including Federal Express and U.S. Postal Service overnight delivery service) or, deposited with the U.S. Postal Service mailed first class, registered or certified mail, postage prepaid, as set forth below:

If to the Company, addressed to:

Visions East, Inc.
1600 W. State Road 84
Suite 5
Ft. Lauderdale, Florida 33315
Fax: 954-522-1665

with a copy to:

Edwards & Angell, LLP
One North Clematis Street
Suite 400
West Palm Beach, Florida 33401
Attention: Mark M. Kamp, Esq.
Fax: 561-655-8719

If to the Executive, to the address set forth on the signature page of this Agreement or at the current address listed in the Company's records.

Notices shall be deemed given upon the earlier to occur of (i) receipt by the party to whom such notice is directed; (ii) if sent by facsimile machine, on the day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) such notice is sent if sent (as evidenced by the facsimile confirmed receipt) prior to 5:00 p.m. Eastern Time and, if sent after 5:00 p.m. Eastern Time, on the day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) after which such notice is sent; (iii) on the first business day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) following the day the same is deposited with the commercial courier if sent by commercial overnight delivery service; or (iv) the fifth day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) following deposit thereof with the U.S. Postal Service as aforesaid. Each party, by notice duly given in accordance therewith, may specify a different address for the giving of any notice hereunder.

14.   Governing Law.  This Agreement shall be construed and enforced in accordance with and governed by the laws of Florida (without giving effect to any conflicts or choice of laws provisions thereof that would cause the application of the domestic substantive laws of any other jurisdiction).

15.   Consent to Jurisdiction

(a)   EACH OF THE PARTIES HERETO HEREBY CONSENTS TO THE JURISDICTION OF ALL STATE AND FEDERAL COURTS LOCATED IN BROWARD COUNTY, FLORIDA, AS WELL AS TO THE JURISDICTION OF ALL COURTS TO

5     DeltaView comparison of iManageDeskSite://172.16.8.25/PMB/211025/2 and
iManageDeskSite://172.16.8.25/PMB/211025/2. Performed on 4/1/2003.

WHICH AN APPEAL MAY BE TAKEN FROM SUCH COURTS, FOR THE PURPOSE OF ANY SUIT, ACTION OR OTHER PROCEEDING ARISING OUT OF, OR IN CONNECTION WITH, THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY, INCLUDING, WITHOUT LIMITATION, ANY PROCEEDING RELATING TO ANCILLARY MEASURES IN AID OF ARBITRATION, PROVISIONAL REMEDIES AND INTERIM RELIEF, OR ANY PROCEEDING TO ENFORCE ANY ARBITRAL DECISION OR AWARD. EACH PARTY HEREBY EXPRESSLY [WAIVES ANY AND ALL RIGHTS TO BRING ANY SUIT, ACTION OR OTHER PROCEEDING IN OR BEFORE ANY COURT OR TRIBUNAL OTHER THAN THE COURTS DESCRIBED ABOVE AND COVENANTS THAT IT SHALL NOT SEEK IN ANY MANNER TO RESOLVE ANY DISPUTE OTHER THAN AS SET FORTH IN THIS SECTION OR AS PROVIDED IN THE NONDISCLOSURE AND DEVELOPMENTS AGREEMENT, OR TO CHALLENGE OR SET ASIDE ANY DECISION, AWARD OR JUDGMENT OBTAINED IN ACCORDANCE WITH THE PROVISIONS HEREOF.

(b)   EACH OF THE PARTIES HERETO HEREBY EXPRESSLY WAIVES ANY AND ALL OBJECTIONS IT MAY HAVE TO VENUE, INCLUDING, WITHOUT LIMITATION, THE INCONVENIENCE OF SUCH FORUM, IN ANY OF SUCH COURTS. IN ADDITION, EACH OF THE PARTIES CONSENTS TO THE SERVICE OF PROCESS BY PERSONAL SERVICE OR ANY MANNER IN WHICH NOTICES MAY BE DELIVERED HEREUNDER IN ACCORDANCE WITH SECTION 13 OF THIS AGREEMENT.

16.   _Equitable Remedies_.  The parties hereto agree that irreparable harm would occur in the event that any of the agreements and provisions of this Agreement were not performed fully by the parties hereto in accordance with their specific terms or conditions or were otherwise breached, and that money damages are an inadequate remedy for breach of this Agreement because of the difficulty of ascertaining and quantifying the amount of damage that will be suffered by the parties hereto in the event that this Agreement is not performed in accordance with its terms or conditions or is otherwise breached.  It is accordingly hereby agreed that the parties hereto shall be entitled to an injunction or injunctions to restrain, enjoin and prevent breaches of this Agreement by the other parties and to enforce specifically such terms and provisions of this Agreement, such remedy being in addition to and not in lieu of, any other rights and remedies to which the other parties are entitled to at law or in equity.

17.   _Waiver of Jury Trial_.  EACH OF THE PARTIES HERETO HEREBY VOLUNTARILY AND IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION OR OTHER PROCEEDING BROUGHT IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

18.   _Severability; Titles and Subtitles; Gender; Singular and Plural; Counterparts; Facsimile_.

(a)   In case any provision of this Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby. *Ai· 05.05.03*

(b)     The titles of the sections and subsections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

(c)     The use of any gender in this Agreement shall be deemed to include the other genders, and the use of the singular in this Agreement shall be deemed to include the plural (and vice versa), wherever appropriate.

(d)     This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together constitute one instrument.

(e)     Counterparts of this Agreement (or applicable signature pages hereof) that are manually signed and delivered by facsimile transmission shall be deemed to constitute signed original counterparts hereof and shall bind the parties signing and delivering in such manner.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement on the date first above specified.

COMPANY:                                          EXECUTIVE:

**VISIONS EAST, INC.**

By: _____          _____
Name: Steve Morton                             Tarmo Linna
Title: PRESIDENT                                  Address:        Vermonrinne 8 B
                                                                          FIN-00370
                                                                          Helsinki, FINLAND

7        DeltaView comparison of iManageDeskSite://172.16.8.25/PMB/211025/2 and iManageDeskSite://172.16.8.25/PMB/211025/3. Performed on 4/1/2003.

# EXHIBIT B

PMD/MMK032803
210689v1

## NONCOMPETITION AND NONSOLICITATION AGREEMENT

This NONCOMPETITION AND NONSOLICITATION AGREEMENT ("Agreement"), made as of this 5 day of _May_, 2003 by and among **VISIONS EAST, INC.**, a Florida corporation, and its affiliates and subsidiaries (collectively the "Company"), and the employee whose name is below his/her signature line below (the "Employee").

### RECITALS

WHEREAS, the Employee has significant knowledge and experience in the Company's business and intimate knowledge of its customers, processes, trade secrets and/or other business information and the Company needs to protect its commercial good will and other assets; and

WHEREAS, as a material inducement for the Company to enter into an employment agreement with Employee, Employee has agreed to execute this Agreement.

NOW THEREFORE, in consideration of the foregoing, the agreements set forth below the parties' desire to preserve the value inherent in the Company for their mutual benefit and the benefit of the Purchasers, and for other valuable consideration (the receipt of which the Employee hereby acknowledges), the Employee, intending to be legally bound hereby, agrees with the Company as follows:

1.    <u>Definitions.</u>

"Competing Business" shall mean any one or more of the following: (i) the development, manufacturing, selling, leasing and provision of consulting services related to the automated equipment and processes for the marine coatings industry; (ii) any other business in which the Company engages on or before the Termination Date; or (iii) any other business in which the Company develops an intention to engage on or before the Termination Date, and (a) for which the Company prepared an existing business plan or study on or before the Termination Date or (b) for which the Board of Directors of the Company commissioned a business plan or study on or before the Termination Date.

"Employment Agreement" means the employment agreement among the Company and Employee dated of even date herewith.

"Person" shall mean an individual, partnership, corporation, limited liability company, association, trust, joint venture, unincorporated organization and any government, governmental department or agency or political subdivision thereof.

"Protected Territory" shall mean worldwide.

"Termination Date" shall mean the date the Employee ceases to be employed by the Company or its Subsidiaries.

2.    Term.  The term of this Agreement shall be for a period commencing on the date hereof and ending 24 months after the Termination Date ("Term").

3.    Noncompetition.  During the Term hereof, the Employee agrees that Employee will not, singly, jointly, or as a partner, member, employee, agent, officer, director, stockholder (except as a holder, for investment purposes only, of not more than five percent of the outstanding stock of any company listed on a national securities exchange, or actively traded in a national over-the-counter market), equity holder, lender, consultant, independent contractor, or joint venturer of any other Person, or in any other capacity, directly or beneficially:  own, manage, operate, join, control, or participate in the ownership, management, operation or control of, or permit the use of his name by, or work for, or provide consulting, financial or other assistance to, or be connected in any manner with, a Competing Business anywhere in the Protected Territory before the Termination Date.

4.    Nonsolicitation.  During the Term hereof, the Employee agrees that Employee shall not:

(i)    employ, retain or engage (as an employee, consultant, or independent contractor), or induce or attempt to induce to be employed, retained or engaged, any person who is or was during the Term of this Agreement, an employee, consultant or independent contractor of the Company;

(ii)    induce or attempt to induce any Person who, as of the Effective Date or at any time thereafter during the Term of this Agreement, is an employee, consultant, or independent contractor of the Company to terminate his or her employment or other relationship with the Company; or

(iii)    induce or attempt to induce any Person who is a customer of the Company or who otherwise is a contracting party with the Company, as of the Effective Date or at any time thereafter during the Term of this Agreement to terminate any written or oral agreement or understanding or other relationships with the Company.

5.    Waivers and Amendments.  The respective rights and obligations of the Company and the Employee under this Agreement may be waived (either generally or in a particular instance, either retroactively or prospectively, and either for a specified period of time or indefinitely) or amended only with the written consent of a duly authorized representative of the Company and the Employee.

6.    Successors and Assigns.  The provisions hereof shall inure to the benefit of, and be binding upon, the Company's successors and assigns.

7.    Entire Agreement.  This Agreement constitutes the full and entire understanding and agreement of the parties with regard to the subjects hereof and supersedes in their entirety all other or prior agreements, whether oral or written, with respect thereto.  *AC 05.05.03*

PMR PMR 210689 1/PDICOMO

8.    <u>Notices</u>.  All demands, notices, requests, consents and other communications required or permitted under this Agreement shall be in writing and shall be personally delivered or sent by facsimile machine (with a confirmation copy sent by one of the other methods authorized in this Section), reputable commercial overnight delivery service (including Federal Express and U.S. Postal Service overnight delivery service) or, deposited with the U.S. Postal Service mailed first class, registered or certified mail, postage prepaid, as set forth below:

If to the Company, addressed to:

Visions East, Inc.
1600 West State Road 84, Suite 5
Fort Lauderdale, Florida 33315
Attention: President
Fax:  954-522-1665

with a copy to:

Edwards & Angell, LLP
One North Clematis Street, Suite 400
West Palm Beach, Florida 33401
Attention: Mark M. Kamp, Esq.
Fax:  561-655-8719

If to the Employee, to the address set forth on the signature page of this Agreement or at the current address listed in the Company's records.

Notices shall be deemed given upon the earlier to occur of (i) receipt by the party to whom such notice is directed; (ii) if sent by facsimile machine, on the day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) such notice is sent if sent (as evidenced by the facsimile confirmed receipt) prior to 5:00 p.m. Eastern Time and, if sent after 5:00 p.m. Eastern Time, on the day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) after which such notice is sent; (iii) on the first business day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) following the day the same is deposited with the commercial courier if sent by commercial overnight delivery service; or (iv) the fifth day (other than a Saturday, Sunday or legal holiday in the jurisdiction to which such notice is directed) following deposit thereof with the U.S. Postal Service as aforesaid.  Each party, by notice duly given in accordance therewith may specify a different address for the giving of any notice hereunder.

9.    <u>Governing Law</u>.  This Agreement shall be construed and enforced in accordance with and governed by the laws of the State of Florida (without giving effect to any conflicts or choice of laws provisions thereof that would cause the application of the domestic substantive laws of any other jurisdiction).    *02, 05, 05.03*

10.    Consent to Jurisdiction

(a)    EACH OF THE PARTIES HERETO HEREBY CONSENTS TO THE JURISDICTION OF ALL STATE AND FEDERAL COURTS LOCATED IN BROWARD COUNTY, FLORIDA, AS WELL AS TO THE JURISDICTION OF ALL COURTS TO WHICH AN APPEAL MAY BE TAKEN FROM SUCH COURTS, FOR THE PURPOSE OF ANY SUIT, ACTION OR OTHER PROCEEDING ARISING OUT OF, OR IN CONNECTION WITH, THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY, INCLUDING, WITHOUT LIMITATION, ANY PROCEEDING RELATING TO ANCILLARY MEASURES IN AID OF ARBITRATION, PROVISIONAL REMEDIES AND INTERIM RELIEF, OR ANY PROCEEDING TO ENFORCE ANY ARBITRAL DECISION OR AWARD. EACH PARTY HEREBY EXPRESSLY WAIVES ANY AND ALL RIGHTS TO BRING ANY SUIT, ACTION OR OTHER PROCEEDING IN OR BEFORE ANY COURT OR TRIBUNAL OTHER THAN THE COURTS DESCRIBED ABOVE AND COVENANTS THAT IT SHALL NOT SEEK IN ANY MANNER TO RESOLVE ANY DISPUTE OTHER THAN AS SET FORTH IN THIS SECTION OR AS PROVIDED IN THE NONDISCLOSURE AND DEVELOPMENTS AGREEMENT, IF ANY, OR TO CHALLENGE OR SET ASIDE ANY DECISION, AWARD OR JUDGMENT OBTAINED IN ACCORDANCE WITH THE PROVISIONS HEREOF.

(b)    EACH OF THE PARTIES HERETO HEREBY EXPRESSLY WAIVES ANY AND ALL OBJECTIONS IT MAY HAVE TO VENUE, INCLUDING, WITHOUT LIMITATION, THE INCONVENIENCE OF SUCH FORUM, IN ANY OF SUCH COURTS. IN ADDITION, EACH OF THE PARTIES CONSENTS TO THE SERVICE OF PROCESS BY PERSONAL SERVICE OR ANY MANNER IN WHICH NOTICES MAY BE DELIVERED HEREUNDER IN ACCORDANCE WITH SECTION 8 OF THIS AGREEMENT.

11.    Equitable Remedies.  The parties hereto agree that irreparable harm would occur in the event that any of the agreements and provisions of this Agreement were not performed fully by the parties hereto in accordance with their specific terms or conditions or were otherwise breached, and that money damages are an inadequate remedy for breach of this Agreement because of the difficulty of ascertaining and quantifying the amount of damage that will be suffered by the parties hereto in the event that this Agreement is not performed in accordance with its terms or conditions or is otherwise breached.  It is accordingly hereby agreed that the parties hereto shall be entitled to an injunction or injunctions or other equitable relief to restrain, enjoin and prevent breaches of this Agreement by the other parties and to enforce specifically such terms and provisions of this Agreement, such remedy being in addition to and not in lieu of, any other rights and remedies to which the other parties are entitled to at law or in equity.  The Company and the Employee agree that the covenants set forth in this Agreement shall be enforced to the fullest extent permitted by law.  Accordingly if, in any judicial proceedings, a court shall determine that such covenant is unenforceable for any reason, including, without limitation, because it covers too extensive a geographical area or survives too long a period of time, then the parties intend that such covenant shall be deemed to cover only such maximum geographical area and maximum period of time, if applicable, and/or shall otherwise be deemed to be limited in such manner, as will permit enforceability by such court.  In the event that any one or more of such covenants shall, either by itself or together with other covenants be adjudged

- 4 -

to go beyond what is reasonable in all the circumstances for the protection of the interests of the Company and its shareholders, but would be adjudged reasonable if any particular covenant or covenants or parts thereof were deleted, restricted, or limited in a particular manner, then the said covenants shall apply with such deletions, restrictions, or limitations, as the case may be. The Company and the Employee further agree that the covenants set forth in this Agreement are reasonable in all circumstances for the protection of the legitimate interests of the Company and its shareholders.

12.     Waiver of Jury Trial.    EACH OF THE PARTIES HERETO HEREBY VOLUNTARILY AND IRREVOCABLY WAIVES TRIAL BY JURY IN ANY ACTION OR OTHER PROCEEDING BROUGHT IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY.

13.     Severability; Titles and Subtitles; Gender; Singular and Plural; Counterparts; Facsimile.

(a)     In case any provision of this Agreement shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions of this Agreement shall not in any way be affected or impaired thereby.

(b)     The titles of the sections and subsections of this Agreement are for convenience of reference only and are not to be considered in construing this Agreement.

(c)     The use of any gender in this Agreement shall be deemed to include the other genders, and the use of the singular in this Agreement shall be deemed to include the plural (and vice versa), wherever appropriate.

(d)     This Agreement may be executed in any number of counterparts, each of which shall be an original, but all of which together constitute one instrument.

(e)     Counterparts of this Agreement (or applicable signature pages hereof) that are manually signed and delivered by facsimile transmission shall be deemed to constitute signed original counterparts hereof and shall bind the parties signing and delivering in such manner.

*Ni  05.05.03*

IN WITNESS WHEREOF, this Agreement has been executed as of the date and year first above written.

COMPANY:

VISIONS EAST, INC.

By: _____

Name: _S.EVE MORTON_

Title: _PRESIDENT_

EMPLOYEE:

_____

Print Name: Tarmo Linna

Address:
Vermonrinne 8 B
FIN-00370 Helsinki
FINLAND

- 6 -

# EXHIBIT C

MMK/032803
210753v1

## NONDISCLOSURE AND DEVELOPMENTS AGREEMENT

NONDISCLOSURE AND DEVELOPMENTS AGREEMENT (the "Agreement") dated as of this 5ᵗʰ day of  May , 2003 by and between **Visions East, Inc.,** a Florida corporation, with an address at 1600 West State Road 84, Suite 5, Ft. Lauderdale, FL  33315 (collectively with any of its subsidiaries, subdivisions or affiliates, the "Company"); and **Tarmo Linna** ("Recipient") with an address at Vermonrinne 8 B, FIN-00370 Helsinki, FINLAND.

### WITNESSETH:

WHEREAS, the Company and/or one of its Affiliates may enter into a business relationship with Recipient and/or an Affiliate, as further described herein, and possesses certain Confidential Information (as herein defined), which has been or may be disclosed to Recipient;

NOW THEREFORE, the parties agree as follows:

1. For purposes of this Agreement, "Confidential Information" means all information, data and knowledge disclosed to the Recipient by the Company concerning the organization, business, technology or finances of the Company or of any third party that the Company is under an obligation to keep confidential, including, but not limited to, trade secrets and other proprietary ideas or confidential information respecting inventions (whether or not patentable), patents, patent applications (under any divisions, continuations, in-whole or in part, patents issuing thereon and issues thereof) products, designs, sketches, plans, calculations, prototypes, models, formulas, specifications, procedures, discoveries, improvements, charts, diagrams, graphs, writings, methods, know-how, techniques, systems, processes, hardware, software, firmware, code, software programs, works of authorship, records, studies, trade practices, customer lists, projects, plans and proposals, whether in written, electronic, magnetic, optical, or any other form.

"Affiliate" shall mean, with respect to an individual, the members of his or her immediate family or any entity directly or indirectly controlled by such individual, and with respect to any entity, any person or entity controlling, controlled by or under common control with, such entity.

2. From time to time, the Company has disclosed to Recipient, and following the execution of this Agreement may continue to disclose to Recipient, Confidential Information. The Confidential Information includes, but is not limited to, information relating to the Company's development, manufacturing, consulting, selling and leasing services and equipment for automated marine coating systems.

3. All Confidential Information disclosed to Recipient by the Company shall remain the property of the Company.

4.    Recipient shall use the Confidential Information only for the purposes described in this Agreement and shall not use the Confidential Information or assist others to use the Confidential Information for any other purposes and shall not publish or otherwise disclose the Confidential Information or any part thereof to any other person, firm or corporation; provided, however, that the obligation not to disclose the Confidential Information shall not apply to any of the following information: (a) information that Recipient can demonstrate by written records is already known to Recipient; (b) information that Recipient receives from a third party without restriction or without breach of this Agreement; (c) information that is approved for release by the written authorization of the Company; or (d) information that is or becomes publicly known other than through a knowing or wrongful act of Recipient.

5.    If, at any time, Recipient shall make, conceive, discover or reduce to practice any invention, modification, discovery, design, development, improvement, method, process, formula, data, technique, know-how, secret or intellectual property right whatsoever or any interest therein (whether or not patentable or registrable under copyright or similar statutes or subject to analogous protection or whether or not such developments are in process or reduced to practice) (all of which are hereinafter collectively termed "Developments") that results from disclosure of the Confidential Information by the Company, such Developments and the benefits thereof shall immediately become the sole and absolute property of the Company.  Recipient agrees to promptly disclose to the Company each such Development; hereby assigns any rights Recipient may have in such Developments and all patents and patent applications arising from such Developments, to the Company without compensation.  In the event that any inventions arising from such Developments are by operation of applicable state law excluded from this assignment, Recipient agrees that the Company shall have a non-exclusive, fully paid license to use for all purposes any inventions within the scope of the Company's actual and anticipated business but not assigned to the Company under this Section 5.

6.    At the request and cost of the Company, Recipient agrees to promptly sign, execute, make and do all such deeds, documents, acts and things as the Company and its duly authorized agent may reasonably require in order to:

(a)    apply for, obtain, register and vest in the name of the Company alone (unless the Company otherwise directs) letters patent, copyrights, trademarks or other analogous protection in any country throughout the world and when so obtained or vested to renew and restore the same; and

(b)    defend any judicial, opposition or other proceedings in respect of such applications and any judicial, opposition or other proceedings or petitions or applications for revocation of such letters patent, copyright, trademark or other analogous protection. _Ai 05.05.03_

    PMB_PMB_210753_1/MKAMP

If the Company is unable, after reasonable effort, to secure Recipient's signature on any application for letters patent, copyright or trademark registration or other documents regarding any legal protection relating to a Development, whether because of Recipient's physical or mental incapacity, unknown whereabouts, lack of cooperation or for any other reason whatsoever, Recipient hereby irrevocably designates and appoints the Company and its duly authorized officers and agents as agent and attorney-in-fact, to act for and on Recipient's behalf and to execute and file any such application or applications or other documents and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent, copyright or trademark registrations or any other legal protection thereon with the same legal force and effect as if executed by Recipient.

7.    Recipient understands and agrees that the Company shall determine, in its sole and absolute discretion, whether an application for patent, for copyright, for mask work registration, or for any other intellectual property right shall be filed on any Development which is assigned to Company under this Agreement, and whether such an application shall be prosecuted or abandoned prior to issuance or registration.

8.    Recipient hereby represents to the best of Recipient's knowledge, that except for those obligations identified and fully described in the space provided below, Recipient has no present obligation to assign to any client, or any other non-Company person, corporation or firm, any Developments covered by Section 5.

9.    Recipient acknowledges that all works of authorship and all mask works that fall within the scope of the Recipient's employment agreement are owned by the Company and are works made for hire.   Accordingly, Recipient agrees to assign and hereby assigns to the Company any and all copyrights and mask work registration rights, and all other mask work rights in all material prepared by Recipient during the term of any consulting or employee agreement which relates to the business of the Company, or to the Company's actual or anticipated research or development, or which was prepared with equipment, supplies, facilities, or know-how of Company.

10.    Upon conclusion of the engagement of Recipient or upon request of the Company, all Confidential Information delivered to Recipient by the Company or any of its representatives shall be returned to the Company promptly, together with all copies thereof made by Recipient or anyone acting on behalf of Recipient, and any other documents or tangible material reflecting Confidential Information prepared by Recipient (including notes) shall simultaneously be either turned over to the Company or destroyed.

11.    Recipient shall exercise the highest degree of care in safeguarding the Confidential Information from disclosure or dissemination that Recipient uses in safeguarding any confidential information.

12.    Recipient understands and acknowledges that failure to comply with the terms of this Agreement may cause irreparable harm to the Company in such a way that the Company could not be adequately compensated by monetary damages.  Each party therefor agrees that a breach or a threatened breach of this Agreement may appropriately be restrained by injunctive relief by any court of appropriate jurisdiction.

13.    In the event that the Recipient is requested or required (by oral questions, interrogatories, requests for information or documents subpoena, civil investigative demand or similar process) to disclose any Confidential Information, the Recipient will provide the Company with prompt notice of such request(s) so that the Company may seek an appropriate protective order and/or waive compliance with the provisions of this Agreement.

14.    This Agreement shall inure to the benefit of and be binding upon the parties and their respective successors and assigns and legal representatives.

15.    This Agreement does not constitute the promise or intention of either party to buy, sell or market any products or services or to enter into any type of arrangement or agreement. All Confidential Information shall remain the sole and exclusive property of the Company at all times.  No license is granted to the Recipient either directly or indirectly by this Agreement nor are any rights of ownership in Confidential Information granted by this Agreement.   The Recipient shall not appropriate, for its use or the use of others, any such designs, specifications, samples or drawings, nor shall the Recipient, nor cause a third party to, disassemble, reverse-engineer or reverse-design any of such Confidential Information.

16.    This Agreement and the Assignment of Concept and Non-Disclosure Agreement represents the complete understanding of the parties with respect to the Confidential Information, and supersedes all previous agreements between the parties.

17.    This Agreement is governed by the laws of Florida applicable to contracts made and to be performed in Florida, and all actions that may arise at law and/or in equity arising from this Agreement may be brought in the courts of Florida or the United States District Court for the Southern District of Florida.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

COMPANY:                                      RECIPIENT:

Visions East, Inc.

By: _____        Tarmo Linna

Name: _____
Title: _____

> >
> >
> >From: "Charles Curren" <charles@transoceanc.com>
> >To: "'Mike Atkins'" <midoceaninc@hotmail.com>
> >Subject: FW: Robotics in painting
> >Date: Thu, 24 Mar 2005 13:28:35 -0500
> >
> >
> >
> >
> >
> >   _____
> >
> >From: Flexmill [mailto:flexmill@mag.fi]
> >Sent: Thursday, March 24, 2005 8:42 AM
> >To: charles@transoceanc.com
> >Subject: FW: Robotics in painting
> >
> >
> >
> >Dear Mr. Curren,
> >
> >
> >
> >My name is Tarmo Linna and I am Sales Manager for our FlexMill robot
> >systems. In past four years four FlexMill five systems has been
>delivered
> >to
> >the marine industry.
> >
> >As Mr.. Laitinen mentioned one of the deliveries has large work
>envelope.
> >The maximum measures are length 54 m, width 12,7 m and height 6,5 m.
> >
> >
> >
> >For visiting the shipyard and see the FlexMill robot system it is
>better to
> >contact Mr.. Thiger CEO of Fagerdala Thiger Marine Systems AB.
> >
> >
> >
> >Our office closed on Friday, weekend and Monday. On Tuesday I collect
>more
> >information to you and send it via e-mail.
> >
> >
> >
> >With Kind Regards,
> >
> >

**EXHIBIT D**

> >
> >Tarmo Linna
> >
> >
> >
> >      _____
> >
> >From: Mika Laitinen [mailto:mika.laitinen@mag.fi]
> >Sent: 24. maaliskuuta 2005 8:38
> >To: 'Charles Curren'; flexmill@mag.fi
> >Subject: Robotics in painting
> >
> >Dear mr. Curren
> >
> >
> >
> >1)     Yes, we are the supplier for that kind of applications.
> >
> >2)     Last year we delivered two large systems for boating industry,
>54
> >m
> >and 30 m long. Total workarea for bigger system was 54 x 10 x 6 m.
>System
> >can be extended easily in x-direction to match you requirements.
> >
> >3)     Check www.fagerdalathiger.com
><http://www.fagerdalathiger.com/>
> >(http://www.fagerdalathiger.com/templates/FTMS.aspx?id=449). Contact
>mr.
> >Pierre Thiger +46 708 182110.
> >
> >
> >
> >I will forward your information to our Sales Manager for this field.
> >He
>
> >will
> >contact you and send some material about our technology and
> >solutions.
> >
> >
> >
> >Best regards,
> >
> >Mika Laitinen
> >
> >
> >
> >
> >
> >      _____

> >
> >From: Charles Curren [mailto:charles@transoceanc.com]
> >Sent: 23 March 2005 21:05
> >To: sales@masterautomationgroup.com
> >Subject: Robotics in painting
> >
> >
> >
> >Dear Sir / Madam
> >
> >
> >
> >I am a marine consultant working with a client looking to establish a
> >shipyard in southern Europe for the production of steel hulls and
>aluminum
> >superstructures in the 40-60m range.
> >
> >This project is in its early stages but I am interested in
> >researching
>all
> >possible ways of maximizing production for the client, including the
>use of
> >robotics.
> >
> >
> >
> >Please would you be kind enough to answer the following-
> >
> >
> >
> >1/ Do you have a suitable robotic system to meet our needs of fairing
>and
> >possibly painting our steel hulls and aluminum superstructures?
> >
> >
> >
> >2/ What is the operating range (length x height) of the system.
> >
> >
> >
> >3/ Do you have systems in operation that I might be able to take my
>client
> >to see in operation?
> >
> >
> >
> >As the project is in its earliest stages, would you kindly forward me
>any
> >available information, by e-mail in the first instant and I will get
>back
> >in

> >touch with you as the project progresses.
> >
> >I thank you in anticipation of your earliest reply.
> >
> >
> >
> >Yours sincerely,
> >
> >
> >
> >Charles A. Curren
> >
> >Trans Ocean Consultants Ltd.
> >

Trans Ocean Consultants   L
Suite 5, Block A
Berzel Court
St. Peter Port
Guernsey
Channel Islands
GY1 4EG
U.K.

+90 544 222 9297 (Turkey)
+ 954 326 3814 (USA)
charles@transoceanc.com